**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KIONA JORDAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 07 C 6452 |
| ) | |
| v. ) | Judge: Coar |
| ) | |
| R&O AURORA, INC, ) | Magistrate Judge: Denlow |
| ) | |
| ) | Jury Trial Demanded |
| Defendant. ) | |
| ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

NOW COMES R & O AURORA, INC., DEFENDANT herein, by and through its attorneys, Elizabeth Hubbard and Brian Ekstrom of Hubbard and O'Connor, Ltd. and Matthew Pappas and Terri Fildes of Pappas & Schnell P.C., submits the following Brief in Support of its Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure, Rule 56 Motion for Summary Judgment and Local Rule 56.1.(a).(2).

I.   **FACTUAL OVERVIEW**

Plaintiff Kiona Jordan took a job with Defendant R&O Aurora, Inc., on December 7, 2005 at a Caterpillar location at a rate of $9.00 an hour and received a raise in January 2006 to $10.00 an hour, at which she remained until she voluntarily resigned on July 31, 2006. (¶6, 9, 75) Jordan was initially assigned to a first shift kitter position although all employees could be moved to any position at the Caterpillar location at the decision of management. (¶5,6) Jordan, as all R&O employees are, was given a copy of R&O's policies and

1

procedures manual at orientation that includes a section on the company's "zero tolerance" sexual harassment policy. (¶10, 11) Employees must report harassment immediately and all reports of sexual harassment are quickly investigated. (¶11) The harassing employee, if the allegations are substantiated, will be terminated. (¶12)

A short time before Plaintiff came to work with Defendant, she had complained of sexual harassment at her previous employer. (¶23) Within nine days of starting employment at R&O, Jordan got into an argument with a co-worker in which the co-worker, Nick Close, called Jordan a "nigger." (¶25) Another employee, not Jordan, reported this incident. (¶26) Close was immediately fired. (¶28) Jordan did not feel any of the scorn or shunning at R&O that she had experienced at her previous employment when she reported the incident. (¶29)

In May, 2006, Jordan and two other employees were transferred from first shift to second shift based on the needs of R&O's customer, Caterpillar. (¶31) Jordan also complained that supervisor Ray Ebner was transferring her because he was a racist. (¶31) Jordan accepted the move to the second shift with the understanding that she would be able to move to the first shift in the event a position came open. (¶32)

On June 26, 2006, Lewis Gregg was promoted to supervisor in the kitting department in the second shift where he supervised Jordan. (¶35) Gregg had been working second shift kitting since about June 15, 2006. (¶35) On June 29, 2006, Gregg criticized Jordan about her job performance and Jordan was convinced she was to be disciplined. (¶37, 38) On June 30, 2006, on the instruction of her mother to write down everything about Lewis Gregg and his conduct toward her which she deemed to be sexual harassment, Jordan presented a 4-page handwritten document to supervisor Ray Ebner. (¶40) Jordan reported that Gregg had asked her to come over to his home to watch X-rated movies, she was "constantly harassed" and

2

"uncomfortable," Gregg was being impolite and Gregg asked her why she didn't call him at home, as he had given her his number. (¶40) Ebner immediately went with Jordan to meet Amanda Olson, the R&O director of human resources, and presented her with Jordan's document. (¶42) Jordan and Olson then had a 45-minute meeting at which Jordan discussed her complaints about Gregg. (¶43)

Olson immediately conducted a thorough investigation of Jordan's complaint. (¶44-49) She attempted to interview the three co-workers Jordan had identified as having information about her complaints: Seneca Carter, Clarissa James and Erica Washington. (¶45,46,47) Olson spoke with Carter and James that day. (¶45) Carter told Olson that he had not witnessed any inappropriate behavior by Gregg toward Jordan and that Gregg told all employees to call him at home if they could not come in to work. (¶47) James told Olson that she had witnessed nothing inappropriate by Gregg toward Jordan but she knew that Gregg had told inappropriate jokes in the workplace. (¶49) Olson could not interview Washington because she had quit previously that day and Olson's attempts to reach her by phone to discuss Jordan's allegations were unsuccessful. (¶46) When Olson interviewed Gregg he denied all the allegations other than giving all employees his phone number as he had yet to receive the company-issued cell phone. (¶48) After collecting information from all the witnesses, Olson made the determination that Gregg had made inappropriate jokes, was unable to conclude any more serious harassment had occurred, and placed Gregg on permanent probation on June 30, 2006. (¶49, 50) Jordan <u>never</u> experienced any further inappropriate behavior or sexual harassment by Gregg following her complaint to Amanda Olson on June 30, 2006. (¶50) Olson considered the matter resolved. (¶53)

