**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIONA JORDAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07 C 6452 |
| | ) | |
| v. | ) | Judge: Coar |
| | ) | |
| R&O AURORA, INC, | ) | Magistrate Judge: Denlow |
| | ) | |
| | ) | <u>Jury Trial Demanded</u> |
| Defendant. | ) | |
| | ) | |

**<u>DEFENDANT'S MATERIAL STATEMENT OF FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
PURSUANT TO RULE 56</u>**

Now Comes the Defendant, R&O Aurora, Inc., by and through its attorneys

Elizabeth Hubbard and Brian Ekstrom of Hubbard & O'Connor, Ltd. and Matt Pappas

and Terri Fildes of Pappas & Schnell, P.C., and submits the following material statement

of uncontested facts in support of its Rule 56 Motion for Summary Judgment[1]:

THE PARTIES:

1. Kiona Jordan, plaintiff, applied for any hourly position with R&O, Specialties on

   November 21, 2005, indicating on her pre-employment questionnaire that she

   was available for any shift. (Tab "1" - Jordan Exh. 1, Jordan application; Tab "C"

   - Jordan 50, lines 15-17)

---

[1] References to a deponent's deposition transcript page are cited as Tab ["Tab letter"] - [Deponent last name] [page number], lines [line numbers], eg. "Tab "A" - Olson 45, lines 4-5." References to deposition exhibits are cited as Tab ["Tab number"] [Deponent last name] Exh. [number], eg. "Tab '45' - Olson Exh. 45."

2.  R&O Specialties does supply chain management work on site at other companies and runs the logistics for the host company, such as truck driving, kitting of supplies, assembly, painting and the like, including at two Caterpillar sites in Joliet and Aurora. (Tab "A" - Olson  21, lines 14-18, Olson 47, lines 9-22)

3.  R&O employees work alongside Caterpillar employees, and do a variety of tasks such as kitting (which involves placing various tools and parts in kits which are then provided to Caterpillar employees on the line to use in assembly of Caterpillar products) painting, trucking, washing of equipment, and repack (which requires the employee to repack various parts, with the use of remotely controlled  hoists, which are received back at the plant and need to be removed from crates and repacked to ensure the parts can be shipped without damage). (Tab "A" - Olson 52, lines 14-24, Olson 53, lines 1-4; Tab "C" - Jordan 53, lines 8-24)

4.  The kitting room is a clean room and is enclosed, heated and air conditioned, due to the nature of parts located there, and is located at the center of the Joliet Caterpillar warehouse, while the repack area in enclosed in the warehouse. (Tab "A" - Olson 53, lines 19-24; Tab "C" - Jordan 53, lines 1-7)

5.  Employees can be reassigned at any time to any position for which R&O provides services for Caterpillar, and employees are moved around daily to different positions. (Tab "A" - Olson 102, lines 23-24, Olson 103, lines 1-4)

6.  Jordan was initially assigned to the kitting department and commenced her employment on December 7, 2005 at the Joliet Caterpillar location. (Tab "C" -

Jordan 52, lines 20-24, Jordan 53, lines 1-2; Tab "28" - Jordan Exh. 28, EEOC Charge)

7.  Employees have class designations which have nothing to do with their rate of pay, but is used solely as a basis for billing Caterpillar. (Tab "A" - Olson 117, lines 11-17, Olson 191, lines 5-13, Olson 202, lines 6-24, Olson 203, lines 1-16, Olson 214, lines 1-4, Olson 217, lines 21-24, Olson 218, line 1)

8.  No one ever explained the class designation to Jordan, but she just assumed that a lower class designation was not good. (Tab "C" - Jordan 64, lines 1-24, Jordan 65, lines 1-3)

9.  Jordan was hired at the hourly rate of $9.00 an hour, which increased on January 9, 2006, to $10.00 an hour, the rate which she continued to earn until she voluntarily resigned her employment. (Tab "8A" - Saltzman Exh. 8A, Jordan wage change form; Tab "B" - Saltzman 33, lines 11-15)

SEXUAL HARASSMENT POLICIES AND PROCEDURES:

