# Exhibit A

Excerpts from the deposition of Amanda Olson

1        A.    Absolutely.

2        Q.    Okay.  What is the highest level of education

3    you've received?

4        A.    My finished degree would be a bachelor's

5    of -- bachelor's of science in management.  I'm

6    currently working on my master's.

7        Q.    When did you receive the bachelor's in

8    management?

9        A.    That would be May of '04.

10       Q.    Where did you go to school?

11       A.    Aurora University.

12       Q.    Where are you getting your -- enrolled in

13   your master's degree?

14       A.    Aurora University.

15       Q.    How close are you to graduation for your

16   master's?

17       A.    May of '09.

18       Q.    Do you have a concentration?

19       A.    I have two.  I have one being leadership, the

20   second one being operations management.

21       Q.    When did you initially start working for R&O?

22       A.    December 19th, 2005.

23       Q.    What position were you hired into?

24       A.    Director of human resources.

1          Q.    What were your duties as director of human

2    resources?

3          A.    I was to oversee two of our office locations,

4    one being Aurora, one being the Shorewood office.  Both

5    offices supported Caterpillar plants.  And it was to

6    handle any escalated human resources issues and

7    institute policy.

8          Q.    So you were in charge of enforcing the

9    harassment policies?

10         A.    Yes.

11         Q.    And you were also in charge of investigating

12   and enforcing the discrimination policies?

13         A.    Being part of an investigation.  I also had

14   two human resources managers that worked underneath me

15   at both offices.  They would handle the investigations

16   if they would come up, and get me involved as

17   necessary.

18         Q.    Okay.  Can you tell me the names of the two

19   people who worked under you but did investigations?

20         A.    Sure.  One was Jermaine Bueno.  And then

21   replacing him for approximately six months before I

22   left was Roxanna, and her last name is Giese.  And

23   that's G I E S E.

24         Q.    Okay.

1       A.   And my other manager was Mike Saltzman.

2       Q.   Now, did Mike Saltzman work under you or

3  above you?

4       A.   Under me.

5       Q.   So these three were the individuals who would

6  actually do the leg work sometimes?

7       A.   Correct.

8       Q.   They would get witness statements if

9  necessary?

10      A.   If a situation was brought to our office,

11 they would be the first line to respond to that and

12 then investigate appropriately.

13      Q.   But you would be in charge of all of them?

14      A.   If something needed to come up and be brought

15 to my attention, they would be bringing that and all of

16 the investigation to me.

17      Q.   But did you direct the investigation, though?

18      A.   No.

19      Q.   So did they determine how to do the

20 investigation on their own or did you tell them how?

21      A.   We had general guidelines, go out get witness

22 statements, look at the situation, depending on

23 whatever situation would happen over at the plant.

24 From there, they would do all that.  If they felt that

Page 21

1    human resources office, and I would be at the Joliet

2    human resources office approximately two times a week.

3        Q.   Now, you said that -- I think you may have

4    told me this, but I apologize.  How many HR offices

5    were you above?  There were two, right?

6        A.   Correct.

7        Q.   One was in Joliet?

8        A.   One was in -- Physical location was Shorewood

9    supporting the Joliet facility.

10       Q.   Okay.

11       A.   And the other one was in Aurora supporting

12   the Aurora facility, separate off-site from

13   Caterpillar.

14       Q.   Which one was in charge of the Caterpillar

15   location?

16       A.   We have two Caterpillar locations, one in

17   Aurora and one in Joliet.  So I would have an office

18   that would support each site.

19       Q.   I see.

20            Which one supported the location where

21   Ms. Jordan worked?

22       A.   The Shorewood office.

23       Q.   And who was the HR person under you in that

24   office?

1           A.    Mike Saltzman.

2           Q.    So it's fair to say that you have experience

3      in investigating allegations of sexual harassment?    Is

4      it fair to say that?

5           MS. HUBBARD:    Objection as to form.

6      BY THE WITNESS:

7           A.    This situation was the first that had been

8      brought formally.    I had very few, maybe one or two,

9      that had been brought to the office, and not so much

10     claiming sexual harassment but maybe, you know, "This

11     makes me feel uncomfortable" situations.

12          Q.    When you say "this situation," you mean with

13     respect to Jordan?

14          A.    No.    I mean with respect to having something

15     coming from the IDHR.

16          Q.    Well, okay, forgetting the IDHR, though, were

17     you experienced in investigating allegations of sexual

18     harassment?

19          A.    Yes.

20          Q.    So at the time Ms. Jordan brought her

21     complaint, you already had experience investigating

22     allegations of sexual harassment?

23          A.    Yes.

24          Q.    Okay.    Can you tell me the experience you

1    already had?

2        A.    Different situations in which either

3    employees would call the office, come into the office,

4    either meet with myself if I was there at the time or

5    if I was covering for one of my human resources

6    managers.  And if there was any type of situation,

7    sexual harassment, or otherwise, I would listen, take

8    the appropriate action, talk to their management

9    personnel over at the plant and do the proper

10   investigation.

11       Q.    Prior to Ms. Jordan's complaint, how many

12   complaints of sexual harassment had you experienced?

13       A.    Two come to mind.

14       Q.    Can you tell me the names of the individuals

15   who complained about sexual harassment?

16       A.    No, I can't recall their names.  I just

17   remember the situations.

18       Q.    Okay.  Did they work at R&O?

19       A.    Yes.

20       Q.    Can you tell me the names of those that

21   claimed that they were harassed?

22       A.    I don't recall their names off the top of my

23   head, no.

24       Q.    Is there anything that would help you recall?

1    just made?

2        A.   I don't have any recollection of that

3    situation, no, the details.

4        Q.   Any other situations where you remember an

5    individual suspended pending an investigation?

6        A.   Any situation, sexual harassment situations?

7    I mean, we have different situations.

8        Q.   Well, I'm focusing on suspensions pending an

9    investigation.

10       A.   I have incidents, injuries.  That has nothing

11   to do with that, but we suspend for that as well.

12       Q.   But as far as discrimination and harassment,

13   do you remember any additional --

14       A.   No.

15       Q.   Alcario, was he disciplined as a result of

16   the complaint?

17       A.   Yes.

18       Q.   What was the discipline?

19       A.   He received a written warning.

20       Q.   Any other discipline?

21       A.   No.

22       Q.   Do you have a zero tolerance policy?

23       A.   Yes.

24       Q.   What does that mean?

1        A.    A zero tolerance policy is if there is any

2    form of harassment or discrimination going on, you'll

3    be terminated immediately.

4        Q.    Alcario Lopez was not terminated?

5        A.    We did not find anything that supported her

6    claims, including the videotape.

7        Q.    Now, you testified that you suspend without

8    pay pending investigation.  Why do you do that?  Why do

9    you suspend without pay pending investigation?

10        A.    Just the directive that was handed down to me

11    through the VP of human resources.

12        Q.    Do you understand the rationale behind it?

13        A.    I can draw a general conclusion, yes.

14        Q.    Can you tell me what the conclusion is?

15        A.    My opinion of that would be you've been found

16    to have done something incorrectly; and until we can

17    decide whether you have done something in the

18    investigation, you need to be removed from your work

19    area.

20        Q.    Do you suspend and investigate, or do you

21    investigate and suspend?

22        A.    I would have to say it's going to be, again,

23    a case-by-case basis.  It depends on the situation.

24        Q.    So sometimes you would investigate and

1    investigate allegations of discrimination, or did they

2    just talk about discrimination and harassment?

3         A.   I know that it was a general overview of

4    harassment and discrimination.  But our jobs as being a

5    human resource outsource center was what to do if we

6    received a claim, a call, somebody came in.  It was all

7    basic training for us.

8         Q.   So you participated in training as to how to

9    handle and investigate allegations of harassment?

10        A.   During my course of five years there, I did

11   that numerous times.

12        Q.   Any other training you received?

13        A.   Outside of the in-house training, no.

14        Q.   So it's fair to say that you were well

15   trained to handle allegations of sexual harassment when

16   you were confronted with the complaint of Ms. Jordan?

17        A.   Yes.  I am extremely comfortable in handling

18   any investigations on a sexual harassment claim.

19        Q.   Since after Ms. Jordan, have you participated

20   in any investigation -- internal investigation of

21   harassment allegations?

22        A.   Well, the two situations that I gave you,

23   mainly the Alcario Lopez, happened after Ms. Jordan.

24   So yes.

Page 47

1        Q.    Any other ones apart from those two?

2        A.    Not that I can recall, no.

3        Q.    Well, the second one, you can't recall much

4    about?

5        A.    No, I cannot.

6        Q.    So really what you can recall is one?

7        A.    Yes.   That I would feel comfortable speaking

8    to, yes.

9        Q.    What does R&O do?

10       A.    We are a supply chain management company.

11       Q.    My understanding is that R&O sets up at

12   different locations or assists companies at different

13   locations?

14       A.    What we do is we kind of partner with a

15   company, and we set up inside their facility and mainly

16   run a lot of the logistics for them.  Does that make

17   sense?

18       Q.    Well, a little bit.

19       A.    Okay.

20       Q.    What do you do for them day-to-day?

21       A.    Run the logistics for truck driving, kitting,

22   assembly, paint.

23       Q.    For the job at -- Let's take the Caterpillar

24   location.  That's where my client worked, right,

1    Jordan?

2        A.    Both of my locations are Caterpillar

3    locations.

4        Q.    Okay.    What is the reporting structure in any

5    one location?

6        A.    It's different for location to location.    The

7    location that Jordan was a part of was Joliet.    And

8    there is a baseline of supervisors from supervisors.

9    From supervisors, it goes up to project managers.    From

10   project managers, it goes into a director of

11   operations.

12       Q.    Who was the highest ranking supervisor

13   on-site at the Caterpillar location?

14       A.    A supervisor?

15       Q.    Yes.

16       A.    I wouldn't know now.

17       Q.    I mean, the rank.    What is the highest rank?

18       A.    They're all level.    Supervisors are all level

19   across the shifts.    They all report into -- at that

20   time there was two, two project managers.

21       Q.    Okay.    Who were the project managers?

22       A.    At that time?

23       Q.    Yes.

24       A.    That was Don Chapman and Keith Cecil.

Olson, Amanda

1       Q.   So they were the highest ranking R&O

2    representatives on location?

3       A.   Supervisors, project managers, director of

4    operations.

5       Q.   Is the director of operations at the

6    location?

7       A.   Yes.

8       Q.   And who was the director of operations at

9    that location at the time?

10      A.   At that time it was Bob McGee.

11      MS. HUBBARD:   You're asking just for R&O people?

12      MR. ASONYE:   Yes.

13      MS. HUBBARD:   Not Caterpillar?

14      MR. ASONYE:   No.

15   BY MR. ASONYE:

16      Q.   So underneath Chapman and Cecil would be

17   supervisors?

18      A.   Correct.

19      Q.   And tell me the supervisors you remember at

20   the time.

21      A.   I would say there's probably maybe ten.

22      Q.   Okay.

23      A.   At the time there was Norma Vargas.   There

24   was Robert Dillon.   There was Lewis Gregg.   There

1   was -- Ray Limney was there.  Ray Ebner was there.

2   Teresa Montelongo was there.

3       Q.   And these individuals that you mentioned now

4   supervised the kitters and the others?

5       A.   Absolutely.

6       Q.   Okay.  So Ms. Jordan worked underneath Lewis

7   Gregg?

8       A.   At the time of that incident, yes.

9       Q.   There is no HR facility located at that

10  Caterpillar location?

11      A.   No.

12      Q.   Okay.  So if they wanted to go to HR, they

13  would have to go to a different office?

14      A.   Correct.  There would be times that we would

15  be over there for meetings or checking and picking up

16  paperwork, but we did not physically reside at that

17  office.

18      Q.   Do you give the employees the number to your

19  office directly?

20      A.   Yes.

21      Q.   Okay.  How do you give them that?

22      A.   It's posted on -- It's posted in the main

23  operations offices there.  I don't know if it was on

24  their badge or not.  I believe it was.  They're given

1    business cards during orientation.  It's also included

2    in their orientation folder.  Our contact information

3    was on any sort of memos that we would distribute.  It

4    was a well published phone number.