R&O made the decision to move Jordan away from Gregg to the first shift which

Olson understood to be Jordan's preference. (¶32,33,54) Later an immediate need in repack arose and the operations department made the decision to move Jordan to a first shift repack position, a routine move at R&O based on client needs. (¶54, 55, 56)

Subsequently, two co-workers of Jordan reported to R&O management that Jordan told one of the co-workers she had made up her sexual harassment allegations against Gregg in order to get transferred to first shift. (¶58) Amanda Olson and Mike Saltzman, the human resources manager, investigated the allegations. (¶59, 60, 61, 62, 63, 64) They spoke with Demetria Jenkins, who had heard Plaintiff make the statement and Constance Daniels, whom Jenkins had told about Plaintiff's statements. (¶59, 60, 61, 62) Olson determined that Jordan's conduct was a scam and she made the decision to suspend Jordan for three days. (¶64)

On July 7, 2006, Olson and other R&O managers had a meeting with Jordan in which they informed Jordan that Gregg was disciplined and they had determined that Jordan had been untruthful about her allegations. (¶66, 67) Jordan did not deny that she had lied about the allegations but yelled at Olson and repeatedly asked for the names of the witnesses who had accused her of fabricating her allegations. (¶69, 70)

On July 17, 2006, Jordan notified R&O that she would voluntarily resign her position and her last day of work would be July 31, 2006. (¶75) On September 5, 2006, Lewis Gregg was terminated after complaints by two other individuals of sexual harassment were received and investigated by R&O. (¶76)

On September 2, 2006, Plaintiff filed an EEOC charge that included several allegations that Gregg had made statements that Jordan found offensive that she had never reported to anyone in management. (¶36; Jordan Exh. 28)

**II.     THE FACTS DO NOT SUPPORT A FINDING OF SEXUAL HARASSMENT**

Plaintiff's claim of Title VII sexual harassment should be dismissed on summary judgment because any harassment Jordan suffered was not severe or pervasive and because R&O is protected under the *Farragher/Ellerth* affirmative defense.[1]

**A.     GREGG'S CONDUCT WAS NOT SEVERE OR PERVASIVE AS REQUIRED BY TITLE VII**

Jordan has not presented evidence sufficient to show Gregg's actions toward her rose to the level of actionable sexual harassment under Title VII. Hostile work environment claims are actionable "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986). In addition, even if the harassing conduct had a sufficiently adverse effect on the plaintiff, her claim must still fail unless the work environment is objectively hostile or abusive. *Saxton v. American Telephone and Telegraph Co.*, 10 F.3d 526 (7th Cir. 1993).

The first and only time the Jordan complained about sexual harassment by Gregg during her employment at R&O came after Gregg criticized her job performance in a meeting and she concluded she was about to be disciplined. (¶37, 38, 40) Following this criticism, Jordan submitted a 4-page letter and told Amanda Olson about several comments by Gregg that she thought were offensive, including that Gregg had asked Jordan to come over and watch X-rated movies, he asked her to go out with him and he gave her his phone

---

[1] The Complaint includes separate counts for hostile work environment and *quid pro quo* sexual harassment under Title VII (Counts I and III). Such distinctions are of limited value following the 1998 Supreme Court opinions of *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998) and *Faragher v. City of Boca Raton*, 54 U.S. 775, 118 S.Ct. 2275 (1998). This memorandum will address Plaintiff's claims of sexual harassment but will not be bound by plaintiff's attempt to utilize the outdated distinction between *quid pro quo* and hostile work environment harassment.

number, all of which she deemed sexually harassing. (¶40) There were no allegations of touching by Gregg. (¶39) Only after she voluntarily quit her position and filed an EEOC charge did she make further allegations against Gregg. (¶36) Again, there were no allegations of touching. (¶39) Her failure to disclose alleged additional incidents of harassment deprived Olson of any opportunity to investigate them. Nevertheless, an examination of the plaintiff's claims show that, viewed in their entirety, they still do not rise to the level of sexual harassment under Title VII. In the new complaints, Jordan complained that Gregg gave her compliments and made flirtatious statements with sexual innuendos to her. (¶36, 40) Title VII case law shows that although this sort of conduct may be objectionable, it does not rise to the level of Title VII harassment. *See, Weiss v. Coca-Cola Bottling Co*., 990 F.2d 333, 337 (7th Cir. 1993). (no actionable harassment where plaintiff's supervisor asked plaintiff out on dates, called her a "dumb blond," placed his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her on one or more occasions). In determining whether or not the alleged conduct rises to an actionable level, a Court must examine "the circumstances" including "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). The standards set by the U.S. Supreme Court for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-2284. The facts in the instant case show that Gregg had acted inappropriately toward Jordan and had made offensive utterances but objectively, he had not acted in a way that physically threatened

6

Plaintiff nor committed severe and pervasive conduct. Further, Jordan complained about Gregg's conduct only three days after he had become a supervisor and the very day after he had criticized her performance. Such a short duration of working under Gregg goes against a finding that the harassment was either severe or pervasive.