10. Jordan was given a copy of R&O's policies and procedures manual at orientation, and she signed a receipt for having been given the policy. (Tab "C" - Jordan 56, lines 10-19, Jordan 61, lines 5-13, Jordan 62, lines 2-4; Tab "3" - Jordan Exh. 3, policy signature page)

11. The policies and procedures of R&O include prohibitions against sexual harassment, for which the company had a "zero tolerance," and also provide: "If you experience or witness sexual harassment in the workplace, report it immediately to the Manager of Human Resources.  If that individual is the person who is harassing you, you may approach any other member of 'R&O Specialties'

3

management with whom you feel comfortable. All allegations of sexual

harassment will be quickly investigated." (Tab "2" - Olson Exh. 2, R&O Sexual

Harassment Policy; Tab "A" - Olson 39, lines 22-24, Olson 40, lines 1-3; Tab

"B" - Saltzman 95, lines 9-24, Saltzman 96, lines 1-6)

12. If allegations of harassment are substantiated, the company's zero tolerance

policy is that the company will not tolerate harassment and that, if the facts

substantiate the allegations, that the employee will be terminated. (Tab "A" -

Olson 40, lines 1-3; Tab "B" - Saltzman  95, lines 9-24, Saltzman 96, lines 1-6).

13. Jordan read the policy and understood it. (Tab "C" - Jordan 56, lines 10-19)

14. Amanda Olson, at all relevant times, was the director of human resources for

R&O, with authority to discipline and terminate employees, having been

employed in that position since December 19, 2005, and  Mike Saltzman was one

of the  human resources managers, who reported to  Amanda Olson. (Tab "A" -

Olson  17, lines 21-24, Olson 18, lines 1-24, Olson 19, lines 1-4; Tab "B" -

Saltzman 26, lines 2-24)

15. Olson had extensive experience investigating employment discrimination claims,

was extremely comfortable investigating sexual harassment claims and would, as

part of her investigative process, document the allegations, interview witnesses,

take statements and issue discipline, if appropriate. (Tab "A" - Olson 22, lines 2-

24, Olson 23, lines 1-13, Olson 46, lines 8-18)

16. Employees are given the well-publicized phone number for Amanda Olson's

human resources office, the phone number is also posted in the main operations

office at the Caterpillar Joliet plant and the employees are given human resources

personnel business cards during initial orientation. (Tab "A" - Olson 50, lines 18-24, Olson 51, lines 1-4)

17. Employees and managers use "conversation forms" to document conversations that need to be recalled, either for discipline, complaint, job performance, schedule change, or anything that needs to be recalled; these forms are available on the intranet and also posted inside the work sites in a manila folder hanging on the office door where everyone has access to them. (Tab "A" - Olson 56, lines 23-24, Olson 57, lines 1-24, Olson 58, lines 1-4; Tab "C" - Jordan 81, lines 3-24; Tab "B" - Saltzman 112, lines 1-8).

18. The conversation forms may be hand written or typed and do not need to be signed by the employee, nor even prepared if the employee does not want to prepare a conversation form. (Tab "A" - Olson 58, lines 5-13, Olson 66, lines 16-21)

19. Employees can also submit other written documentation to management concerning any issues or concerns they have. (Tab "C" - Jordan 85, lines 21-24, Jordan 86, line 1)

20. In investigating a complaint of harassment, Amanda Olson would want to talk to the parties involved and understand what their knowledge of the situation is; to the extent that she can maintain confidentiality, pursuant to the company policy, she will do so but depending on the specific situation, she may need to go to the person against whom the complaint is lodged and ask about the situation. (Tab "A" - Olson 62, lines 7-24, Olson 63, lines 1-24, Olson 64, lines 1-24, Olson 65, lines 1-22)

21. Jordan had previously met and interviewed with Mike Saltzman, the manager of human resources and had had conversations with him on the phone and knew the location of the Shorewood, Illinois R&O human resources office. (Tab "C" - Jordan 50, lines 21-24, Jordan 51, lines 1-6; Tab "A" - Olson 18, lines 1-24, Olson 19, lines 1-4)