5        Q.    What do -- What does a floater do?

6        A.    A floater was a position that we had there

7    that we would utilize those individuals to cover

8    different areas for absences and, you know, escalated

9    work flows.

10       Q.    How about -- What's the class of a floater?

11   Is it Class 1, 2, 3?

12       A.    I don't know off the top of my head.

13       Q.    Can you tell me what the classes are?

14       A.    I know that they ranged from zero to six.

15   And they were merely broken out based on the bill rate

16   that we would provide to Caterpillar.

17       Q.    Okay.  So the bill rate is determined by the

18   class?

19       A.    Yes.

20       Q.    What is the relationship between the bill

21   rate and the class?

22       A.    That's out of my realm, but there is the --

23   We had -- Based on whatever markup that was agreed on

24   between the sales force and the client, that would

Olson, Amanda

Page 52

1    translate to a bill rate.  The bill rate, based on that

2    markup, would translate to a range of pay rates within

3    those classes for our employees.

4         Q.    So the higher the class, the higher the bill

5    rate?

6         A.    Correct.

7         Q.    And then the higher the salary?

8         A.    Ultimately as you worked your way up through

9    the pay ranges, yes, it was -- they were higher paid

10   positions.  Some of them did have some overlap, though.

11        Q.    Okay.  But in general as your class

12   increases, your salary increases?

13        A.    Right.

14        Q.    What does a kitter do?

15        A.    A kitter is -- works in this area, and they

16   make a assemblies.  They gather all of the different

17   parts that we need to complete this assembly and make

18   little kits so that when the kits go to the line

19   they've got all the parts they need to assemble

20   whatever they're working on.

21        Q.    How about repack?  What is that?

22        A.    Repack, my understanding of repack is when we

23   would get parts in or we would be ready to ship parts

24   out, if they were packed poorly, as they continued to

Olson, Amanda

Page 53

1   be damaged as we shipped them back from facility to

2   facility, we would actually have to take the parts out

3   of the tubs or crates and repack them to ensure that

4   they would make it there without being damaged.

5        Q.   Okay.   That job requires more lifting than

6   the kitter job?

7        A.   Not necessarily.   There's hoists and things

8   of that sort over there.

9        Q.   But it requires more manual labor, though?

10       A.   Not necessarily, no.

11       Q.   Are you sure?

12       A.   Not 100 percent.   I don't really have a lot

13  of experience in the repack area.   But the repack area

14  uses hoists, which is all with the remote control.   And

15  with kitting, you're physically pulling parts out of

16  buckets and making kits.   So I wouldn't say that it

17  would be a lot more manual labor.   The environment is

18  different.

19       Q.   How different is the environment?

20       A.   The environment of the kitting area is a

21  controlled environment, meaning that it's heated

22  appropriately, air conditioned appropriately due to the

23  nature the parts that are in, where, repacking area,

24  you're out on the side of the dock.

1      Q.    Okay.  So the temperature can be --

2      A.    Depending on how it is outside, yeah.

3      Q.    Isn't it dirtier also?

4      A.    Yes.

5      Q.    So the kitter location is cleaner than the

6   repack location?

7      A.    Yes.

8      Q.    And the environment in the kitter location is

9   better than the one in the repack position?

10     A.    It is a more controlled environment, yes.

11     Q.    Okay.  What are the differences -- What other

12  differences are there between the kitter location and

13  the repack location?

14     A.    I'm not real familiar with the repack

15  location, I mean, the day-to-day operations of the

16  repack location.  I know it's located outside one of

17  our docks there in Joliet whereas the kitting position

18  is located in a separate room.

19     Q.    Would you agree that the repack position is

20  more physically challenging than the kitter position?

21     A.    Without being there every day, I would say

22  that I'm not able to make -- I'm not able to make that

23  determination.  I know that in the repack position,

24  they have the use of a hoist.  If they're bending or

Olson, Amanda

```
1   an HR manager?

2        A.    My supervisor was a man named Joe Harper.

3        Q.    What was his job title?

4        A.    He was a senior vice president.

5        Q.    Was he your supervisor all throughout?

6        A.    Yes.

7        Q.    Do you know his supervisor?

8        A.    His supervisor was Greg Antevaras.

9        Q.    And what was Greg's position?

10       A.    He's the president.

11       Q.    Of the job titles that you told me earlier,

12  who has the ability to hire people?

13       A.    All the hiring is done within the human

14  resources office.

15       Q.    How about terminations?

16       A.    Terminations could be across operations or

17  human resources.

18       Q.    Do supervisors have the authority to

19  terminate?

20       A.    They do.

21       Q.    So Lewis Gregg had the ability to terminate?

22       A.    Yes.

23       Q.    What is a conversation form?

24       A.    A conversation form is a form that we use to
```

1    acknowledge any conversation that's taken place.

2         Q.    Who -- How does it come about that you get a

3    conversation form?

4         A.    It could be based on, again, any

5    conversation.  It could be a counseling session.  It

6    could be, you know, a job performance situation; Okay,

7    we're doing this situation this way; it needs to be

8    done this way, documenting, you know, that this

9    conversation did take place.  And that could be, again,

10   through counseling, not so much as disciplinary action

11   but conversations that needed to be recalled.

12        Q.    Who has the physical forms?

13        A.    They're made available to everyone.

14        Q.    Okay.  So when you say it's available, is it

15   like at a location where you can just --

16        A.    They're on our intranet, and they're also

17   posted inside our sites in a manila folder hanging

18   right on the door where everyone has access to them.

19        Q.    In what situations do you ask people to

20   prepare a conversation form?

21        A.    I ask them to prepare it in anything that's

22   counseling; if it's something that's not so much of a

23   disciplinary action but saying, Okay, hey, we need to

24   document that we did it this way but we need to redo it

1    this way, to say that we had this conversation.  I

2    document it in something as simple as, I'm changing

3    your schedule.  Any conversation that I want to be able

4    to recall, I say use a conversation form.

5        Q.    Now, do you have them write on there?  Who

6    writes it?

7        A.    It's whatever you feel comfortable with, if

8    you have access to a computer and you want to type it.

9    If you don't have access to a computer and you want to

10   hand write it, either way is acceptable.

11       Q.    When you use it for witness statements, do

12   you have the witnesses write them or do you write them?

13       A.    I have them write them.

14       Q.    And do you have them sign them too?

15       A.    That's not mandatory, no.

16       Q.    Okay.  Do you ask them to sign them anyway,

17   or no?

18       A.    I don't, no.

19       Q.    So they can sign or they don't have to sign?

20       A.    True, yes, depending on if they're -- what

21   the preference is.

22       Q.    Are there some situations where you type it

23   for them?

24       A.    If it's a situation in which I want to recall

```
1    my realm.
2         Q.   But this is a policy you're enforcing, right?
3         A.   Correct.
4         Q.   Okay.  So you understand the policy?
5         A.   Yes.
6         Q.   And you were enforcing it?
7         A.   As the directive given to me by my superiors,
8    yes.
9         Q.   That's why I'm asking you.  Why is it
10   important to maintain the confidentiality of the
11   individual complaining?  Or do you even maintain the
12   confidentiality?
13        A.   I don't understand what you're asking me.
14        Q.   I'll ask it differently.
15             Do you make an effort to maintain the
16   confidentiality of the individual making a complaint of
17   sexual harassment?
18        A.   I guess I will have to say it would depend on
19   the case.  If it's a person coming to me saying, This
20   has happened to me, I'm going to go back to the person
21   that they're accusing and saying, This person raised a
22   complaint that this happened.  And I would disclose who
23   the person was.
24        Q.   Okay.
```

1        A.    In order to investigate that.

2        Q.    Okay.  Do you do anything to follow this

3    policy that is written here?

4        A.    I guess I'm not understanding.

5        Q.    Well, it says "To the extent possible the

6    confidentiality" -- Strike that.

7              It says "To the extent possible, your

8    confidentiality and that of any witnesses and any

9    alleged harasser will be protected against unnecessary

10    disclosure."

11              My question to you is:  What do you do to

12    comply with this policy?

13        A.    To the extent possible.  If I'm talking to an

14    individual that's raising a concern, in my best efforts

15    to -- to the extent possible.  If I need to act upon

16    that situation, I'm going to have to disclose details

17    of that conversation.

18        Q.    And why do you try to do it to the extent

19    possible?  Do you know why you would try to maintain

20    confidentiality?

21        A.    If there are situations that would come up in

22    which an employee would want to remain nameless, I will

23    do that as long as I possibly can.  But if it's a

24    direct situation which they're telling me about a

1   specific situation, I am going to be forthcoming with
2   that information.

3       Q.   Okay.  You will not maintain their
4   confidentiality when they tell you that someone
5   harassed them?  You will disclose their name to the
6   alleged harasser?

7       A.   I want to be clear in saying this.  If
8   somebody comes to me and says, This happened to me, I
9   need you to do something about it, I would go to the
10  person that is doing this and say, This has been
11  brought to my attention, and investigate it in that
12  said manner.

13           Obviously if that -- If a certain situation
14  happened between two people, they can draw their own
15  conclusions on that.  I'm not going to speculate on
16  that.  If it's a situation that's been brought to my
17  attention that I can investigate without disclosing
18  that information, I will not disclose that information.
19  Again it's a case-by-case situation.

20      Q.   So in some cases you disclose the identity of
21  the person bringing the allegation and, other cases,
22  you will not?

23      A.   It's a case-by-case basis.  If there was any
24  situation in which that information would be shared, I

1   would make sure that the person that shared it with me

2   would be comfortable with that.

3       Q.   Well, I guess the reason you're doing it is

4   because it's important to you to get information

5   whether or not the allegations are true?

6       A.   I need to have all the information.  And then

7   we need to be able to investigate to figure out what

8   exactly happened.

9       Q.   What is the -- Why do you investigate the

10  allegations?

11      A.   Because there's two sides to every story.

12      Q.   So you want to get the --

13      A.   I want to get the most information as I can.

14      Q.   So you want to get the story of the

15  individual claiming harassment and the story of the

16  individual who is saying that they did not harass?

17      A.   Any witnesses.

18      Q.   And all the witnesses?

19      A.   Absolutely.

20      Q.   So you want to give everyone an opportunity

21  to express themselves about the facts of the case?

22      A.   I would want to ask everybody involved what

23  their interpretation of what happened is, yes.

24      Q.   And you try to do that in order to know both

1   sides of the story, like you said?

2        A.   Yes.   I want to have everybody's

3   interpretation of the situation that occurred.

4        Q.   So that you can determine whether discipline

5   should be issued?

6        A.   Based on the investigation, we do review it

7   and take the appropriate steps no matter what the

8   situation may be.   If it results in discipline, it

9   results in discipline.

10        Q.   Well, part of the reason you do the

11   investigation is to determine whether the allegations

12   are true?

13        A.   Part of the investigation is to see, yes,

14   what has been said.   It's not so much to see what's

15   true or not.   I need to make sure that I have witnesses

16   that are either acknowledging this said behavior has

17   happened or see if it's -- see what the other side of

18   the story is.   I need to see all aspects of the

19   situation.

20        Q.   You want to hear from all sides?

21        A.   Right.   I'm not in a position to decide

22   what's true or not.

23        Q.   You want to hear from all sides including the

24   person claiming harassment and the person claiming they

Olson, Amanda

1   were harassed?

2       A.   Absolutely, yes.

3       Q.   Okay.  So you give them an opportunity to

4   speak their minds?

5       A.   Yes.

6       Q.   And if they wanted to prepare a conversation

7   form, you let them?

8       A.   The situations that I've encountered, nobody

9   has ever come to me with a prepared conversation form.

10      Q.   But if they want to prepare one, you will not

11  stop them?

12      A.   Based on the conversation we're having, yeah.

13  If they're not filling out a conversation form, I'm

14  going to be filling out a conversation form.  The

15  conversation will be documented.

16      Q.   But it's fair to say that an employee who is

17  either accused of harassment or anything else has every

18  right to prepare a conversation form?

19      A.   I don't see why not, no.  If they wanted to

20  prepare a conversation form and submit it to me, I

21  would find that to be acceptable.