In *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998), the Seventh Circuit held that harassment including ambiguous teasing about bananas, rubber bands, low-neck tops, staring and attempts to make eye contact and touchings on the arms, fingers and buttocks did not amount to conduct severe enough to constitute an objectively hostile environment under Title VII. *See also, McPherson v. City of Wa*ukegan, 379 F.3d 430 (7th Cir. 2004) (inquiries about the plaintiff's bra color, suggestive tone when asking whether he could "make a house call" and pulling back the plaintiff's tank top with his fingers did not create a hostile environment.)

The fact that Jordan was not touched inappropriately by Gregg favors a finding that his conduct was not sufficient enough to create a hostile work environment. Jordan is basing her claim of discrimination instead on several comments allegedly made by Gregg. Most of the comments, while arguably inappropriate, are in the nature of ambiguous, sexually tinged jokes but not enough to constitute harassment. Jordan also complains that Gregg attempted on more than one occasion to give her his home phone number, although the testimony shows that Gregg gave his home phone number to all subordinates. He was a new supervisor without a work-issued phone and needed employees to call him if they were not showing up for work. Arguably the most inappropriate comment made by Gregg was an isolated comment in which he invited Jordan to watch "x-rated movies." Even if this comment is viewed as rising above the level of a merely inappropriate joke, the isolated

nature of the comment, just like the isolated touchings in *Adusimilli* and *McPherson*, combined with other inappropriate comments, does not meet the level of severity or pervasiveness to change the terms and conditions of employment.

B.   R&O IS NOT LIABLE FOR ANY HARASSMENT BY GREGG BECAUSE IT TOOK REASONABLE STEPS TO PREVENT AND CORRECT SEXUAL HARASSMENT AND JORDAN FAILED TO TAKE ADVANTAGE OF THE PROCEDURES IN PLACE

1.   NO TANGIBLE EMPLOYMENT ACTION OCCURRED

Even if Gregg were to be found to have created an actionable sexually hostile environment under Title VII, R&O has met the *Faragher/Ellerth* affirmative defense. R&O needs to prove that it took reasonable steps to prevent and correct promptly any harassment that occurred, and that the employee unreasonably failed to take advantage of any preventive or corrective measures or to otherwise avoid the harm. *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S. Ct. 2257 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 742, 118 S. Ct. 2275 (1998). In order to utilize this defense, the employer cannot have taken tangible employment action against the plaintiff.

As the Supreme Court stated: "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 118 S. Ct. at 2268. Thus, a tangible employment action is akin to an adverse employment action. The record is clear that neither Gregg nor R&O took any employment action against Jordan. She was not terminated or demoted; she experienced no decrease in salary and/or benefits. She voluntarily quit weeks later. Thus, the *Farragher/Ellerth* defense is available to R&O.

2.    R&O TOOK REASONABLE STEPS TO PREVENT AND CORRECT ANY HARASSMENT THAT OCCURRED

   a.    R&O HAD POLICIES TO PREVENT AND CORRECT HARASSMENT

R&O had in place sexual harassment policies and procedures and executed them with respect to Jordan, thus meeting the first prong of the *Farragher/Ellerth* defense. (¶¶10-22) Jordan read and understood R&O's sexual harassment policies and procedures by her own admission. (¶10-13) These policies detail a zero tolerance policy for sexual harassment and require harassed employees to report such harassment to the Manager of Human Resources and states that all allegations of sexual harassment will be quickly investigated. (¶11) Amanda Olson, the director of human resources who investigated Jordan's complaint, had extensive experience investigating employment discrimination claims and as part of R&O's investigative process would document the allegations, interview witnesses, take statements and issue discipline if appropriate. (¶15)

   b.    R&O TOOK REASONABLE CORRECTIVE MEASURES

R&O conducted a prompt and thorough investigation of Jordan's claims and took appropriate action against Gregg. An employer cannot be considered to have knowledge of sexual harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999). As soon as R&O learned of Jordan's complaint, it took immediate action to investigate and correct the problem. Olson began her investigation <u>the very day</u> that Jordan brought her complaints to her attention and began a thorough investigation including attempting to contact every individual Jordan said had knowledge of facts supporting her claim. R&O met its burden with respect to the first element of the *Farragher/Ellerth* affirmative defense. *See, McPherson*, 379 F.3d at 441. After Jordan complained, not one single instance of sexual

9

harassment by Gregg against Jordan occurred. The harassment stopped <u>the very day</u> Jordan voiced her complaint. What more could any employer accomplish with these facts?