22. Employees who lie to management are subject to discipline, up to and including termination and in fact two employees, who had not made sexual harassment allegations, were terminated for being dishonest and untruthful with management. (Tab "A" - Olson 208, lines 1-24, Olson 209, line 1)

PLAINTIFF'S PRIOR COMPLAINTS:

23. Jordan had previously filed an EEOC charge against Kemlite, which was not her employer, for sexual harassment, while she was working on site at Kemlite, while an employee of Manpower. (Tab "C" - Jordan 7, lines 7-12, Jordan 36, lines 10-17)

24. Jordan felt that after she filed her charge against Kemlite, her co-workers shunned her and she was embarrassed; she subsequently failed to pursue her EEOC charge, after Kemlite made her an unconditional offer of re-employment which she did not accept. (Tab "C" - Jordan 27, lines 3-18, Jordan 33, lines 15-24, Jordan 34, lines 1-4, Jordan 36, lines 15-24, Jordan 37, lines 1-24, Jordan 38, lines 1-21)

25. On December 16, 2005, nine days after she had commenced her employment at R&O, Jordan met with Keith Cecil, project manager at R&O regarding an incident with a Caucasian co-worker, Nick Close, who had gotten into a quarrel

6

with Jordan and called her a "nigger." (Tab "C" - Jordan 52, lines 21-24, Jordan 69, lines 4-21, Jordan 70, lines 19-24, Jordan 71, lines 1-24, Jordan 72, lines 1-24, Jordan 73, lines 1-5)

26. Jordan never reported this incident, which was, instead reported by a Caucasian male co-worker. (Tab "C" - Jordan 69, lines 6-12, Jordan 71, lines 11-14)

27. Jordan wrote a memo to management about the incident, although she had not been the one to initiate the complaint, which was in fact brought to the attention of R&O's management by a Caucasian co-worker who had overheard the comments by Nick Close. (Tab "A" - Jordan 69, lines 10-21, Jordan 70, lines 12-18, Jordan 71, lines 11-12, Jordan 72, lines 20-24, Jordan 73, lines 1-4; Tab "6" - Jordan Exh. 6, Conversation form dated December 16, 2005)

28. Human resources at R&O immediately investigated the incident and Nick Close was immediately terminated by R&O because of his racial slurs against Jordan. (Tab "C" - Jordan 74, lines 3-12, Jordan 75, lines 1-24, Jordan 76, lines 1-7; Tab "B" - Saltzman 114, lines 17-23)

29. No one retaliated against Jordan after her complaint about Close and no co-workers shunned or scorned her, which she had previously experienced at Kemlite.  (Tab "C" - Jordan 161, lines 15-24, Jordan 162, lines 1-13)

30. Jordan was given a $1.00 per hour pay increase in January, 2006, to $10.00 an hour, an amount she continued to earn throughout the remainder of her employment with R&O. (Tab "C" - Jordan 60, lines 16-21; Tab "B" - Saltzman 33, lines 11-15; Tab "8A" – Saltzman Exh. 8A, Jordan wage change form)

31. In May, 2006, Jordan and two other employees were transferred from first shift to second shift and Jordan, who wanted to remain on first shift, had complained about the transfer because of her child care situation and accused Ray Ebner, supervisor on first shift, of being a racist in his decision on who to select for transfer. (Tab "A" - Olson 113, lines 2-24, Olson 114, lines 1-21, Olson 204, lines 5-18, Olson 205, lines 2-21; Tab "19" - Olson Exh. 19, Warning notice dated July 3, 2006; Tab "18" - Olson Exh. 18, Olson notes dated May 10, 2006; Tab "13" - Jordan Exh. 13, Keith Cecil Notes dated May 2, 2006; Tab "14" - Jordan Exh. 14, Conversation form dated May 2, 2006; Tab "B" - Saltzman 113, lines 9-23, Saltzman 114, lines 2-16).