22      Q.   Are you concerned that revealing the name of

23  the individual accusing another of harassment could

24  result in retaliation against the individual

1    complaining?

2        A.    Personally that's not a fear of mine, no,

3    because we do have these policies in place that

4    institute that this is not going to happen.  So I'm

5    able to go into work every day knowing that that

6    practice is not happening.

7        Q.    Are you ever worried that that can happen,

8    though?

9        A.    Anything can happen.  I can't speak to the

10   behaviors of the rest of the workforce out there.

11       Q.    Have you now told me everything you do to

12   comply with the policy we read as paragraph -- as

13   Exhibit No. 2?

14       A.    Yes.  I would say yes.

15       Q.    And it's also true that when the

16   investigation is complete, you inform the individual

17   complaining about the outcome of that investigation?

18       A.    Yes.

19       Q.    Have you ever issued any suspensions

20   personally since -- during your period of work with

21   R&O?

22       A.    Yes.

23       Q.    Who did you suspend?

24       A.    My employee Jackie Zepeda.

1          Q.    Anyone else?

2          A.    No.

3          Q.    Have you terminated any -- Strike that.

4                Have you engaged in any terminations during

5     your employment at R&O?

6          A.    Within my direct office, yes.  Have I

7     participated in conversations of termination through

8     R&O as an organization?  Yes.

9          Q.    Who did you terminate personally?

10         A.    Me personally?

11         Q.    Yes.

12         A.    A woman named Norma Navarro.

13         Q.    And why did you terminate her?

14         A.    Dishonesty.

15         Q.    How did you initially become aware that

16    Ms. Jordan had a problem with Lewis Gregg?

17         A.    I was at the Joliet facility that day.  I

18    don't know the exact date off the top of my head.  And

19    I believe her supervisor came to me and handed me --

20    handed me a note, and I reviewed the note.  And Jordan

21    was on the site, and that's when I directly spoke with

22    her.

23         Q.    Who was that supervisor that handed you the

24    note?

1      A.   I believe it was Ray Ebner, but I'm not 100

2   percent sure.

3      Q.   Was the supervisor at that time Ray Ebner, or

4   was it Lewis Gregg?

5      A.   It was Lewis Gregg.  She was just in a

6   transition of moving from first to second, I believe,

7   shift, which would have meant changing supervisors.

8      Q.   Okay.  She was moving from -- Can you say

9   that again.  I'm sorry.

10     A.   At that time she was in a transition of

11  moving from first shift to second shift or it had just

12  happened.  So her supervisor would be switching.

13     Q.   Had she started the second shift, or no?

14     A.   I would have to look at the dates.  I'm not

15  sure.  I believe at this time when she had brought me

16  this letter she was already on second shift.

17     Q.   Who was the supervisor on second shift?

18     A.   Lewis Gregg.

19     Q.   How about Ray Ebner?  Was that the supervisor

20  of the first shift?

21     A.   Yes.

22     Q.   Okay.  There are three shifts.  Can you tell

23  me the times of the first shift?

24     A.   Approximate times.

Olson, Amanda

Page 71

1          MR. ASONYE:  Okay.  This is -- I mean, this is --

2     It looks like the copy may have been chopped off the

3     bottom.  Well, let's ask the witness.

4     BY MR. ASONYE:

5          Q.   You're familiar with the note, right?

6          A.   I have read the note, yes.

7          Q.   Okay.  Did you read it to prepare for this

8     deposition?

9          A.   I scanned it, yes.

10         Q.   Okay.  Does the note appear complete, or do

11    you believe that some material is missing?

12         A.   I don't know.

13         Q.   Anything jump out at you as missing from the

14    note?

15         A.   I don't know.

16         Q.   Does anything jump out at you as missing?

17         A.   Just that -- with it ending in the middle of

18    the sentence.

19         Q.   At the bottom of the fourth page?

20         A.   Correct, titled 74.

21         Q.   Okay.  Apart from that, do you see any other

22    parts of the note that may be incomplete?

23         A.   I don't know.

24         Q.   Okay.  Well, at the time that the note was

Page 72

1   given to you, though, you had a chance to read the

2   whole thing?

3        A.    Mm-hmm.

4        Q.    That's yes?

5        A.    Yes.

6        Q.    Okay.  And the note you saw was complete,

7   correct?

8        A.    At that time, yes.

9        Q.    Okay.  After you read the note that was given

10  to you, what did you do?

11       A.    I spoke to her in person.

12       Q.    Who did you speak to?

13       A.    Kiona Jordan.

14       Q.    Who was present during your conversation with

15  Ms. Jordan?

16       A.    It was just Kiona and myself.

17       Q.    What did you say to Kiona, and what did she

18  say to you?

19       A.    I asked her to explain this note to me.

20       Q.    What did she say?

21       A.    She revisited the topics that are on this

22  note, but I wanted to hear it.  This is kind of written

23  more in a narrative format.  I needed to know the

24  specifics of, On this time, this date, this was said to

1  me, this was said to me, things of that sort.

2      Q.  How long did that conversation last?

3      A.  I would say approximately maybe 45 minutes.

4      Q.  And what did you do after the conversation

5  with her?

6      A.  If memory serves me correctly, I know it was

7  in the afternoon.  It might have been towards the end

8  of her shift.  I think she went home.  And she asked me

9  to speak to three witnesses on the situation as well.

10  And I met with each of them individually.

11      Q.  Who did you meet with?

12      A.  Actually, there's only two of the three that

13  were present that day.  I met with Seneca Carter,

14  Clarissa James.  And the other witness was Erica

15  Washington, but she was not at work that day.

16      Q.  Who was the second witness?  I'm sorry.

17      A.  Seneca Carter, Clarissa James, and Erica

18  Washington.

19      Q.  Can you tell me what your conversation with

20  Seneca Carter entailed?

21      A.  Seneca Carter, she -- Kiona had told me that

22  she had confided in Seneca, crying a lot of the time,

23  saying how inappropriate Lewis was.  I believe she had

24  brought up something about asking for the home phone

1    number or giving his phone number out, something along

2    those lines.  That was what she had told me.

3            When I had spoke to Seneca, he said that the

4    episodes of crying and coming up to her did not happen.

5    He also said that the phone number conversation did

6    happen but it did not happen just to Kiona.  It

7    happened to all of his group of employees because him

8    becoming a new supervisor, he did not have a

9    work-issued cell phone.  And he was telling them with

10   being on second shift if you weren't coming in for any

11   reason, please give me a call at home and let me know.

12           I also asked him if he felt that Lewis was

13   acting inappropriate in any way.  And he said not to

14   his knowledge.

15       Q.   Is it Ms. Carter?  Did she prepare a

16   conversation form?

17       A.   Seneca Carter is a man.

18       Q.   Okay.  I'm sorry.

19       A.   And I don't -- He did not prepare a

20   conversation form.  I made all the notes for this

21   conversation.

22       Q.   Did you prepare a conversation form for that?

23       A.   No.  I did it in a Word document, as I

24   continued all of the investigation on a Word document.

1        Q.    Why didn't you prepare a conversation form?

2        A.    I don't really deal with most of my

3    investigations on a conversation form when it's

4    something like this.  These conversation forms are more

5    of a one-time instance.  This was going to be ongoing,

6    so I do it in a word document.

7        Q.    Did you ask him to do a conversation form?

8        A.    I did not ask him to do a work conversation

9    form.

10       Q.    Why not?  You didn't want to hear his own

11   words?

12       A.    I wrote everything down in his own words.  It

13   was my investigation.  I conducted it in a Word

14   document.  I didn't need him to do that as I was

15   investigating.

16       Q.    You wrote his comments in your own words?

17       A.    I wrote his comments on my notes and typed it

18   in there verbatim.

19       Q.    But those were your words, not his?

20       A.    I wrote his comments to me in my

21   investigation as they were said.

22       Q.    Tell me about your conversation with James --

23   Clarissa, you said?

24       A.    Clarissa James, I asked her similar

1    questions, you know, had Lewis been acting

2    inappropriately, has Kiona come up to you at any time

3    and said anything.

4            At that time Clarissa told me that Kiona had

5    not said anything to her.  When I asked Clarissa the

6    question of is Lewis Gregg acting inappropriately, she

7    responded back and said the only thing that she had

8    seen him do was tell some inappropriate jokes.

9            I asked her if she could expand to me on the

10   content of the jokes.  And she said no.  She said the

11   only thing that she could tell me is that they were

12   inappropriate for a supervisor to be telling his

13   employees.

14           At that time I asked if there was anything

15   else she wanted to share with me.  She said that was

16   it.  And that's when Lewis received a writeup based on

17   the fact that he was telling jokes.

18       Q.   Who were the jokes told to?

19       A.   I'm assuming -- Clarissa just said that he

20   was telling jokes to his other employees.  And she used

21   it as a plural.

22       Q.   Sexual jokes, racial jokes?

23       A.   She did not give me the content of the jokes

24   even though I asked.

Olson, Amanda

1    Q.    What did she say?

2    A.    It was just jokes that were inappropriate for

3    a supervisor to be telling his employees.

4    Q.    Did you ask her for examples?

5    A.    I asked her for examples, content,

6    everything.  And she would not disclose that.

7    Q.    And you documented all this in your Word

8    Perfect note?

9    A.    Yes, I did.

10    Q.    Did you give her a conversation form to fill

11    out?

12    A.    No, I did not.

13    Q.    Why not?

14    A.    Because I had it all documented in my

15    investigation.

16    Q.    You didn't need her conversation form?

17    A.    No, I did not.

18    Q.    Did you prepare a conversation form?

19    A.    No, I did not.

20    Q.    Did you ask any of these individuals to sign

21    a statement?

22    A.    No, I did not.

23    Q.    Why didn't you ask them to sign the

24    statement?

1      A.    I just had it in my investigation.  I did not

2   ask them to sign anything.

3      Q.    Did you ask them to write anything?

4      A.    No.  It's just a verbal conversation to which

5   I took notes.

6      Q.    The notes that you took, were they that you

7   summarized your words or their words?

8      A.    I wrote down their exact phrases as they said

9   them to me.

10     Q.    How about Erica Washington?  What was your

11  conversation with her?

12     A.    I didn't get to have a conversation with

13  Erica Washington.  She never rushed to work.  I had

14  exchanged -- Previous to this situation, I had

15  exchanged some different phone messages with her in

16  regards to just if she was coming back to work or if it

17  was job abandonment.  And when this came up, I never

18  spoke to her after that.

19     Q.    Was she fired or did she quit?

20     A.    She never -- Three-day no-call, no-show,

21  which is voluntary resignation.

22     Q.    Did she ever complain about sexual

23  harassment, to your knowledge?

24     A.    Erica Washington?

1        Q.    Yes.

2        A.    No, she did not.

3        Q.    Did you make any attempt to call her at home

4    to follow up on this investigation?

5        A.    I had talked to -- I had called her numerous

6    times before and after this investigation to which we

7    never had -- I never connected to her since.

8        Q.    I'll show you what is marked as Exhibit 19a.

9    I would like to ask if you recognize that document.

10       A.    I do.

11       Q.    Okay.  What do you recognize the document to

12   be?

13       A.    This is my notes from when I talked to Kiona

14   Jordan when she presented me with the note and my

15   conversation.

16       Q.    Okay.  This is a summary of your

17   investigation?

18       A.    Yes.

19       Q.    Here you say in the second full paragraph --

20   I guess it's probably the third -- regarding Seneca

21   Carter, you say "We spoke to Seneca Carter."  You say

22   "we."  Who was in the conversation?

23       A.    My listing at the top indicates Don Chapman.

24   I didn't remember if I had a witness.  He must have

1    been there with me.

2        Q.   So there were two people in the conversation

3    with Carter?

4        A.   Yeah.  If Don -- If Don was with me, he

5    stayed through the whole thing.  I did these

6    consecutively after I got done talking to Kiona.

7        Q.   Okay.  So was this document prepared all on

8    the same day or was it prepared -- Did you add to it?

9        A.   No.  This document, when I interviewed the

10   witnesses, it was taken on a memo pad.  And when I got

11   back to the office, I typed it up.