Title VII affords an employer an opportunity to remedy any harm that has occurred and prevent future harassment. *Jackson v. County of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) ("We have said that '[a]n employer's response to alleged instances of employee harassment must be reasonably calculated to *prevent further harassment* under the particular facts and circumstances of the case at the time the allegations are made,'" quoting *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)). Olson moved Jordan out of the second shift kitting department immediately to a first shift position, completely removing the threat of further harassment by Gregg. In fact, no harassment by Gregg occurred after the moment Jordan complained to Olson. (¶50) Olson also reprimanded Gregg, putting him on permanent probation. (¶50) This action by R&O is sufficient to prevent future harassment and is sufficient to meet the first prong of the *Farragher/Ellerth* defense.

Jordan would have preferred a different result but the emphasis of Title VII in this context is not on redress, but on the prevention of future harm. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). So "the question is not whether the punishment was proportionate to [the] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." Id., 524 U.S. at 786. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000). It is not Jordan's right to make decisions about how to handle this situation.

  c.  JORDAN DID NOT REPORT CONDUCT PROMPTLY

10

The second prong of the *Farragher/Ellerth* affirmative defense asks if the plaintiff unreasonably failed to take advantage of the sexual harassment reporting procedures available, or to otherwise avoid the harm. Fear of reprisals will not be sufficient for the plaintiff to avoid the obligations of reporting the harassment. *Montero v. AGCO Corp.,* 192 F. 3d 856 (9th Cir. 1999).

Under R&O's policies and procedures, Jordan was required to report the alleged harassing behavior immediately. Instead, in her 4-page written complaint and during a 45-minute conversation with Amanda Olson, she only brought up that Gregg had given her his home phone number, asked her out and asked her to come over and watch X-rated movies. After she had quit her job, she filed an EEOC charge suddenly alleging other conduct by Gregg. Olson did not have the opportunity to investigate these later allegations (assuming for summary judgment purposes the alleged conduct occurred) because Jordan never even brought the allegations to Olson's attention. *See*, *Jackson v. County of Racine*, 474 F.3d 493 (7th Cir. 2007), where the court found the plaintiff had failed to utilize remedial procedures though she had reported sexual harassment against a co-worker but did not fully report her complaints until a later date. *See also, Ellerth,* 118 S. Ct. at 2270; *Faragher,* 118 S. Ct. at 2292-93. ("And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.")

Jordan delayed for at least 15 days in reporting Gregg's alleged conduct. (¶36,40) She then only reported a fraction of her allegations against him. She has a duty to behave reasonably in curing the problems she encountered and failed to do so. If Jordan had her

11

way, she gets a jury trial, even though R&O establishes thorough policies and procedures in an effort to prevent harassment and then completely stops the harassment the day the employee reports the conduct. This approach makes no sense and is not in accordance with established decisional law.

If the defendant meets its affirmative defense, sexually harassing conduct is not actionable. *Hetreed v. Allstate Insurance Co.,* No. 96 C 2021, 1999 U.S. Dist. LEXIS 7219 (N.D. Ill. 1999) (plaintiff claimed rape, sodomy, assault; district court held that the employer met its affirmative defense, and granted summary judgment to the defendant as the plaintiff had not reported the conduct.) The affirmative defense trumps the alleged sexually harassing conduct. If plaintiff unreasonably will not or does not use procedures she knows to be available to her in order to avoid the harm, she loses. In this case, Jordan should lose on the basis of her own inaction in utilizing procedures that she knew were available to her.

### III.   THE FACTS DO NOT SUPPORT A FINDING OF RETALIATION

Jordan's retaliation count should be dismissed because she did not suffer any adverse action and because her suspension was unrelated to the protected activity.

### A.   TRANSFER TO FIRST SHIFT REPACK WAS NOT RETALIATORY

Under both the direct and indirect methods of proving retaliation, the plaintiff must show a materially adverse employment action. *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Jordan cannot meet that burden and so she cannot meet the *prima facie* case of retaliation under either the direct or indirect method. No adverse action was taken against Jordan by initially moving her to a first-shift kitting opening, but rather a good-faith effort to prevent any further encounters between Gregg and Jordan.