32. Olson gave Jordan the option of staying on second shift or being terminated and rehired when a position on first shift occurred; Jordan elected to take the second shift job, although she advised Olson she did want to remain on first shift. (Tab "A" - Olson 114, lines 1-17, Olson 116, lines 2-24; Tab "18" - Olson Exh. 18, Olson notes dated May 10, 2006)

33. At no time did Jordan ever advise Amanda Olson that she had changed her mind and was no longer interested in returning to first shift. (Tab "A" - Olson 204, lines 11-18)

34. Jordan had also complained that Ray Limley was a racist. (Tab "A" - Olson 205, lines 2-9, lines 22-24)

INCIDENTS WITH LEWIS GREGG AND PLAINTIFF:

35. On June 26, 2006, Lewis Gregg was promoted to supervisor over Jordan, having worked in kitting on second shift since on or about June 15, 2006 as a supervisor

in training, Greg then had the ability to impose discipline, including termination, of Jordan. (Tab "A" - Olson 56, lines 1-22, Olson 69, lines 3-18; Tab "40" - Jordan Exh. 40, Gregg employee change form dated June 26, 2006; Tab "B" - Saltzman 121, lines 23-24, Saltzman 122, lines 1-7; Tab "C" - Jordan 123, lines 5-7)

36. At **no** time did Jordan report the following alleged statements made by Lewis Gregg from June 15 to June 29, 2006 to management (which statements are alleged in her complaint and/or her deposition testimony and/or her EEOC charge) to R&O's management, despite the fact that she apparently considers the conduct to be sexual harassment and despite the fact that the policy states that such conduct is to be reported "immediately":  Lewis Gregg stated (a) "I love the way you look," (b)"You are very sexy to me,"(c) "You need to stop coming to work looking like that," (d)"I see you driving a mustang, that's a nice looking Mustang. If I was you, I would do whatever I tell you to do if you want to keep it"(e) "I wouldn't have a problem with you leaving early if you would have buttered me up the other day"(f) "You can leave under one condition, you come over to my house when I get off at 11:30 or 12," (g) "If you come over to my house I can guarantee you will be satisfied and you would end up falling in love with me" (h)  "Fine then. If you leave at 8 and get written up, don't be mad at me," (i)"Why didn't you come over to my house like you said you would? You should be glad I didn't write you up for leaving,"(j) "Kiona and Erika, I need you all to handle my wood [allegedly referring to his penis]. I'm just playing but I really do need you to move some wood" (k) men with big shoes, like Gregg, "can

go all night;" (l) "I sell them nasty movies, by the end of the night you will be in love with me. I got all type of movies: movies with just girls in them, girls on girls, and you know all type of positions."  (Tab "2" - Olson Exh. 2, R&O Sexual Harassment Policy; Tab "56" - Olson Exh. 56, Answer to Complaint; Tab "51" - Jordan Exh.  51, EEOC Charge against Kemlite dated November 4, 2005; Tab "15" - Jordan Exh. 15, Conversation form dated March 3, 2006; Tab "A" - Olson 72, lines 20-24, Olson 73, lines 1-3, Olson 80, lines 20-24; Tab "C" - Jordan 134, lines 2-24, Jordan 135, lines 1-10, Jordan 136, lines 2-24, Jordan 137, lines 1-24, Jordan 138, lines 1-24, Jordan 139, lines 1-24, Jordan 140, lines 1-11, Jordan 152, lines 3-24, Jordan 153, lines 1-12, Jordan 160, lines 16-24, Jordan 161, lines 1-13; Tab "B" - Saltzman 122, lines 15-18).