12       Q.   So it was typed up on June 30, 2006?

13       A.   I would say that that's pretty accurate, yes.

14       Q.   So you say that you spoke to Seneca Carter

15   and that you asked him if at any time he felt that

16   Lewis was acting inappropriately.  Is that what you

17   asked?

18       A.   Yes.

19       Q.   Did you ask him anything else?

20       A.   I asked him -- I reviewed the three things.

21   Kiona had stated that he had asked her to come over to

22   watch X-rated movies, asked her to go out with him

23   repeatedly, and that he kept asking for his phone

24   number and, in turn, gave him hers.  And I asked Seneca

```
 1    about Kiona mentioning that she confided in him and the
 2    crying episodes, which he said that that did not occur.
 3    I asked.
 4         Q.   Well, let's go over your notes.  At the
 5    time -- You prepared the notes at the time that it
 6    occurred, right?
 7         A.   Correct.
 8         Q.   So the notes would have reflected the
 9    incidents as they occurred?
10         A.   Correct.
11         Q.   Okay.  And this happened in 2006, correct?
12         A.   Correct.
13         Q.   Okay.  Can you look at your entire summary
14    and tell me if it's a fair and accurate reflexion of
15    what happened that day?
16         A.   Yes, this is accurate.
17         Q.   Okay.  Is there anything on this document
18    that you would like to change that's not true?
19         A.   No.
20         Q.   Okay.  Anything you would like to add or
21    remove?
22         A.   The only thing I'll add to it, as this was a
23    document that was started on June 30th, obviously I had
24    continued to add to it as we had these other
```

1    to everybody that's involved in the incident to make

2    sure that everything is matching up.

3        Q.   Before you would issue discipline?

4        A.   Depending on whatever the situation is, not

5    so much as discipline, any conversation.

6        Q.   Is it fair to say that when you interviewed

7    Clarissa James, you also did not want to receive any

8    hearsay?

9        A.   I would say that's valid.

10       Q.   Okay.  And also when you interviewed Kiona

11   Jordan, you did not want to receive any hearsay

12   information?

13       A.   When interviewing, I don't really want to be

14   filtering out the hearsay.

15       Q.   Why do you think hearsay is not important?

16       A.   If somebody provides me with somebody else I

17   need to talk to to validate a conversation, I would

18   rather go directly to them than just trust that.

19       Q.   That's common sense?

20       A.   I would say so, yes.

21       Q.   Okay.  Your note on Exhibit 19a goes on to

22   say "I spoke with Clarissa James.  She said that in her

23   opinion Lewis Gregg was very friendly to everyone in

24   the department.  The only inappropriate thing she felt

Olson, Amanda

1    he was doing was telling jokes.  I asked her what kinds

2    of jokes and she just said they were inappropriate for

3    a supervisor to be telling his employees."

4            Your memo does not include you asking her for

5    any examples, does it?

6        A.    No, it doesn't.

7        Q.    Okay.  Your memo doesn't include whether or

8    not you asked her whether they were sexual jokes?

9        A.    The document doesn't reflect that, no.

10       Q.    The document doesn't reflect and your notes

11   do not reflect the names of the employees who were

12   present to hear the jokes?

13       A.    Those names were not disclosed.

14       Q.    Well, your summary doesn't even say you asked

15   for names?

16       A.    I know what I said in the conversation.  This

17   does not reflect that.

18       Q.    Okay.  You also did not write down in this

19   memo why or that you asked her why she felt that the

20   jokes were not appropriate?

21       A.    In this document, no.

22       Q.    Okay.  But you do -- But you did ask her if

23   she had been a witness to anything that was being said

24   specifically to Kiona, and she said no?  You asked her

Page 88

1    that?

2         A.    I asked her if there was anything

3    inappropriate in his behavior, to which she responded

4    with the only inappropriate thing was the jokes.

5         Q.    Well, I'm looking at the next sentence.    It

6    says "I asked her if she had been a witness to anything

7    that was being said specifically to Kiona, and she said

8    no."   That is true, correct?

9         A.    Well, yes, that was true.    As these were the

10   three witnesses that Kiona wanted me to speak to to

11   validate her argument, I would think that she would

12   know that.    That was why I asked her that question.    I

13   didn't pick these witnesses.    They were given

14   specifically to me.

15        Q.    Well, you go on to say that James heard that

16   comments had been made to Erica?

17        A.    Mm-hmm.

18        Q.    Do you see that part?   Is that correct?

19        A.    I see that there, yes, I didn't recall that,

20   but I read it there now.

21        Q.    So it's fair to say that James told you that

22   Gregg had made comments to Erica?

23        A.    Mm-hmm.   I see that here, yes.

24        Q.    Okay.   Well, your statement is true?

```
 1    BY THE WITNESS:

 2         A.   Can you please repeat it.

 3         Q.   Why didn't you ask James to write the note or

 4    prepare a conversation form in her own words so that

 5    you wouldn't need to use the "say, slash, know" type --

 6         A.   Because I was conducting the investigation

 7    and I didn't require any of the witnesses to prepare

 8    any sort of document for me.

 9         Q.   Okay.  Let's talk about Erica Washington.

10    Your note says that she came in to work on that day,

11    picked up her checked and left?

12         A.   Yes.

13         Q.   Was that her last day?

14         A.   That was the last day we had seen her.

15         Q.   Okay.  So Ms. Washington, that was the day

16    you saw her last?

17         A.   I didn't physically see her.  I received that

18    feedback from her supervisor, that she came in to pick

19    up her check and left.

20         Q.   And to your knowledge she never came to work

21    after that?

22         A.   She did not come back to work after that, to

23    my knowledge.

24         Q.   You're certain she wasn't fired?
```

1       Q.    Did you leave her a message?

2       A.    Yes.  I never, ever had a verbal conversation

3    with her.  I can tell you there were two conversations

4    because one was to ask her directly about this

5    situation here.  The other was to ask her if she was

6    planning on coming back to work, neither of which my

7    call was returned.

8       Q.    Did you leave her a voicemail message?

9       A.    Yes.

10      Q.    Did you tell her in your voicemail what you

11   were calling her for?

12      A.    I don't remember exactly what my voicemail

13   message stated.  But I told her that she needed to give

14   us a call at the human resource office and talk to

15   myself or Mike Saltzman.

16      Q.    Okay.  19a, page 2, states "I then spoke to

17   Lewis Gregg."  Why did you speak to Lewis Gregg about

18   the situation?

19      A.    Because the accusations were towards him.

20      Q.    You wanted to get his own side of the story?

21      A.    Yes.

22      Q.    What did you say to him when you started

23   talking to him?

24      A.    When I spoke to him, I took the three points

1    from the previous page that Kiona had specifically said

2    were instances that happened in her department and

3    said, This is what's been brought to my attention, can

4    you please comment on all of these, to which we went

5    through there.

6         And he came back at me with talking about

7    Kiona and that it was difficult to work with her, as it

8    says there in the first paragraph.

9    Q.    Did you suspend him?

10   A.    At that time, no.

11   Q.    Did you suspend him ever?

12   A.    No.

13   Q.    Okay.  Did you suspend him at any time

14   pending investigation?

15   A.    No.

16   Q.    Why not?

17   A.    It's not the path that we chose to go with

18   him.

19   Q.    You chose to let him work and get paid while

20   the investigation was going on?

21   A.    Yes.

22   Q.    Why did you choose to do so?

23   A.    That is the case by case that we chose for

24   that with, in turn, moving Kiona to a different shift.

Page 95

1      Q.    What about his case made it -- gave him the

2    opportunity or earned him the opportunity to stay

3    working with pay during the investigation?

4      A.    I didn't have anything to back up the

5    accusations that were made.

6      Q.    Well, you got some backup that he told

7    inappropriate jokes?

8      A.    To which it also says there he was written

9    up.

10     Q.    Yeah.  But couldn't that cause him to have

11   been suspended pending investigation?

12     A.    This investigation that we had at hand to the

13   three witnesses that were told had specific knowledge

14   of the situations didn't provide us with anything.  So

15   we made both accommodations to move Kiona at her

16   request, and we left Lewis Gregg working.

17     Q.    Well, I'm focused more on the suspension

18   pending investigation.

19     A.    It was not warranted.

20     Q.    Okay.  Why wasn't it warranted?

21     A.    I didn't have anything to support a

22   suspension.

23     Q.    Okay.  At the time, though, you were still

24   going to investigate but you -- because you were going

1    to be calling Erica Washington, right?

2         A.    Yes.

3         Q.    Why didn't you suspend him pending the time

4    that you at least had an opportunity to try to contact

5    Erica Washington?

6         A.    I didn't feel it was warranted.  And as I

7    told you before, it's a case-by-case basis that we look

8    at that.

9         Q.    So his case wasn't bad enough to warrant a

10   suspension pending investigation?

11        A.    The situation that was brought forth did not

12   provide enough information for us to warrant that type

13   of disciplinary action at that time.

14        Q.    So the suspension pending investigation

15   was -- it's a form of discipline?

16        A.    It was just not warranted.  It was not a

17   warranted form of practice at that time, no.

18        Q.    Well, suspension pending investigation, is

19   that a form of discipline?

20        A.    I would say no.

21        Q.    Well, it's without pay.  That is a form of

22   discipline, isn't it?

23        A.    We do suspension -- Like the example I gave

24   you before too, we do suspensions pending investigation

1    is she did not want to be on second shift. Gregg was

2    on second shift. Her position at this time was on

3    second shift. To accommodate one of her other

4    situations that she had brought to our attention is she

5    wanted to be back on first shift. So we were able to

6    move her to a first-shift kitting position.

7         Q.    Why didn't you move Gregg?

8         A.    Why would I?

9         Q.    You need to answer the question.

10        A.    I have no point to move Gregg.

11        Q.    Okay. Did you consider moving Gregg?

12        A.    No. I had no reason to.

13        Q.    Did you change his class?

14        A.    No.

15        Q.    Why not?

16        A.    Because he was still a supervisor. Nothing

17   about his position changed.

18        Q.    Was he disciplined at all?

19        A.    He received a writeup.

20        Q.    It says "Due to Kiona's situation, we moved

21   her effective Monday, July 3rd, to a first-shift

22   kitting position."

23              Did you ever tell her that she was going to a

24   first-shift kitting position?

1       A.    This says "kitting."  But by the time she

2    started, which would have been three days later, it

3    might have been to a position in repack.  We move

4    positions for employees daily.

5       Q.    It says here "On Wednesday, July 5th, we

6    moved Kiona Jordan to another first-shift position open

7    up in repack reporting to Norma Vargas."  Is that true?

8       A.    Yes.  And I --

9       Q.    Again, this was a later move; is that

10   correct?

11      A.    It would have been after July 3rd, yes.

12      Q.    Okay.

13      A.    And it also gives you the background.

14      Q.    There is no question pending.

15            You say again this was a later move.  Did you

16   mean lateral move?

17      A.    I believe I did.

18      Q.    Okay.  Now, in this repack position, she went

19   from a Class 3 to a Class 1; is that correct?

20      A.    I'm not familiar on what positions had the

21   classes.  I do remember it being a difference in class.

22   I'm not sure on which ones.

23      Q.    Okay.  You indicated that there was a

24   warning -- written warning issued to Lewis Gregg?

1      A.    Mm-hmm.

2      Q.    Yes?

3      A.    Yes.

4      Q.    Okay.  Did you meet with him to go over the

5   warning?

6      A.    Yes.

7      Q.    Okay.  Did you sign the warning?

8      A.    I signed the warning, and I believe he did.

9   It was on a warning form, not to be confused with a

10  conversation form.

11     Q.    Okay.  Did both of you sign the warning?

12     A.    I signed the warning.  The employee reserves

13  the right to refuse to sign the warning.  I wouldn't

14  know unless I saw it.  But that would be the case.

15     Q.    How many warnings did you give him?

16     A.    I gave him one warning.

17     Q.    Okay.  Did you attach anything to the

18  warning?

19     A.    I attached, I believe, notes in regards to

20  what the warning stood for.

21     Q.    Handwritten notes?

22     A.    Typed notes, I believe.  I'm pretty sure it

23  was typed notes.