The change in Jordan's responsibilities is non-existent. Jordan must have suffered

some real harm by a quantitative or qualitative change in the terms or conditions of employment. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). ("[T]he employee must complain of some action on the employer's part that causes her to suffer a real harm."). Jordan suffered no such harm and cannot claim any adverse action.

Following the investigation of Jordan's allegation and Gregg's permanent probation discipline, R&O initially moved Jordan from a second shift to a first shift kitting position to accommodate her discomfort in being around Gregg. (¶52) Just a month and a half prior Jordan had been moved from the first shift to the second shift in order to meet R&O's customer needs and Jordan had complained bitterly about the move, but had finally agreed to it after she received assurances that if a first shift position opened up, she would be given an opportunity to move back to first shift. (¶31) R&O then moved her to repack to fill a need in that department at the same rate of pay and benefits. (¶54, 55)

An employee's unhappiness does not equate to retaliation. *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004). Employees were moved all the time at R&O and in fact it was a requirement of R&O employees that they be willing to fill in where needed.

B.   JORDAN'S SUSPENSION WAS NOT RETALIATORY

Jordan is further alleging that her 3-day suspension was retaliatory. The facts do not support her incorrect assumptions. Olson investigated the allegations that Jordan's sexual harassment complaint was falsely put forth in order to move to first shift, based on the information from two unbiased coworkers. (¶64) R&O's policy was to discipline employees for untruthful behavior and dishonesty, up to and including termination. In fact, other employees had been terminated for telling lies. Jordan never once denied the allegation

13

against her. (¶70) Olson, however, decided to suspend Jordan for three days. The evidence shows that this suspension was unrelated to Jordan's complaints of sexual harassment. Her intervening conduct of untruthfulness motivated her suspension, not her allegations of sexual harassment.

Others were also punished for dishonesty. R&O policy allows for an employee to be terminated for acts of dishonesty. (¶22) In fact, two employees who had <u>not</u> made sexual harassment allegations, were terminated for dishonesty. (¶22) Although Jordan could have been terminated, she was only given a three-day suspension. Olson's decision to suspend Jordan for three days was a good faith response to Jordan's apparently fabricated allegations against Gregg. Even if Jordan in fact had not made up the allegations to get moved to the first shift and even if Olson in fact made a poor decision by suspending Jordan or even if her investigation of Jordan's lies was not thorough enough, such facts do not create Title VII liability for R&O. Employment discrimination laws "have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involved intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995). Employment discrimination laws "do not prohibit employment decisions based upon …erroneous evaluations…or even unsound business practices." *Hill v. St. Louis University*, 123 F.3d 1114, 1120 (8th Cir. 1997). The sexual harassment investigation ended with Gregg's being disciplined. Subsequently, new evidence developed that Jordan had lied. One unbiased witness said Jordan made up the allegations to go back to first shift. R&O had every right to discipline Jordan for its good faith belief in her dishonesty. It did that.

IV.    **CONCLUSION**

14

Jordan did not suffer any conduct that would objectively rise to the level of harassment under Title VII and when R&O learned of Jordan's complaints, some time after the conduct allegedly started, R&O took immediate steps to separate Jordan from her alleged harasser. R&O cannot be held liable because a disgruntled employee did not like her job when R&O took every step necessary to prevent and correct any perceived harassment against Jordan. Jordan's case should be dismissed on summary judgment because no facts exist that would support her claims.

           Respectfully Submitted,
           R&O AURORA, INC. DEFENDANT

           <u>s/ Elizabeth Hubbard</u>
           One of Its Attorneys

Elizabeth L. Hubbard
Brian Ekstrom
HUBBARD & O'CONNOR, LTD.
900 West Jackson Blvd., Suite Six West
Chicago, IL 60607
Telephone:     (312) 421-5960
Email: ehubbard@hubbardandoconnor.com

Matthew P. Pappas
Terri L. Fildes
PAPPAS & SCHNELL, P.C.
1617 Second Avenue – Suite 300
Rock Island, IL 61204
Telephone:     (309) 788-7110
Fax:               (309) 788-2773
Email: mpappas@pappasandschnell.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

      I, Elizabeth Hubbard, an attorney, certify that I caused to be served on Uche Asonye and Mark Pando this Defendant's Brief in Support of Motion for Summary Judgment by electronic filing with the Clerk of the court using the court's electronic filing system, which will send notification of such filing to the above-reference address on this 15th day of September, 2008.

                                                _s/ Elizabeth Hubbard_____
                                                 Elizabeth Hubbard

John O'Connor
Elizabeth Hubbard
Brian Ekstrom
HUBBARD & O'CONNOR, LTD.
Attorneys for Plaintiff
900 West Jackson, Suite Six West
Chicago, Illinois 60607
(312) 421-5960