37. At an employee meeting on June 29, 2006, Lewis Gregg criticized Jordan about her job performance, stating that she had been with the company for seven months, should know her job duties and should not have to be told what to do. (Tab "C" - Jordan 140, lines 12-24, Jordan 141, lines 1-9; Tab "28" - Jordan Exh. 28, EEOC Charge)

38. Jordan was convinced that because of Gregg's comments she would be disciplined. (Tab "C" - Jordan 156, lines 23-24, Jordan 157, lines 1-16)

39. At no time did Gregg physically touch Jordan nor did she think he was going to touch her. (Tab "C" - Jordan 155, lines 20-24)

40. On June 30, 2006, Jordan gave a supervisor, Ray Ebner, at R&O a four page written document about her experiences with Lewis Gregg, having been told by her mother to write down everything that had happened to her, and detailed his

conduct toward her, which she deemed to be sexual harassment, which conduct she substantively described as (a) Gregg asking her to come to his home to watch X-rated videos, (b) her feeling that she was "constantly harassed" and "uncomfortable" (c) Gregg being impolite (d) Gregg asking why she didn't call him at home as he had given his home number in case people did not come in. (Tab "31" - Jordan Exh. 31, Jordan's notes[2]; Tab "C" - Jordan 149, lines 8-18, Jordan 172, lines 6-15)

41. This communication to Ray Ebner was the first time Jordan communicated her sexual harassment allegations to anyone in management at R&O. (Tab "C" - Jordan 161, lines 4-10)

42. Ray Ebner immediately took the notes from Jordan, and he and Jordan went to meet with Amanda Olson, who was on site at Caterpillar that day. (Tab "A" - Olson 68, lines 15-24, Olson 69, lines 1-2)

THE INVESTIGATION OF JORDAN'S ALLEGATIONS

43. During the 45 minute interview between Amanda Olson and Jordan, Olson told Jordan that she was sorry this had happened to Jordan, stated that she would immediately get to the bottom of the situation, and was told by Jordan that (a) Gregg had asked Jordan to come over and watch X-rated movies, (b) had asked Jordan to go out, and (c) had given her his home phone number. (Tab "A" - Olson 73, lines 2-3, Olson 80, lines 20-24; Tab "19A" - Olson Exh. 19A, Olson notes dated June 30, 2006; Tab "C" - Jordan 159, lines 7-13, Jordan 166, lines 1-3, Jordan 167, lines 1-3, Jordan 168, lines 6-17)

---

[2] Attached to and included in Jordan Exh. 31 is the typed transcription of Jordan's handwritten note provided by Plaintiff's counsel and the email by which the transcription was sent.

44. Jordan's handwritten notes about her experiences with Lewis Gregg were the basis for Amanda Olson's investigation on June 30, 2006. (Tab "A" - Olson 71, lines 5-24, Olson 72, lines 1-24, Olson 73, lines 1-10)

45. Jordan provided Olson with the names of three co-worker witnesses (Seneca Carter, Clarissa James and Erica Washington) to the conduct of Lewis Gregg toward her and asked Olson to speak with them, and Olson did interview Seneca Carter and Clarissa James about Gregg's conduct and Jordan's allegations on that day, June 30, 2006. (Tab "A" - Olson 73, lines 8-18, Olson 201, lines 12-24, Olson 202, lines 1-5; Tab "C" - Jordan 169, lines 23-24, Jordan 170, lines 1-2)

46. On June 30, 2006, the third witness, Erica Washington, had collected her paycheck and never returned to work; Erica Washington never returned phone calls, placed to her by Amanda Olson to discuss Jordan's allegations and Washington's absences, and Washington was listed as a three day "no call-no show," voluntary resignation. (Tab "A" - Olson 78, lines 10-21, Olson 79, lines 3-7, Olson 91, lines 9-23, Olson 92, lines 20-24, Olson 93, lines 1-9)

47. During her conversation with Seneca Carter on June 30, 2006,  Olson learned that Jordan had not been crying in his presence, that Carter  at no time felt Lewis Gregg was behaving inappropriately, that Carter had witnessed nothing inappropriate between Jordan and Gregg, and that the reason Gregg's home phone number was distributed was because Gregg, as a new supervisor, did not have a work-issued cell phone and had told the shift  to call him at home if an employee were not coming in for any reason. (Tab "A" - Olson 73, lines 19-24,

Olson 74, lines 1-14; Tab "19A" - Olson Exh. 19A, Olson notes dated June 30,

2006; Tab "C" - Jordan 128, lines 1-23, Jordan 181, lines 13-18)