24     Q.    Was it -- Do you know what was in the typed

```
1        A.    I do.  Okay.

2        Q.    Okay.  What do you recognize this to be?

3        A.    This is my form that I typed out.

4        Q.    Okay.  This is the warning?

5        A.    Mm-hmm.

6        Q.    Is this the warning you gave Mr. Gregg?

7        A.    Yes.

8        Q.    Is page 2 correct or not correct of the

9   warning?

10       A.    I don't recall.

11       Q.    So do you remember what was attached to the

12  warning you gave him?

13       A.    I remember discussing the handbook which

14  would make this appropriate.

15       Q.    Are you sure that the handbook was attached

16  to the warning or are you guessing that?

17       A.    I can't be certain, no.

18       Q.    So you don't remember what was attached to

19  it?

20       A.    I remember this front page as being my work,

21  yes.

22       Q.    But you don't remember what was attached to

23  it?

24       A.    No.
```

Page 112

1    the first shift?

2        A.    Correct.

3        Q.    So at the time of your investigating, she

4    didn't come to you and say, Take me to the first shift?

5        A.    No.

6        Q.    Okay.   The reason you transferred her to the

7    first shift was to get her away from Lewis Gregg at the

8    time?

9        A.    At the time that we -- We had been waiting

10   for first shift for her to open up in the kitting area.

11   And we told her we would accommodate that at that time.

12             When this situation arose, we took a look

13   again at the other first-shift positions to see if

14   there was something else to kind of alleviate her

15   feeling uncomfortable around Lewis and to accommodate

16   her original request of moving to first shift.

17       Q.    That request to move to the first shift came

18   before she made the complaint?

19       A.    Correct.

20       Q.    Okay.   So you weren't -- And it was -- had

21   been concluded that she wasn't going to be moved at

22   that time when she made the request?

23       A.    At that time, I did not have a position open

24   for her doing kitting in first shift at that time.

1    Q.    Okay.

2    A.    And I told her that -- This time she came to

3    me and said she would be willing to do any position as

4    long as it was on first shift due to her child care

5    restrictions.  And we were kind of in a holding pattern

6    waiting for something to open up.

7    Q.    That request occurred in May?

8    A.    It was prior to the incident.  I don't know

9    the exact date.

10   Q.    The incident where you say she wanted to be

11   on the first shift occurred when three people were

12   moved from the first shift to the second shift?

13   A.    I believe it was three employees, yes.

14   Q.    So there were three employees and they were

15   moved, and they didn't like it?

16   A.    Mm-hmm.

17   Q.    Yes?

18   A.    Yes.

19   Q.    That had nothing to do with the sexual

20   harassment complaint?

21   A.    No.  Separate instances.

22   Q.    Okay.  You considered the request in May to

23   move her, and at the time you didn't have a spot and

24   you told her she had to stay on the second shift

1    because you had no spot on the first shift?

2         A.    I remember giving Kiona two options.  We had

3    several phone conversations.  And I said, Kiona, I

4    don't have anything open in first shift -- At this time

5    she wanted to remain a kitter -- I don't have anything

6    open on first shift, not to mention that they were

7    moved off of that to the second.  I said, We can do one

8    of two things.  I said, If you're having child care

9    restrictions, we can end your employment and leave you

10   in good standing with a rehire status until we have

11   something else become available on first shift and we

12   would rehire you; or you can stay on second, you can

13   wait to be transferred to anything that -- to a first

14   shift kitting position.

15         And at that time she told me, Amanda, I will

16   take anything on first shift.  So that opened it up to

17   other arenas in her skill set.

18         Q.    And that was in May 2006?

19         A.    May sounds about right.  It was before her

20   initial sexual harassment complaint.  I don't know the

21   exact date.

22         Q.    But she was told at that time that she

23   couldn't transfer, is that correct, to the first shift?

24         A.    She could not?

1        A.    Correct.

2        Q.    And she had made arrangements for her

3    children and could continue; is that correct?

4        A.    Correct.

5        Q.    But she couldn't permanently remain on the

6    second shift; is that correct?

7        A.    That's what she said, yes.

8        Q.    At the end you say that you ended the

9    conversation on a positive note.  Was that a fair

10   assessment?

11       A.    Absolutely.

12       Q.    And that the situation was resolved; is that

13   right?

14       A.    Absolutely.

15       Q.    And then you say you will need to look at

16   moving her to a first-shift position if one indeed

17   became available, correct?

18       A.    Correct.

19       Q.    And she was to remain in the second-shift

20   position if one didn't become available?

21       A.    Correct.

22       Q.    Okay.  The conversation was resolved at that

23   time?

24       A.    Absolutely.

1      Q.    Okay.   So that is the request you were saying

2    that she made to transfer to the first shift?

3      A.    Yes.

4      Q.    She didn't make that request again after this

5    note, right?

6      A.    No.   This is still just the pending request.

7      Q.    Okay.   Just to be clear, she did not request

8    to be given a reduction in her class, did she?

9      A.    When she said she would go to first shift,

10   she said she was open to any position.

11     Q.    She didn't ask you to reduce her class, did

12   she?

13     A.    We didn't discuss classes.   Classes really

14   don't pertain on an employee level anyway.   It's for

15   billing purposes.   She said she was open to every

16   position.   And we do have quite a few positions that

17   are different class positions.

18     Q.    She didn't ask to be suspended, did she?

19     A.    No.

20     Q.    She didn't ask to be put in a position where

21   she would work in a dirty environment, did she?

22     A.    It's a warehouse.   The entire warehouse is

23   dirty.

24     Q.    But I'm asking you a question, though.   She

Page 135

1      Q.    Why didn't you make an attempt?  Because this
2  was important to find out exactly what Ms. Jordan said.
3      A.    Me reading my writing right here, in the "in
4  so many words" section is what the employees said to
5  me.
6      Q.    Right.
7            Why didn't you ask the employee, Can you tell
8  me exactly what Jordan said?
9      A.    That she filed a sexual harassment suit
10 against Gregg so she could go to first shift.
11     Q.    Well, it says that she said that in so many
12 words.  She didn't quote her, right?
13     A.    That's what was told to me at this time.
14     Q.    I'm trying to figure out why you didn't try
15 to pin the witness down as to tell you the exact words
16 that Ms. Jordan used.
17     A.    Probably for the same reason the other
18 witness wouldn't tell me the context of the jokes.  I
19 can only go with the information that's provided.
20     Q.    So this Witness No. 1 was talking to another
21 employee, correct, and not Jordan herself?
22     A.    Correct.
23     Q.    So you would have considered that hearsay?
24     A.    Correct.

1      Q.    That witness never told you -- Witness 2
2    never said that Kiona lied?
3      A.    In my verbal conversation with her, it was
4    said.
5      Q.    Okay.  But you didn't document that?
6      A.    Apparently this isn't a good reflection of
7    that.
8      Q.    So would you like to now change the quotes
9    that you got from the two witnesses, or are you just --
10     A.    No, I would not.
11     Q.    You also got conversation forms from them,
12   right?
13     A.    I don't have the copy of the file.  I believe
14   they were done, yes.
15     Q.    Are those correct or incorrect also?
16     A.    They were correct.  I typed them as they were
17   sitting in front of me.
18     Q.    Okay.  So they would be more accurate than
19   the summaries you have in Exhibit 21, right?
20     A.    Absolutely.
21     Q.    And they would contain everything the
22   witnesses said?
23     A.    Their statement was documented on the
24   conversation forms, their statement.

1   the information, correct?

2        A.   Yes.

3        Q.   And you go on to say you will be suspending

4   her for three days, no pay while you investigate?

5        A.   Yes.

6        Q.   And you did that?

7        A.   Yes.

8        Q.   You made the decision to suspend her for

9   three days with no pay after speaking to the two

10  witnesses?

11       A.   Yes.

12       Q.   You go on to say, When she returns -- being

13  Jordan -- she will continue her repacking position and

14  if she was not happy with that we would -- you would

15  accept her resignation, correct?

16       A.   Yes.

17       Q.   She had to stay in repacking or resign?

18       A.   That was the position that she had at that

19  time, yes.

20       Q.   Okay.  She had no choice but to stay in

21  repacking, or be terminated?

22       MS. HUBBARD:  Objection.  That is not what the

23  document says.  That is not her testimony.

24       MR. ASONYE:  She can answer.

1        MS. HUBBARD:  You're misconstruing her testimony.

2        MR. ASONYE:  She can correct me.

3        MS. HUBBARD:  Well, don't try to put words in her

4    mouth.

5        MR. ASONYE:  She can answer or correct me or she

6    can say I'm wrong.

7    BY THE WITNESS:

8        A.    The position that she had to come -- Her

9    assigned position at that point in time was repack.  In

10   the future, if she wanted something else, just as every

11   other employee has the opportunity to take on a

12   different position.

13           But at that time, yes, she was to come back

14   to her position, which at the time was repack, or we

15   would accept her resignation.

16       Q.    Okay.  She had no other options?

17       A.    She has every option as everybody else does.

18       Q.    Well, her options were go back to repacking

19   or resign?

20       A.    Those were -- Yes, at that point in time,

21   come back to work at a position or resign.

22       Q.    Okay.  No other options?

23       MS. HUBBARD:  Objection.  That's not her

24   testimony.

1    she wasn't -- that she was more reluctant to cooperate?

2        A.    Mike Saltzman, the HR manager, when he

3    contacted Robert Dillon to ask that those two witnesses

4    come and talk to us -- She didn't want to talk to HR.

5    And when she did come in and end up meeting with Mike

6    Saltzman and myself, you know, when we were trying to

7    put together the statement, she didn't want her name

8    used at all.  But we told her that to the best of our

9    ability, we would keep it nameless and just kind of a

10   statement for as long as we could.

11       Q.    Now, she -- The Witness No. 1 was more eager

12   to cooperate?

13       A.    Neither one of them were really thrilled

14   about us talking to them.  But when it came down to it,

15   she was willing to answer any questions that we had or

16   anything of that short.

17       Q.    Now, Witness No. 1 had no firsthand

18   information directly from Jordan, right?

19       A.    Correct.

20       Q.    The one that was reluctant -- more reluctant

21   to cooperate was the one that supposedly actually heard

22   directly from Ms. Jordan?

23       A.    Correct.

24       Q.    And then you assured her that you will not be

1    giving out her information?

2        A.    I told her for as long as I could keep that

3    confidential that I would.

4        Q.    And then she went on and gave you the

5    statement?

6        A.    Yes.

7        Q.    Why did you assure her that you would not be

8    giving out her information?

9        A.    For the same confidentiality reasoning.  She

10   didn't want me to go back to Kiona and say that her

11   name was the one that said this statement.

12       Q.    So you assured her that she essentially would

13   not be retaliated against?

14       A.    I told her that I would not be sharing any of

15   her personal information with anybody in regards to

16   this investigation.

17       Q.    And that was also to help her be truthful to

18   the best extent possible?

19       A.    Sure, comfortable.

20       Q.    With respect to Witness No. 1, what

21   department did she work in?

22       A.    I don't know what department either one of

23   them worked on.  At the time Robert Dillon was a

24   supervisor of the dock area.

1      Q.   Okay.

2      A.   What position they maintained under him, I'm

3   not sure.

4      Q.   They both worked under Mr. Dillon?

5      A.   Yes.  But for the off-shifts like that, our

6   managers oversee the entire building, which is several

7   areas.  I'm not sure what area they worked in.

8      Q.   Do you know what shift?

9      A.   I don't.

10     Q.   The dock, how far is the dock from the

11  location where Kiona worked?

12     A.   I don't know.

13     Q.   Did you try to find out to see if it's close

14  enough where they would see each other during the day?

15     MS. HUBBARD:  Objection as to relevance.

16  BY THE WITNESS:

17     A.   I don't know.  I don't know what shifts they

18  were on, if they were on the same shift or what work

19  area.  I don't know.

20     Q.   Well, why didn't you try to -- Why didn't you

21  try to find out how closely they are with respect to

22  the locations where they worked?

23     A.   It really wasn't part of my investigation.

24  Since I wasn't releasing the information, I didn't

1       A.    I do.

2       Q.    Okay.  Is this the conversation form from

3   Witness 1?

4       A.    Yes.

5       Q.    Now, at the bottom, it has Witness 1.  It has

6   Constance Daniels.  Is that who the Witness 1 was?

7       A.    I do remember Constance Daniels being one of

8   the witnesses, yes.