48. On June 30, 2006, Amanda Olson also interviewed Lewis Gregg who denied the

statements made by Jordan, but did state that he had given everyone in the

department his home phone number to let him know about absences or people

who wanted to leave early. (Tab "19A" - Olson Exh. 19A, Olson notes dated June

30, 2006; Tab "C" - Jordan 216, lines 3-14)

49. Olson learned from the second witnesses, Clarissa James, that Lewis Gregg was

very friendly to everyone in the department, that James had witnessed nothing

inappropriate by Gregg toward Jordan, but Gregg had been telling inappropriate

jokes in the work place and Olson determined that Gregg needed to be placed on

permanent probation due to his behavior. (Tab "A" - Olson  86, lines 21-24,

Olson 87, lines 1-3, lines 22-24, Olson 88, lines 1-14)

50. Gregg was placed on permanent probation on June 30, 2006 and the sexual

harassment conduct toward Jordan **never** continued past the date Jordan reported

it to Amanda Olson. (Tab "38" - Jordan Exh. 38, Olson notes re: Gregg write-up

dated June 30, 2006; Tab "C" -  Jordan 184, lines 3-10, Jordan 218, lines 8-13,

Jordan 244, lines 3-24, Jordan 245, lines 1-6; Tab "37" - Olson Exh. 37, Gregg

warning notice dated July 3, 2006; Tab "A" - Olson 104, lines 4-23)

51. Olson then met with Gregg and discussed the sexual harassment policy with him

and gave him the written permanent probation notice, which stated that if an

incident were to occur again: "It will result in immediate dismissal. Zero

tolerance." (Tab "37" - Olson Exh. 37, Gregg warning notice dated July 3, 2006; Tab "A" – Olson 105, lines 22-24, Olson 106, lines 1-24)

52. Olson had nothing to substantiate Jordan's allegations from the witnesses Jordan had provided to Olson, as the information provided was insufficient to warrant a suspension of Gregg,  so elected not to suspend Gregg and moved Jordan to another  first shift kitting  position, in order to accommodate Jordan's discomfort in being around Lewis Gregg.( Tab "A" - Olson 94, lines 9-24, Olson 95, lines 1-24, Olson 96, lines 1-13, Olson 99, line 24, Olson 100, lines 1-6, Olson 112, lines 6-16, Olson 188, lines 2-9, lines 23-24, Olson 189, lines 1-2)

53. Once Gregg was disciplined by being placed on permanent probation, Olson considered the matter to be closed. (Tab "A" - Olson 206, lines 12-18)

54. On July 5, 2006, Jordan was transferred to first shift repack department, on the same shift and at the same rate of pay and benefits. (Tab "19" - Olson Exh. 19, Gregg warning notice dated July 3, 2006; Tab "A" - Olson 181, lines 4-24, Olson 182, lines 1-6; Tab "C" - Jordan 60, lines 16-21, Jordan 187, lines 6-13, Jordan 188, lines 6-19)

55. The reason for the transfer of Jordan to repack at this time was because the company had an immediate need in repack. (Tab "A" - Olson 182, lines 1-24, Olson 186, lines 3-24, Olson 187, lines 1, Olson 188, lines 2-20; Tab "59" - Olson Exh. 59, Defendant's Answers to Interrogatories; Tab "C" - Jordan 207, lines 15-20)

56. Transferring employees was daily routine at R&O and was based on management's assessment of the business needs of the department. (Tab "A" - Olson 103, lines 3-4, Olson 181, lines 10-17, Olson 190, lines 3-5)

57. Jordan, however, did not like the repack department because it was not air-conditioned, as was the kitting room, and it was dirty and required various heavy objects to be moved with a hoist. (Tab "C" - Jordan 191, lines 2-22, Jordan 196, lines 8-10, Jordan 210, lines 7-24, Jordan 211, lines 1-4)

KIONA JORDAN FOUND TO HAVE LIED ABOUT SEXUAL HARASSMENT ALLEGATIONS:

58. On June 30, 2006, another supervisor, Robert Dillon was told by two employees, Constance Daniels and Demetria Jenkins, whom he supervised, that Jordan had apparently decided to make up the sexual harassment allegations against Lewis Gregg in order to get transferred back to first shift, a shift she had preferred, as Jenkins had been told by Jordan about the fabrication. (Tab "20" - Olson Exh. 20, Conversation form dated July 5, 2006; Tab "22" - Olson Exh. 22, Olson notes re: Jordan fabricating claims; Tab "24" - Olson Exh. 24, Conversation form re: "witness 2"; Tab "A" - Olson 135, lines 7-10, Olson 149, lines 4-5, Olson 159, lines 12-24, Olson 160, lines 8-18; Tab "B" - Saltzman 47, lines 5-24)

59. One of the witnesses, Demetria Jenkins had a conversation with Mike Saltzman in which Jenkins stated Jordan had told her Jordan had made up the harassment allegations against Lewis Gregg in order to get him suspended or terminated and to get transferred back to first shift, conduct which Jenkins did not consider to be

fair. (Tab "B" - Saltzman  66, lines 3-24, Saltzman 67, lines 1-3, Saltzman 82, lines 6-24, Saltzman 83, lines 1-16)

60. Jenkins told Amanda Olson, who investigated the allegations, that Kiona Jordan had lied to the company about the sexual harassment allegations concerning Lewis Gregg. (Tab "A" - Olson 142, lines 1-4; Tab "B" - Saltzman 71, lines 1-22)

61. Saltzman, who knew Demetria Jenkins, considered Jenkins to be a truthful, unbiased witness and gave credence to her statements to him, as she had no motive to lie to him about this situation. (Tab "B" - Saltzman 113, lines 1-8)

62. Another employee, Constance Daniels [Witness 1]  had been told by Jenkins about Jenkins' conversation with Jordan and both employees had reported their concerns to Robert Dillon, a supervisor.  (Tab "A" - Olson 147, lines 2-23, Olson 152, lines 2-12; Tab "23" -  Olson Exh. 23, Conversation form re: "Witness 1"; Tab "B" - Saltzman 85, lines 11-16, Saltzman 89, lines 1-22, Saltzman 90, lines 3-10)

63. The two witnesses against Jordan who had reported their knowledge did not want Olson going back to Kiona Jordan and telling her that one of them had reported the statements Jordan had made. (Tab "A" - Olson 148, lines 7-19)

64. Amanda Olson, who concluded Jordan's conduct was a scam, made the decision to suspend Kiona Jordan for three days with no pay after she had spoken to the two witnesses, who had reported Jordan's fabrication, and determined Jordan would return in three days to her first shift position in repack. (Tab "A" - Olson 144, lines 3-19, Olson 145, lines 8-21; Tab "21" -  Olson Exh. 21, Olson notes

dated July 6, 2006; Tab "22" – Olson Exh. 22, Olson notes re: Jordan fabricating claims)

65. Bob McGee and Keith Cecil, supervisors, knew of the facts and were in agreement with Olson's decision to suspend Jordan for three days. (Tab "A" - Olson 174, lines 10-24)

MEETING WITH JORDAN:

66. On July 7, 2006, Jordan was called into a meeting with Amanda Olson, Bob McGee, director of operations at the R&O operation at Caterpillar Joliet, and Keith Cecil, project manager and Don Chapman, project manager (Tab "A" - Olson 48, lines 4-24, Olson 49, lines 1-10; Tab "22" - Olson Exh. 22, Olson notes re: Jordan fabricating claims; Tab "C" - Jordan 184, lines 12-19, Jordan 187, lines 3-17; Tab "B" - Saltzman 31, lines 10-24, Saltzman 32, lines 1-9)

67. During this meeting, Jordan was told that she had lied to the company about her allegations, that Lewis Gregg was disciplined and that she would be suspended for three days because of the company's concerns over her apparent untruthfulness regarding her allegations against Gregg. (Tab "22" - Olson Exh. 22, Olson notes re: Jordan fabricating claims, Tab "C" - Jordan 202, lines 11-24, Jordan 203, lines 1-24, Jordan 204, lines 1-24)