9       Q.    Okay.  And she signed it?

10      A.    I don't believe that that was -- Oh, you know

11  what, I apologize.  We did go back and have her sign

12  that.

13      Q.    Okay.  Did you have Witness 2 sign hers too?

14      A.    Witness 2?

15      Q.    Yes.

16      A.    That, I'm not aware of.

17      Q.    Did you go back to her to have her sign hers

18  too?

19      A.    I didn't do this portion of it.  Mike

20  Saltzman did.

21      Q.    How did you know that this was taken back to

22  the witness to sign?

23      A.    I advised him to do that.

24      Q.    Okay.  So did you ask him to take both

1    documents of both witnesses or just one document?

2        A.    I asked him to contact both of the witnesses

3    and tell them that we need them to verify that this is

4    still correct and that's what we were going to turn in.

5        Q.    And then you asked him to get signatures?

6        A.    Correct.

7        Q.    Why did you ask him to get signatures?

8        A.    Because we had "witness" in there and not

9    their names.  So we needed to have it registered to

10   them saying that this was their statement.

11       Q.    Any other reason you wanted them to sign it?

12       A.    No.

13       Q.    Did you want them to make sure that the

14   statements are true?

15       A.    I think it's just mainly again to verify

16   Witness 1 and Witness 2 so that if it came back up at a

17   later date there wasn't any misrepresentation or

18   misunderstanding on who each party was and that this

19   was exactly what we turned in.

20       Q.    Well, did you want them to sign the statement

21   to indicate that the statement is true?

22       A.    Yes.

23       Q.    Okay.  So they were supposed to sign that the

24   statement is true, at least from the direction you

Page 159

1      Q.    Why didn't you ask the witness to sign the

2   document there and then after?

3      A.    Because conversation forms don't require

4   signatures.

5      Q.    Did you at least show it to them to see if it

6   was true?

7      A.    Absolutely.  I mean, they had the same access

8   watching the screen as I typed.

9      Q.    Did she tell you that what you typed is

10  correct?

11     A.    Yes.

12     Q.    I show you what is marked as Exhibit No. 20.

13  Do you recognize this one?

14     A.    Yes.

15     Q.    This is a conversation form prepared by

16  Robert Dillon?

17     A.    Correct.

18     Q.    And he signed it at the bottom.  Is that his

19  signature?

20     A.    That is his signature.

21     Q.    Now, this is about -- He talks about the two

22  statements that we just went through, correct?

23     A.    Correct.

24     Q.    Now, is this a statement that you were saying

Page 160

1   that you later on realized not to be true, that --

2   Strike that.

3           This says that on February -- On Friday,

4   6/30/06, two employees told him. Now, June 30, '06,

5   was the same day that Erica Washington came up and

6   picked up her check and left; is that correct?

7       A.   Correct.

8       Q.   When did you receive this document for the

9   first time, if you ever did?

10      A.   I did receive it, and I don't know the date.

11      Q.   Okay. Did you receive it before or after you

12  spoke to the witnesses?

13      A.   I don't know.

14      Q.   I would like to show you what we marked as

15  Exhibit No. 22. Do you recognize this document?

16      A.   Yes.

17      Q.   Okay. You prepared this document?

18      A.   Yes.

19      Q.   It doesn't have a date on it. Do you know

20  what date you prepared this document on?

21      A.   I don't know. It should have a date on it.

22  Looks like it's kind of gone from the copy.

23      Q.   Okay. In the third paragraph you say that it

24  was brought to your attention by multiple witnesses and

1    documentation that Kiona Jordan had filed the sexual

2    harassment claim as a scam.  Do you see that part?

3         A.    Yes.

4         Q.    Who are the multiple witnesses you were

5    referring to?

6         A.    Well, there was the witness, the one witness

7    of the two, and then the witness talking to Robert

8    Dillon that this conversation did take place.

9         Q.    Witness 1 and Witness 2?

10        A.    Well, then, of the Witness 2, which actually

11   had the firsthand conversation, and Robert Dillon by

12   having Witness 2 come and talk to him.

13        Q.    So the multiple witnesses would be Witness 2

14   and --

15        A.    Robert Dillon.

16        Q.    -- Mr. Dillon?

17        A.    Correct.

18        Q.    So it's two witnesses?

19        A.    Multiple, correct.

20        Q.    On documentation, what documentation are you

21   referring to?

22        A.    Conversation forms.

23        Q.    So apart from the conversation forms, there

24   is nothing else you're referring to when you say

1    "documentation"?

2         A.    Just their statements.

3         Q.    Okay.  It goes on to say that you told

4    Ms. Jordan that if she wasn't satisfied with going to

5    repack, you would accept her resignation.  Did you tell

6    her that?

7         A.    Yes.

8         Q.    And then she said that -- Strike that.

9               Ms. Jordan said that she was upset about the

10   way you handled the investigation of Lewis Gregg,

11   right?

12        A.    Correct.

13        Q.    Did you ask her why she was upset?

14        A.    She told me she was upset because he wasn't

15   fired or suspended.

16        Q.    And then what did you say in response to the

17   suspension?

18        A.    I don't have any evidence that proves that he

19   would need to be resulted in that type of disciplinary

20   action.

21        Q.    What type of evidence or proof do you need to

22   suspend?

23        A.    I interviewed the three witnesses that she

24   brought to my attention to which none of them backed up

1      A.    These aren't instances in which she came

2    looking for me.  These are other people in my office.

3    So just like the other witnesses that filled out

4    conversation forms, I had those instances recorded as

5    well.

6      Q.    Well, did you ask Ms. Jordan to fill out a

7    conversation form about whether or not --

8      A.    I never spoke to Ms. Jordan after this.

9      Q.    Just hear me out.  The question was different

10   than you anticipated.

11           Did you ask Ms. Jordan to fill out a

12   conversation form concerning the allegation that she

13   made the comment about setting up Lewis Gregg?

14     A.    No.  She didn't have any feedback for me

15   whatsoever during that conversation, and I never spoke

16   to her after this date.

17     Q.    Did you ask her whether she did it?

18     A.    She had no feedback whatsoever except being

19   adamant about knowing who my two witnesses were, not --

20   I'm not even going to speculate on that, no.

21     Q.    I'm just asking you a simple question.

22     A.    No.

23     Q.    Did you ask her if she did it?

24     A.    No.

1    Q.    Okay.  Did it matter whether or not she did

2    it?

3    A.    Absolutely.

4    Q.    Then why didn't you ask her whether she did

5    it?

6    A.    I don't recall.

7    Q.    Okay.  You assumed she did it?

8    A.    I didn't assume anything.

9    Q.    When Gregg was accused of discrimination and

10   harassment, you gave him a chance to answer each and

11   every allegation, correct?

12   A.    Correct.

13   Q.    Why didn't you give Ms. Jordan a chance to

14   answer each and every of these allegations?

15   A.    She had the same time with me that Lewis had.

16   And instead she chose to spend her time yelling at me,

17   asking for witness information instead of even offering

18   the fact that she didn't do it.  So she had the same

19   opportunity.  She chose to do something different with

20   her time.  I don't know what else to say.

21   Q.    Well, you asked Mr. Lewis whether he did it,

22   right?

23   A.    Mm-hmm.

24   Q.    Yes?

 1        A.    Correct.

 2        Q.    You never asked her if she did it, did you?

 3        A.    I don't recall.

 4        Q.    Okay.  Nowhere in your notes did you say that

 5   you actually asked her or gave her the opportunity to

 6   deny it?

 7        A.    No.

 8        Q.    Because you had already decided to suspend

 9   her as a part of your plan of action before you even

10   spoke to her?

11        A.    Correct.

12        Q.    Before you spoke to her, you had decided that

13   you will suspend her with no pay and that her only

14   choices would be either go to repackaging or resign,

15   correct?

16        A.    Correct.

17        Q.    So it didn't matter whether or not she denied

18   the allegation?  She would have had the same options,

19   correct?

20        A.    I had witnesses.  Correct.

21        Q.    Now, I know I asked you this question.  Now,

22   the witnesses you're talking about are Witness 2 and

23   Dillon?

24        A.    Correct.

1    Q.   No one else?

2    A.   Correct.

3    Q.   Now, in your note on page -- in Exhibit 22

4  regarding your conversation with Ms. Jordan, you say

5  that she was crying hysterically, correct?

6    A.   Correct.

7    Q.   Did you ask her why she was crying?

8    A.   No.

9    Q.   Did she tell you that she felt that her

10  suspension was unfair?

11   A.   No.

12   Q.   Did you consider firing her that day?

13   A.   No.

14   Q.   You didn't ask Ms. Jordan to tell her own

15  side of the story, did you?

16   A.   No.

17   Q.   I'll give you what is marked as

18  Exhibit No. 29.  Do you recognize this document?

19   A.   Yes.

20   Q.   Okay.  This is one of the conversation forms

21  that document her complaint with her mom?

22   A.   Correct.

23   Q.   When was the first time you saw this

24  document?

```
 1     is our VP of human resources.  But it's still -- It's a

 2     local decision.

 3          Q.   When you say that she had no other choices,

 4     she really literally had no other choices beyond what

 5     you presented her?

 6          A.   Work related for working, position-wise?

 7          Q.   Yes.

 8          A.   It was coming back to repack or accepting a

 9     resignation, again, yes.

10          Q.   She couldn't go above your head to get any

11     change, right?

12          A.   You can go above my head and talk to whomever

13     you like, but that's the decision that's been reviewed

14     by not only myself but with management.

15          Q.   Who in management reviewed it?

16          A.   Bob McGee from the -- that I discussed

17     earlier.

18          Q.   Who else reviewed it?

19          A.   Keith Cecil.

20          Q.   Who else?

21          A.   That's it.

22          Q.   Okay.  So they all were aware of the facts,

23     and they agreed that your decision was correct?

24          A.   Correct.
```

Olson, Amanda

1      Q.    And before that you hadn't seen that

2    document, had you?

3      A.    No, I haven't.

4      Q.    Going back to July 3rd, I think you testified

5    that Ms. Jordan was transferred -- was going to be

6    transferred to a kitter position first and then ended

7    up in repack; is that right or wrong?

8      A.    Correct.  And she ended up being on vacation,

9    which is why she didn't start until the 5th.

10      Q.    Why didn't she stay in that repack

11    position -- Why was she transferred a second time?

12      A.    As I said before, these positions come up

13    daily and we move employees daily.  When we made the

14    arrangements for July 3rd, Monday, I had a kitter

15    position open.  That following Wednesday, we had an

16    immediate need in repack.  They moved her to repack.

17    It's not an uncommon practice for any employee.

18      Q.    So the only reason that she couldn't start in

19    that -- work in that kitter position was because you

20    needed her in repack?

21      A.    Can you rephrase.

22      Q.    The only reason she couldn't continue in the

23    kitter position on July 3rd -- after July 3rd was

24    because you needed her in repack?

1      A.    Yes, we had an immediate need in repack.  I

2  don't know what the situation was, if it was a new

3  position gained or turnover issue or what.  But we

4  needed -- an immediate need in repack.  And since she

5  was starting new to the first shift anyway, they moved

6  her into repack.

7      Q.    Any other reason why she was moved from

8  kitter to repack at that time?

9      A.    No.

10     Q.    Who made the decision to move her from

11  repack -- I'm sorry.  Who the made the decision to move

12  her from kitter to repack then?  Was it you?

13     A.    No.  That would come from the operations

14  side, which would either be Don Chapman, Keith Cecil,

15  or Bob McGee.  I don't make decisions on what positions

16  they go to.

17     Q.    How did you come to learn that she had been

18  moved from kitter to repack from -- with respect to

19  July 3rd and July 5th?

20     A.    Someone from the plant had called and said

21  that we're moving her over here.

22     Q.    Because they needed an immediate person

23  there?