68. Jordan stated during the meeting that she was upset about the way the sexual harassment investigation had been handled, as she wanted Lewis Gregg terminated or suspended. (Tab "A" - Olson 162, lines 9-15; Tab "C" - Jordan 203, lines 20-24, Jordan 204, lines 1-18)

69. Jordan yelled at Amanda Olson and repeatedly asked for the names of the witnesses who had accused her of fabricating the information about Lewis, but Amanda Olson did not give her the names. (Tab "A" - Olson 166, lines 13-20, Jordan 210, lines 2-8; Tab "C" - Jordan 203, lines 19-24, Jordan 254, lines 1-10, Jordan 258, lines 5-15)

70. At no time did Jordan deny that she had fabricated the allegations against Gregg either during this meeting or at any subsequent point in time, although she had the opportunity in the meeting to state anything about the situation she wished.( Tab "A" - Olson 165, lines 11-19, Olson 166, lines 13-20, Olson 167, lines 17-20, Olson 209, lines 21-24, Olson 210, lines 1-21, Olson 229, lines 18-23, Olson 231, lines 11-22; Tab "28" - Jordan Exh. 28, EEOC Charge)

71. The decision to suspend Jordan for three days, to continue Jordan in the repack department and to accept her resignation if she were not happy was made by Amanda Olson. (Tab "A" - Olson 184, lines 6-20)

EVENTS SUBSEQUENT TO SUSPENSION OF JORDAN

72. Jordan, at no time after her transfer to repack, suffered a loss in pay or benefits, although Jordan, incorrectly deemed the routine job change to be a "demotion." (Tab "28" - Jordan Exh. 28, EEOC Charge)

73. Jordan returned to work in the repack department on July 11, 2006. (Tab "C" - Jordan 205, lines 1-2)

74. On July 17, 2006, Jordan attended a job fair and obtained a job offer from Schneider Logistics. (Tab "C" - Jordan 205, lines 19-24, Jordan 206, lines 1-4)

75. Jordan notified R&O that she would be voluntarily resigning her position on July 17, 2006 and her last day of pay was July 31, 2006, after she gave two weeks notice. (Tab "A" - Olson 199, lines 22-23, Olson 200, lines 1-7;  Tab "C" - Jordan 206, lines 1-24, Jordan 207, lines 1-5)

76. On September 5, 2006, Lewis Gregg was terminated when complaints by two other employees of sexual harassment were received and investigated. (Tab "B" - Saltzman 42, lines 4-21; Tab "60" - Exh. 60, Lexis Gregg Termination Notice)

Respectfully Submitted,
R&O AURORA, INC. DEFENDANT


<u>BY: Elizabeth Hubbard</u>
One of Its Attorneys

Elizabeth L. Hubbard
Brian Ekstrom
HUBBARD & O'CONNOR, LTD.
900 West Jackson Blvd.
Suite Six West
Chicago, IL 60607
Telephone:    (312) 421-5960
Email: ehubbard@hubbardandoconnor.com

Matthew P. Pappas
Terri L. Fildes
PAPPAS & SCHNELL, P.C.
1617 Second Avenue – Suite 300
Rock Island, IL 61204
Telephone:    (309) 788-7110
Fax:              (309) 788-2773
Email: mpappas@pappasandschnell.com

ATTORNEYS FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

      I, Elizabeth Hubbard, an attorney, certify that I caused to be served on Uche Asonye and Mark Pando this  Defendant's Material Statement of Facts in Support of its Motion for Summary Judgment Pursuant to Rule 56 by electronic filing with the Clerk of the court using the court's electronic filing system, which will send notification of such filing to the above-reference address on this 15th day of September, 2008.


                 _s/ Elizabeth Hubbard_____
                 Elizabeth Hubbard


John O'Connor
Elizabeth Hubbard
Brian Ekstrom
HUBBARD & O'CONNOR, LTD.
Attorneys for Plaintiff
900 West Jackson, Suite Six West
Chicago, Illinois 60607
(312) 421-5960