24     A.    Due to a need in the repack area.

1      A.    Operations decides who goes where.

2      Q.    Okay.  So when you say "operations," you're

3  talking the same three names you mentioned before, Don

4  Chapman, Keith Cecil, and Bob McGee?

5      A.    Correct.

6      Q.    Okay.  Going back to Exhibit No. 21, the

7  section where you summarize your plan of attack, which

8  is the last paragraph, who made the decision that she

9  would be suspended for three days with no pay while you

10  investigate?

11      A.    I would say that was just myself.

12      Q.    Who made the decision that when she returns

13  from the suspension, she will continue in the repacking

14  position?

15      A.    Myself.

16      Q.    Who made the decision that if she wasn't

17  happy, you would accept her resignation?

18      A.    Myself.

19      Q.    So at that time, it wasn't operations --

20      A.    No.

21      Q.    -- that made the decision?

22      A.    I always let them know what we were doing or

23  the outcome of situations like these in which we're

24  dealing with situations with employees to make sure

1    know.

2         Q.    Okay.  I show you what is marked as

3    Exhibit No. 59.  I would like to refer you to page 6.

4    Here it says that plaintiff was moved to repack

5    position by human resources director Amanda Olson and

6    project manager Don Chapman in order to move her away

7    from Lewis Gregg and accommodate her request.  Is that

8    a true statement?

9         A.    Correct.

10        Q.    So the decision to move her was made by you

11   and Don Chapman?

12        A.    The decision to move her to first shift was

13   done by me.  The position that they filled was done by

14   Don Chapman.  Again, I informed her of this decision.

15        Q.    Now, you testified earlier that she was moved

16   to repack because of an immediate need.  Is that true

17   or not true?

18        A.    She was moved to first shift to accommodate

19   her request.  Being moved to repack was an immediate

20   need, the first position that we had there, yes.

21        Q.    Okay.  The move to repack was because there

22   was an immediate need?

23        A.    Her move to first shift was done by myself.

24   Where they put her on first shift was due to the

1    behavior.  It is not responsive to my question.

2        MR. ASONYE:  You can let her answer.

3    BY MS. HUBBARD:

4        Q    My question is simply, did you ever get

5    told that Lewis Gregg was disciplined, "yes" or "no"?

6        MR. ASONYE:  No, Counsel, she doesn't have to

7    answer "yes" or "no."  She needs to answer it the way

8    she thinks is best.

9                Now take a deep breath.  I know things

10   are getting charged.

11   BY MS. HUBBARD:

12       Q    Were you ever told --

13       MR. ASONYE:  Let her answer.  There's a

14   question pending.

15                Go ahead.  You need to take a deep

16   breath.

17       THE WITNESS:  Amanda looked at me and said, You

18   are being suspended and he is being disciplined.

19   You're being suspended because you lied on him, and

20   we have two witnesses that said that you lied on him.

21   So when you get your three days' suspension, you're

22   going to return to your Class 1 job, Repack.

23   BY MS. HUBBARD:

24       Q    So she did tell you that he is being

1    disciplined; correct?

2        A    Correct.

3        Q    And when did this conversation occur?

4        A    This conversation happened around July, I

5    don't know the exact date.

6        Q    If you look at your EEOC charge, if you

7    look at 2B, C -- 1C, Page 7, you state, On or around

8    July 5 you were demoted to -- from the kitter

9    position to the repack position.  Is this the date of

10   the conversation with Amanda or was that conversation

11   at a different date and time?

12       A    That happened after I was already in

13   Repack.  So it happened after July 5th.

14       Q    The conversation with Amanda?

15       A    The conversation with me being suspended

16   and her telling me that he was being disciplined for

17   what he did.

18       Q    So when did you learn you were going to be

19   reassigned to the repack position?

20       A    I don't know the exact date, but I was

21   told -- Ray Ebner came to me and he said, Kiona, get

22   your things, I need you to come with me.  And I said,

23   What's going on, you know, am I in trouble?  He said,

24   Oh, no, we just need you to work in Repack.  I said,

1    business need.  She was originally set up on the 3rd as

2    a kitter.  On the 5th, they had to move her to repack

3    based on an immediate need.

4       Q.    Because if that immediate need hadn't been

5    there, she would have stayed as a kitter?

6       A.    She could have stayed as a kitter, and that's

7    what we had her set up for.  She could have moved two

8    days after repack too.  I mean, that's -- Every

9    employee faces that same predicament.

10      Q.    If that immediate need had not come up, she

11   would have stayed as a kitter after she was moved?

12      A.    She was set up to be a kitter on July 3rd.

13      Q.    And she would have stayed there had that

14   immediate need not come up in repack?

15      A.    She would have started as a kitter.

16      Q.    And she would have stayed as a kitter?

17      A.    I don't know.  Based on her performance, her

18   attitude.  I can't speculate to that.  She was set to

19   start as a kitter.

20      Q.    And she would have stayed as a kitter until

21   something necessitated another move to another --

22      A.    That's a valid comment.

23      Q.    Is that a yes?

24      A.    There would be no problem with her staying as

Olson, Amanda

1   a kitter provided other situations didn't come into

2   play, yes.

3        Q.   And the reason she was moved that time was

4   because of the immediate need in repack?

5        A.   Yes.  As every other employee can face, sure.

6        Q.   She didn't ask to be moved to repack, did

7   she?

8        A.   In May when she wanted to go to first shift,

9   she said she would take any position.  However, she was

10  set to go as a kitter at this time on July 3rd.  Due to

11  the need, she needed to go to repack.

12       Q.   My question is very simple.  She never asked

13  you to put her in repack?

14       A.   No.

15       Q.   Okay.  She never asked you to put her in a

16  position where she would be in a reduced class?

17       A.   She asked me to put her on first shift.

18       Q.   She didn't ask you, though -- Strike that.

19            Did she ask you to put her in a position

20  where her class was lower than 3?

21       A.   Just as I told her, classes have nothing to

22  do with positions.  But she said she was open to any

23  class of position.  Yes, she did.

24       Q.   Okay.  Did she -- Did you put that in the

1    memo you prepared for her?

2        A.    No, I didn't.

3        Q.    So you skipped that?

4        A.    I didn't skip it.  I did not note it.

5        Q.    Okay.  We went over a lot of the

6    preparation -- of documentation you prepared in

7    connection with your interviews.  How do you determine

8    what information to put in there and what not to put

9    in?

10       A.    Class, as I said before, is dealing with

11   billing information.  It is not relative to an employee

12   or the position that they maintain, so thus I did not

13   include it.

14       Q.    But when you documented Erica Washington's

15   request, you thought it was appropriate to document

16   class?

17       A.    I didn't.  I didn't document it in Kiona's,

18   and I can't tell you why.

19       Q.    But you do document class, right?

20       A.    I do.  But it's not relevant to an employee's

21   stance on a position.  It's for billing purposes only.

22       Q.    You documented it in the case of

23   Ms. Washington but you didn't document it in the case

24   of Ms. Jordan, right?

1      Q.    What if someone else like one of your HR

2   people fired her, would you know?

3      A.    I would know about that.

4      Q.    How would you know?

5      A.    My HR staff is not permitted to fire anyone.

6   The only people that would be permitted to do that is

7   myself, Roxanna, and Mike Saltzman.

8      Q.    Was Mr. Gregg fired?

9      A.    I know he was released from his position,

10  yes.  I did not take part in that, no.

11     Q.    Who fired him?

12     A.    I do not know.

13     Q.    How did you come to know he was fired?

14     A.    I believe Mike told me that in passing, yes.

15     Q.    So someone could be fired and you wouldn't

16  know?

17     A.    I understand that.  But you're not listening

18  to me.

19           You said in my HR office, would I -- would my

20  HR staff be firing individuals.  And I said, no, they

21  would not.  I told you before that everybody from a

22  supervisor to a project manager to a director of

23  operations can terminate someone without my approval.

24  My interoffice staff, no, they cannot.

1          Q.    So someone participated in it and let you
2     know?
3          A.    Absolutely.
4          Q.    Okay.  Do you know who that is that --
5          A.    Mike Saltzman.
6          Q.    Okay.  So if she says that she complained
7     about sexual harassment, she would be lying?
8          MS. HUBBARD:  Objection, assuming facts not in
9     evidence.
10    BY THE WITNESS:
11         A.    I'm afraid I don't understand.
12         Q.    If Ms. Washington claims that she complained
13    about sexual harassment, she would be lying?
14         A.    I wouldn't know.  I never spoke to her.
15         Q.    Okay.  To your knowledge, did Lewis Gregg
16    have any type of business, movie business on the side?
17         A.    I don't know anything about that, no.
18         Q.    Any employee tell you whether he sold any
19    material in the workplace?
20         A.    I don't know anything about that, no.
21         Q.    Okay.  Did you ever see a business card?
22         A.    No.
23         Q.    Okay.  How did the employment of Ms. Jordan
24    end?

1    with Ms. Wright ever.

2        Q.    Have you ever conveyed to Ms. Wright in any

3    manner how she should go about testifying in her

4    deposition?

5        A.    No.

6        Q.    You've never told her that she shouldn't be

7    forthcoming about her concerns about Lewis Gregg?

8        A.    No.

9        Q.    Has anyone to your knowledge told that to

10   Felicia Wright?

11       A.    No.

12       Q.    Okay.  Exhibit 31 was Jordan's note in regard

13   to Lewis Gregg.  How much time elapsed between your

14   getting that note and your commencing your

15   investigation?

16       A.    I remember arriving at the plant sometime in

17   the afternoon and getting this note from her

18   supervisor.  And I remember asking her to come and meet

19   me in the conference room immediately.

20       Q.    And you then started that same day the

21   conversations with Clarissa Jones and Seneca Carter?

22       A.    And Lewis Gregg, all the -- in the same day,

23   yes.

24       Q.    Okay.  So is it fair to say that there was no

1    time lapse between your getting the note and your

2    commencement of the investigation?

3        A.    No, there wasn't.

4        Q.    So you started to promptly investigate?

5        A.    Yes.

6        Q.    There has been some discussion about this

7    Class 3, Class 1 circumstance.  And explain what you

8    mean in terms of saying this was for billing purposes.

9        MR. ASONYE:  Objection, form, asked and answered.

10            You can go ahead and answer.

11   BY THE WITNESS:

12       A.    The classes are broken down in the way that

13   we bill our customer Caterpillar.  There's ranges, and

14   that's what divides the Classes 0 to 6.  But it is

15   strictly for billing purposes.  And the rate of class

16   doesn't necessarily tie in with their pay rate.

17       Q.    So if an employee is moved from Class 1 down

18   to -- or up to Class 3, they don't get any more money?

19       A.    I'm sorry.  Can you say that again.

20       Q.    If an employee is moved from Class 1 to

21   Class 3, do they get any more money?

22       A.    Class 1 to Class 3, if it is indeed a

23   promotion, you know, taking on additional

24   responsibilities, perhaps it's a harder job and it

Page 203

1    changes pay rates, yes, there is an increase going up

2    the classes.

3        Q.   Okay.  When the plaintiff here got moved from

4    class to class, was there any pay impact that she

5    suffered?

6        A.   No.

7        Q.   Okay.  What is your class?

8        A.   My class when I was with R&O was a Class 0.

9        Q.   Does that mean Caterpillar does not get

10   billed?

11       A.   Yes.  It was a nonbillable position.

12       Q.   So the classes really are only for purposes

13   of billing Caterpillar?

14       MR. ASONYE:  Objection, form, asked and answered.

15   BY THE WITNESS:

16       A.   Correct.

17       Q.   Ms. Jordan told you that she would take

18   anything on first shift; is that correct?

19       A.   Yes.

20       Q.   She didn't say, I will take anything on first

21   shift as long as it's kitting?

22       A.   She said she would be open to any first-shift

23   position.

24       Q.   She was aware that first shift was part of

1    repack as well?

2        MR. ASONYE:  Objection, form.

3        MS. HUBBARD:  I'll rephrase.

4    BY MS. HUBBARD:

5        Q.  Repack had a first shift?

6        A.  Repack does have a first shift, yes.

7        Q.  And do you have any reason to believe that

8    the plaintiff did not understand that fact when she

9    told you she would take anything on first shift?

10       A.  No.  I believe she understood.

11       Q.  Okay.  Did she ever come to you at any time

12   and say, Well, I've changed my mind; I would be willing

13   to take second or third shift?

14       A.  No.

15       Q.  So by May, your understanding of her

16   preference was if at all the possible she wants first

17   shift, right?

18       A.  Correct.

19       Q.  Nicholas Close, what ever happened to him?

20       A.  The situation between Kiona and Nicholas

21   Close happened before I started at R&O.  But looking at

22   that paperwork, he was fired immediately after those

23   comments were made.

24       Q.  Because of Kiona's allegations against him?

Olson, Amanda

1     A.    Correct.

2     Q.    Had she made other allegations alleging

3  discrimination against other employees at R&O?

4     A.    Yes, two.

5     Q.    Tell me about those.

6     A.    They were against both of her direct

7  supervisors, one being Ray Limley, one being Ray Ebner.

8  And she felt that she was being racially discriminated

9  against.

10     Q.    Do you recall when the one was with

11  Mr. Ebner?

12     A.    I don't.

13     Q.    Had she been having -- Had Mr. Ebner been

14  having some kind of problem with her?

15     A.    Not that I'm aware of, no.

16     Q.    And Mr. Limley?

17     A.    I don't remember there ever being a situation

18  that would have -- that that would have resulted from.

19     Q.    Okay.  So we have her initiating racial

20  discrimination allegations against Mr. Ebner, correct?

21     A.    Correct.

22     Q.    And we have her initiating racial

23  discrimination claims against Mr. Limley?

24     A.    Correct.

1      Q.    And we have her alleging racial comments by

2   Nick Close, correct?

3      A.    Correct.

4      Q.    And Lewis Gregg, what's his race?

5      A.    He's African-American.

6      Q.    Okay.   And so this is the fourth allegation

7   against an employee of discrimination, correct?

8      A.    Correct.

9      Q.    Were you in any manner upset that she had

10   made allegations against Mr. Close?

11     A.    No.

12     Q.    Did you consider the manner -- matter closed

13   after the warning had been given to Mr. Close?

14     A.    Yes.

15     Q.    So as far as you were concerned, until you

16   found out about these two witnesses, the matter was

17   over; is that fair?

18     A.    Correct.

19     Q.    Did you in any manner retaliate against

20   Ms. Jordan for having made this allegation?

21     A.    No.

22     Q.    Was there anything to your understanding that

23   the two witnesses were going to gain by coming forward

24   and complaining about --

## ERRATA SHEET

I wish to make the following changes for the following reasons:

| PAGE | LINE | | |
|------|------|---|---|
| 192 | 19 | SHOULD BE: | I never have personally ~~and hamanias~~ seen the repack |
| | | REASON: | |
| 206 | 10 | SHOULD BE: | against Mr. Gregg |
| | | REASON: | |
| 206 | 13 | SHOULD BE: | given to Mr Gregg |
| | | REASON: | |
| 207 | 10 | SHOULD BE: | against Mr Gregg |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |
| —— | —— | SHOULD BE: | |
| | | REASON: | |

Signed    Amanda Cain

9-15-08

1      Q.    And if -- So is it fair to say that someone's

2   employment might be on the line if another employee is

3   lying to management about what occurred?

4      A.    Yes.

5      Q.    Have employees been fired for being dishonest

6   and untruthful to management in your knowledge?

7      A.    Yes.

8      Q.    Who?

9      A.    I had two situations come to mind.  One was

10  an employee that was interviewing for another position

11  with the customer, being Caterpillar, and she did this

12  on company time, meaning she was punched into the time

13  clock in a position that she would have been doing.

14  Instead she was off for a three-hour interview.  So

15  that was stealing company time, being dishonest.

16          The other situation was actually within my

17  local human resources office.  And it was a similar

18  situation on a day that I was out of the office.  She

19  was punched into the clock and was gone for all hours

20  of the day.

21      Q.    Were these employees both fired?

22      A.    Yes, they were.

23      Q.    Had they made any kinds of discrimination

24  complaints?

```
1        A.    No, they hadn't.

2        Q.    Did the conversation forms exist in readily

3   available form to anyone?

4        A.    Yes.

5        Q.    And you said they were also online?

6        A.    Yes.

7        Q.    They were available in paper forms?

8        A.    They were available on our intranet, and they

9   were posted in our general comment areas for employees

10  or supervisors to access.

11       Q.    And were they blank?

12       A.    Yes.

13       Q.    So anyone could have picked up a handful if

14  they wanted to and kept them, correct?

15       A.    Correct.

16       Q.    In your experience, had Kiona been hesitant

17  about filling out information for human resources in

18  regard to the various concerns that she had with her

19  employment there?

20       A.    No.

21       Q.    Did she, at any time during this meeting that

22  you had with her when you told her about the

23  suspension, say to you that what you had been told was

24  not true?
```

1        A.    No.

2        Q.    What to the best of your recollection did she

3    say to you during this conversation?

4        A.    I remember her being very upset and crying

5    and just repeatedly asking me who the two witnesses

6    were.

7        Q.    You did not tell her; is that true?

8        A.    I did not tell her, no.

9        Q.    Did she say anything else to you that these

10   witnesses were in some manner being untruthful with

11   you?

12       A.    No.

13       Q.    Did she have the opportunity to say that if

14   she wanted to?

15       MR. ASONYE:   Objection, form, asked and answered,

16   foundation.

17            You can answer.

18   BY THE WITNESS:

19       A.    Yes.   We were in a setting where it was me

20   and another witness that it was kind of a free-form.

21   So the opportunity was there.

22       Q.    Okay.   Has anyone to your knowledge during

23   their tenure as director of human resources been

24   punished for bringing forward an allegation of

Page 211

1   discrimination?

2      A.   No.

3      Q.   Is that against the policy of the company?

4      A.   No.

5      Q.   No, it's not against the policy of the

6   company?

7      MR. ASONYE:  Objection.  Objection, asked and

8   answered.

9      MS. HUBBARD:  Wait.  We need to clean this up.

10  She obviously misunderstood the question.

11     MR. ASONYE:  Counsel --

12     MS. HUBBARD:  You don't get a free pass.

13     MR. ASONYE:  You just gave her the answer.  She's

14  going to say she didn't understand the question now

15  that you told her she didn't understand the question.

16  You can't do that, Counsel.

17     MS. HUBBARD:  You don't get free lunch on this

18  one.

19  BY THE WITNESS:

20     A.   I'll say that employees were never punished

21  or reprimanded in any way, shape, or form for bringing

22  forth any information.

23     Q.   Did the company have a policy that prohibited

24  retaliating against employees?

Page 214

1        Q.    Okay.  So someone who is a Class 3 would

2    obviously be billed out at a higher rate than someone

3    that's a Class 1?

4        A.    Correct.

5        Q.    And that will reflect in their pay grade,

6    right?  Well, you don't -- You're not billing your

7    client more -- Okay.  Well, let's put it this way.

8    Strike that.

9             Somehow there is a relationship between what

10   you bill your client and what you pay the employee,

11   right?

12       A.    It's not a specific formula.  I mean, the

13   bill rate is the bill rate for the clients.  What we

14   choose to pay our employee is up to us.  There is

15   obviously a pay range that associates with that, but

16   there is some different circumstances that we've

17   encountered.

18       Q.    Okay.  So if you bill your client at a

19   Class 3 level, you will pay that employee at a Class 3

20   level generally?

21       A.    Generally, yes.

22       Q.    Because they're offering better and higher

23   quality service, correct?

24       A.    Based on the skill, yes.

Page 217

1    be a PDI, or whatever.  They don't come to me and say,

2    I want to be a Class 5.  They don't even know what

3    positions are a Class 5.

4         Q.   Well, they want to have a higher position so

5    they can get a higher pay?

6         A.   Absolutely.

7         Q.   Okay.  And if they get a higher class, they

8    probably possibly get a higher pay?

9         A.   Generally, yes.

10        Q.   Okay.  So the whole thing is about pay, isn't

11   it?

12        A.   Yes.

13        Q.   Okay.  So it's fair to say that an individual

14   given the choice of being a Class 1 versus a Class 5

15   will pick a Class 5 because it's going to pay higher?

16        A.   If they understand it, yes.

17        Q.   But you understand it, right?

18        A.   I do.

19        Q.   Okay.

20        A.   But I was also a Class 0.

21        Q.   You were a Class 0 because your services

22   weren't being billed out to the company?

23        A.   Well, that's what I'm saying.  It has no

24   reflection directly with pay.  So it's really not an

Page 218

1   employees's concern.

2        Q.   In your own case, class doesn't matter

3   because you got your own pay anyway, right?

4        A.   I was a Class 0.

5        Q.   And you got your pay anyway?

6        A.   Right, as did Kiona.

7        Q.   Okay.  But if Kiona had been a Class 5, she

8   would have gotten more than --

9        A.   Class 5 wasn't even on the table.

10       Q.   But had she -- her dream come true --

11       A.   Had her dream come true and she aspired to be

12  a Class 5, absolutely.

13       Q.   Now, you talked about the fact that Jordan

14  complained before about discrimination.  She was called

15  a nigger, right, in the workplace?

16       A.   That, I just know from reference because that

17  situation had happened before I was employed.  But,

18  yes, I did see documentation on that.

19       Q.   And it wasn't -- She had witnesses that saw

20  that she was called a nigger?

21       A.   From what I've read, I believe, yes.

22       Q.   Okay.

23       A.   Marty Stanic.

24       Q.   So her allegations were founded on that

1    you had been talking to, would you have investigated?

2         A.   I would have taken some feedback back to

3    those witnesses, yes.

4         Q.   Would you have negated the three-day

5    suspension?

6         A.   I would have said, Let's leave it on hold

7    right now and let me do some more investigating.

8         MS. HUBBARD:  No further questions.

9              FURTHER REDIRECT EXAMINATION

10   BY MR. ASONYE:

11        Q.   You never asked Ms. Jordan whether or not the

12   statements were true, did you?

13        A.   No.

14        Q.   Okay.  You never gave her an opportunity to

15   explain whether they were true or not, correct?

16        A.   She had the opportunity to demand the name of

17   my witnesses.  She had plenty of opportunity.

18        Q.   Did you give her the opportunity to deny

19   whether or not the statements were true?

20        A.   We had the opportunity to which we were in a

21   face-to-face meeting that she could have told me

22   anything that she wanted to, and she chose not to state

23   anything about that.

24        Q.   But you didn't ask her if it was true,

1    though?

2        A.    I did not ask her point blank, no.

3        Q.    Well, you didn't ask her in any way whether

4    it was true?

5        A.    No.

6        Q.    You didn't ask her the same way you asked

7    Mr. Gregg whether the allegations were true, did you?

8        A.    I handled the investigation similarly in both

9    situations.

10        Q.    Well, did you type up notes of what she said

11    about the allegations when you asked her if --

12        A.    I told you that she said -- she was crying

13    hysterically demanding to know the names of my two

14    witnesses.   That's the extent of that conversation.

15    That's all that was said.

16        Q.    Let's look at your written summary, because

17    obviously the written summary is contained --

18        A.    Do you have a number on that, please?

19        Q.    Number 22.

20              Nowhere in that written summary did you write

21    down that you gave her the opportunity to respond to

22    the allegations, correct?

23        A.    No, I did not.

24        Q.    Okay.   Nowhere in this written summary did

1    you document that you gave her the opportunity to say

2    anything she wanted?

3         A.   No.  It's not written there, no.

4         Q.   Okay.  Nowhere in this written summary did

5    you put in that you gave her the opportunity to defend

6    herself?

7         A.   No.

8         MR. ASONYE:  No further questions.

9                   FURTHER RECROSS-EXAMINATION

10   BY MS. HUBBARD:

11        Q.   On Exhibit 22, she obviously got to say to

12   you that she was upset that you hadn't handled the

13   Lewis Gregg situation correctly, didn't she?

14        A.   Yes.

15        Q.   And she obviously got the opportunity to say

16   she thought he should be suspended or fired, correct?

17        A.   Correct.

18        Q.   So couldn't she have had the opportunity to

19   say, None of this is true?

20        MR. ASONYE:  Objection, form.

21   BY THE WITNESS:

22        A.   Yes.

23        Q.   Does anyone in Kiona Jordan's position have

24   the right to tell management how to handle discipline