# Exhibit B

Excerpts from the deposition of Mike
Saltzman

Saltzman, Mike

1      A.    Yes.  Still HR manager, yes.

2      Q.    When did you become HR manager?

3      A.    In 2006.

4      Q.    Prior to that did you hold any position?

5      A.    I did -- with the company, yes, I did.  I was

6   an HR assistant at the time when I was hired.

7      Q.    When were you hired?

8      A.    2005.

9      Q.    What are your job duties as HR manager?

10     A.    Well, in our office we handle benefits;

11  compensation; investigating harassment, discrimination,

12  other work-related conflict.  We also have our

13  recruiting, so I oversee -- We have a recruiting

14  manager, and I also oversee her.

15     Q.    Who is your boss in the position -- in your

16  position as HR manager?

17     A.    Currently it's Lou Nomen.

18     Q.    When did he start supervising you in that

19  position?

20     A.    When Amanda left just in May of '08.

21     Q.    Amanda Olson?

22     A.    Yes.

23     Q.    So Amanda Olson was your supervisor prior?

24     A.    Yes.

1    that that transfer was approved; so, no, they should not

2    be changing positions without a transfer form.

3        Q.   What is done with -- After the supervisor

4    prepares the transfer form or position change form, what

5    does the supervisor do with it?

6        A.   The supervisor will either -- If it's a line

7    supervisor, like, a lower supervisor, he'll probably

8    submit it to his project manager and then to the

9    operations manager.

10       Q.   Okay.  I'll show you what is marked as Exhibit

11   No. 35, and I'll ask you if you can identify this

12   document.

13       A.   Okay.  This is Lewis Gregg's position change

14   form taking him from a forklift operator -- a line

15   trucker to a logistics trucker.

16       Q.   So this is what you were referring to with the

17   position change form?

18       A.   Correct.

19       Q.   It says that the form must be filled in

20   completely in the box; is that correct?

21       A.   Yes, it does.

22       Q.   Okay.

23       A.   In this case, it was actually Don Chapman -- I

24   can tell by his handwriting -- that he actually

1   completed the entire form.  He was the project manager,

2   so he would be over any supervisor or any general

3   foreman there.

4        Q.   I see.  And this Exhibit No. 36 also is a

5   position change form that is used?

6        A.   Yes, it is.  And this one, it was taking Lewis

7   from a forklift operator on the paint line to a

8   supervisor in the clean room, also approved by Don

9   Chapman, the project manager.

10       Q.   I'll show you Exhibit No. 8.  Is that also a

11   position change form?

12       A.   Yes, it is.

13       Q.   Okay.  Can you tell me what this one

14   represents?

15       A.   This is Kiona's position change form taking

16   her from a floater on first shift to a kitter position

17   on first shift, also approved by Don Chapman.

18       Q.   And the date of this is January 30, 2006?

19       A.   Yes, it is.

20       Q.   I'll show you what is marked as Exhibit 8A.

21   Can you tell me -- Strike that.

22            It says "Wage Change Request" at the top.  Can

23   you tell me what that is?

24       A.   Like I said earlier, wage change is taking

1    someone from either -- if it was their anniversary,

2    increasing their wage, increasing their wage because

3    they're moving to a higher level position or even, like,

4    a promotion.

5        Q.   So in this case Jordan was moving to a higher

6    level position?

7        A.   Apparently she was being taken to a Class 3

8    position because it says "Class Change to Class 3." And

9    it was approved by the project manager Don Chapman, Bob

10   McGee who was the operations manager at the time, and --

11       Q.   And now with the Class 3 change, she had a pay

12   increase?

13       A.   Yes, because it says, "Class 3," taking her --

14   Well, up at the top it says something about $13; but it

15   should be from $9 to $10.

16       Q.   Well, Class 3 -- Well, each class has a range

17   of pay, correct?

18       A.   Yes.  That could be what they call the top-out

19   rate, is 13 for a Class 3.

20       Q.   I see.  So a Class 3, the wage range would be

21   from 10 to $13?

22       A.   Yes, correct.

23       Q.   And Class 1 would be a different wage range,

24   right?

1    involved, you were still keeping her up to date

2    throughout?

3         A.   Yes.

4         Q.   Who made the decision to terminate Mr. Gregg?

5         A.   That was most likely Larry Reddish, the

6    operations director; probably Bob McGee, the operations

7    manager; Amanda Olson, who was the HR director.

8         Q.   Why do you believe that these three people

9    made the decision to terminate Mr. Gregg?

10        A.   Those would be the people in the highest

11   position for our location that would make that call.

12        Q.   Did you participate in the decision to

13   terminate him?

14        A.   No, I did not.

15        Q.   How did you find out that he was going to be

16   terminated?

17        A.   That's kind of what I was alluding to earlier.

18   I know that Amanda had already had a conversation to get

19   Lewis Gregg's take on things, more or less; but I know

20   that the decision was made before I went and actually

21   spoke with Lewis on that final day.

22        Q.   Okay.  But how do you -- Strike that.

23             How did you learn he had been -- he was going

24   to be terminated?

1        A.    Very minimal.  Amanda -- Like I said, we spoke
2    quite often.  She would keep me abreast about what was
3    happening and things like that at the time, what
4    Kiona -- what her actually complaint was and things, the
5    details and whatnot.  Beyond that, there were two
6    witnesses that had apparently come up to Robert Dillon,
7    who was our -- he was a supervisor at the time; he's now
8    our general foreman -- but basically to complain that
9    Kiona had gone around saying that she was going to try
10   and get Lewis Gregg in trouble so that she can get
11   transferred to a different shift of some kind or
12   something.
13        Q.    Okay.  That one, did you get involved in that
14   investigation?
15        A.    Only in the part where I was trying to
16   determine who the two employees were because apparently
17   they wanted to be anonymous.  And I had actually asked
18   Robert to tell me who they were, and he did.
19        Q.    Okay.  Did you go talk to those individuals?
20        A.    I did have conversations with both of them
21   actually.
22        Q.    Face-to-face?
23        A.    No.  I believe one was face-to-face and one
24   was over the phone.

1       MS. HUBBARD:  Objection.  You're asking him to

2   speculate about someone else's state of mind.

3   BY MR. ASONYE:

4       Q.   Well, were you there when he wrote this

5   conversation form?

6       A.   No.  Actually, he probably faxed this.  It's

7   got a fax stamp on there and things, and he probably

8   faxed this to our office.  As you can see, it was

9   written on the 3rd when we were there.  He probably

10  faxed it to our office -- wrote it later on in the day

11  and faxed it to our office on the 6th.

12      Q.   Did Ray -- is it Lindley?

13      A.   Yes, Lindley.

14      Q.   When he came in there to talk to you guys, did

15  he tell you when it was that Kiona engaged in this

16  rubbing against him?

17      A.   I don't believe he actually gave an actual

18  date, no.

19      Q.   Well, was it -- Did you form an impression

20  whether it was month, weeks, days?

21      A.   Within a relative -- you know, it probably

22  would have been a matter of days.  It wouldn't be, like,

23  months or weeks or anything.  It would probably be days

24  before.

Saltzman, Mike

1   hesitant to talk to me a little bit.  Like I said, I

2   think they both wanted to be -- kind of remain

3   anonymous, more or less.  But out of the two, Demetria

4   was telling me that she overheard Kiona state that she

5   wanted to get Lewis Gregg suspended or terminated,

6   something to that effect.

7        Q.   What else did she tell you?

8        A.   That was primarily the conversation right

9   there --

10       Q.   Anything else --

11       A.   -- what she overheard.

12       Q.   -- she tell you?

13       A.   No.  Not that I can recall, no.

14       MS. HUBBARD:  What was the question?  I didn't hear

15   you.

16   BY MR. ASONYE:

17       Q.   Anything else she tell you?

18       A.   Not that I recall, no.

19       Q.   You said that she -- Ms. Jenkins said that she

20   overheard.

21       A.   That she heard Kiona say that.

22       Q.   Okay.  So who was Kiona talking to when she

23   said that?

24       A.   Demetria.

1      Q.   Okay.  So she didn't overhear it; she was told

2  it?

3      A.   She heard it directly -- I'm sorry -- yes.

4      Q.   Who else was present during that conversation?

5      A.   I don't recall if she actually told me that.

6      Q.   So she told you that Kiona walked up to her

7  and just said that or was there some type of --

8      A.   What the context was or something?

9      Q.   Yes, anything.

10     A.   Apparently they were having some kind of

11  conversation that had nothing to do with Lewis Gregg,

12  and it somehow came up in the conversation.  I don't

13  know --

14     Q.   Just out of the blue or ...

15     A.   I don't know.  I wasn't part of the

16  conversation.  I don't know.

17     Q.   Well, you were interviewing her because, you

18  know, those are serious allegations, right?

19     A.   Yeah.  Well, the part that I wanted to

20  determine is what exactly she heard that had to do with

21  Lewis Gregg.

22     Q.   Okay.  But it was going to be an important

23  interview?

24     MS. HUBBARD:  Objection as to form.

1    A.    My job, like I said earlier, was to try and

2    determine, A, who the employees were and, B, to try and

3    get some context about what they heard or thought they

4    heard.  Like I had said, when Amanda first told me that

5    Robert had known about this, we didn't even know who the

6    employees were at the time.

7        Q.    Okay.  Now, you testified that Amanda then

8    decided to now go talk to the witnesses herself?

9        A.    Yes.

10       Q.    Directly?

11       A.    Yes.

12       Q.    Did she say she didn't believe what you said

13   or ...

14       A.    No.  She said she wanted to speak with them

15   personally herself and if they would make a written

16   statement as opposed to just a verbal statement.

17       Q.    Okay.  Did she ask you to go collect written

18   statements?

19       A.    No.  Actually, I just pretty much told her

20   what I had talked to them about.  Demetria, like I said,

21   I'm pretty sure I spoke with her by phone.  Constance, I

22   remember speaking with her at the plant itself.

23       Q.    So Ms. Olson didn't ask you to go get

24   statements from them?

```
1        A.   Okay.  No.  As far as Demetria and Constance
2   goes, they did not tell me that it was a scam or
3   anything like that.  They just told me -- Constance told
4   me she heard from Demetria; Demetria heard firsthand
5   from Kiona.
6        Q.   Okay.  When you spoke to Constance -- Demetria
7   Jenkins -- I'm sorry -- did she say anything about
8   Ms. Jordan wanting to go to the first shift?
9        A.   I believe -- Yes, she did.  She did say that
10  that's why she wanted to accuse Lewis Gregg of
11  harassment.
12       Q.   Who told you that?
13       A.   Demetria.
14       Q.   Okay.  So there is things that Demetria told
15  you that you haven't told me?
16       A.   No.  But reading this right here, that is
17  true.  She did say it was to be moved.  So Demetria did
18  say that she wanted to be moved to first shift.
19       Q.   Okay.  Now that you've had a chance to -- Is
20  there any additional thing that she told you that you
21  haven't told me?
22       A.   No.  But now that I think about it, though,
23  she probably did say, I want --
24       Q.   Probably?
```

1       A.    She told me she wanted to get Lewis Gregg

2    suspended or terminated so that she can get moved to

3    first shift.

4       Q.    Okay.  So if -- So the reasoning being that if

5    Lewis Gregg was suspended, she would move to the first

6    shift?

7       A.    Yes.  That's what she told me.  I do remember

8    that now.

9       Q.    So you believe that it was Demetria Jenkins

10   who told you that?

11      A.    Yes.

12      Q.    Or was it Constance Daniels?

13      A.    Demetria.

14      Q.    Okay.  And Demetria is the one who you claim

15   spoke to Kiona directly?

16      A.    Correct.

17      Q.    So is Demetria Jenkins Witness 1 or Witness 2?

18      A.    Well, if I'm reading this correctly, it says,

19   "I, Witness 1, was talking to another employee and she

20   stated that she had talked to Kiona."  So I assume that

21   Witness 1 would be Constance Daniels and Witness 2 would

22   be Demetria Jenkins.  Now, Witness 2, it also says Kiona

23   told another employee, Erica Washington, that she should

24   do the same thing.

Saltzman, Mike

1    statement?

2         A.    Yes.

3         Q.    Okay.  Did anyone tell you the second part of

4    this, that Ms. Jordan also said, slash, encouraged

5    another employee, Erica Washington, to do the same?

6         A.    No, they did not.

7         Q.    So this conversation form does not reflect the

8    conversation you had with either Ms. Jenkins or

9    Ms. Daniels?

10        A.    No, sir.

11        Q.    Now, Constance Daniels, was she the one that

12   claimed that Ms. Jordan spoke to her directly or was it

13   Ms. Jenkins?

14        A.    Ms. Jenkins is the one that said that she

15   spoke with Kiona directly.  Constance said she heard

16   from Demetria.

17        Q.    Okay.  And this is the statement of the

18   person -- Exhibit 24 is the written statement of the

19   person who said that she spoke to Ms. Jordan directly?

20        A.    Correct.  This would be Witness 2 that's

21   referred to in this one.  It says, "Person Completing

22   Form," up here.  It says, "Witness 2."  If I read

23   Amanda's statement here, that is Demetria Jenkins.

24        Q.    Okay.

1      A.    When she said -- When Constance states, I was

2  talking to another employee and she stated she had

3  talked to Kiona and in so many words Kiona said that she

4  filed sexual harassment against Lewis Gregg so that she

5  can go to first shift, that part is what Constance told

6  me, that she heard Demetria tell her; not the second

7  part about Erica Washington though.

8      Q.    I thought you said that the person who told

9  you about the first shift --

10     A.    Was Demetria.

11     Q.    -- was Demetria; not Constance?

12     A.    That sounds like what -- I don't understand.

13     Q.    Okay.  The comment about Jordan going to the

14  first shift, were you told that by Constance Daniels or

15  were you told that by Demetria Jenkins?

16     A.    Okay.  I understand what you're saying now.

17  Okay.  Demetria is actually the one that told that to me

18  about going to first shift.

19     Q.    So the statement contained in Exhibit 23 does

20  not reflect what Constance Daniels told you?

21     A.    It does in parts, just simply the fact that

22  she was talking to Demetria.

23     Q.    So the only true part of it as to what she

24  told you was that she was speaking to Demetria Jenkins?

1          MS. HUBBARD:  Objection as to form.

2     BY THE WITNESS:

3          A.    The part where she says she was talking to

4     another employee -- that employee being Demetria -- is

5     what Constance told me.

6          Q.    Okay.  That is correct?

7          A.    And that she heard that Kiona was going to

8     file harassment against Lewis Gregg, that's true.

9     That's what Constance told me that she heard from

10    Demetria; not from Kiona.  The second part about

11    first -- The last part in that sentence about going to

12    the first shift, that's what Demetria told me.

13         Q.    Did Constance Daniels tell you that?

14         A.    No, she did not.

15         Q.    So this statement does not reflect what she

16    told you with respect to the first shift?

17         A.    Parts of it do, but --

18         Q.    Parts of it don't?

19         A.    -- parts of it do not, yes.

20         Q.    Constance didn't tell you anything about Erica

21    Washington?

22         A.    No, she did not.

23         Q.    Showing you what is marked as Exhibit 22, and

24    I'd like to ask you if you've seen this document before?

1      Q.   This document does not say that Lewis Gregg

2   was suspended pending an investigation.  Do you believe

3   that that was just an error or that it just wasn't

4   documented here?

5      MS. HUBBARD:  Objection.  You're asking him to

6   speculate.

7   BY THE WITNESS:

8      A.   I don't know.

9      Q.   Can you tell me what the zero tolerance policy

10  is?

11     A.   Our company's zero tolerance policy is that we

12  do not tolerate harassment from one employee to another.

13     Q.   The zero tolerance policy, does that mean

14  termination; or no?

15     A.   I think zero tolerance -- By that, the

16  company -- Now, this is a company policy; not Mike

17  Saltzman's policy.  But they are saying that they will

18  not tolerate and they want to discourage employees from

19  behaving in that manner, essentially.

20     Q.   It doesn't mean automatic termination?

21     A.   No, because you have to have facts probably to

22  terminate an employee.

23     Q.   Okay.  Well, if you have facts that someone

24  engaged in inappropriate sexual comments in the

1     workplace, does the zero tolerance policy require that

2     the person be terminated?

3          A.    Yes.  Up to termination, yes.

4          Q.    Up to termination or must be terminated?

5          A.    It's up to -- face disciplinary up to and

6     including termination.

7          Q.    I'll show what is marked as Exhibit No. 41.

8     I'd like to ask you if you've seen this document before.

9          A.    Yes, I have seen this before.

10         Q.    How did it come about that you saw it?

11         A.    This was completed by Felicia Wright and

12    handed in to either a project manager or supervisor over

13    there who faxed it over to us, I bet.

14         Q.    Okay.  So you're familiar with the facts in

15    Exhibit No. 41?

16         A.    Yes, I am.

17         Q.    How about 42 -- Exhibit 42, do you recognize

18    the document?

19         A.    I do.

20         Q.    Okay.  Is that the complaint against -- Strike

21    that.

22               Can you tell me what it is?

23         A.    This is Scott Johnson -- He was the

24    third-shift supervisor at the time.  And he's stating

1      Q.    Explain how they are readily available.

2      A.    Up in the TNT office, which is our centrally

3  located office for our company in the plant, there's

4  actually a file holder that's open for any employee --

5  not just supervisors, but anyone to go in there and grab

6  a blank conversation form simply because conversation

7  forms can be used for just day-to-day things; not

8  necessarily disciplinary actions, but anything.

9      Q.    And employees can take blank ones and take

10  them home if they wanted to?

11     A.    They could possibly have access to do that,

12  yes.

13     Q.    Are they available on any computer system?

14     A.    They are, yes.

15     Q.    Do the employees have access to computers?

16     A.    Only -- Typically only supervisors have access

17  to computers that would have, you know, a link to the

18  conversation form.

19     Q.    Okay.  But the paper forms are readily

20  available?

21     A.    Yes, they are.

22     Q.    You talked to Ms. Jenkins about her

23  conversation with the Plaintiff?

24     A.    Yes.

Saltzman, Mike

1    Q.   You had referenced that, I believe, Felicia

2    and Angelinna were credible.  Did you consider

3    Ms. Jenkins to be credible?

4    A.   I did, yes.

5    Q.   Did you believe her when she told you what she

6    told you?

7    A.   I did, yes, simply for the fact that Demetria

8    would have no reason to lie about it.

9    Q.   Had, to your knowledge, Kiona Jordan made

10   allegations of race discrimination against anyone?

11   A.   Yes, she did.

12   Q.   Against who?

13   A.   Her previous supervisor, Ray Ebner.

14   Q.   Do you know anything about the circumstances

15   of that situation?

16   A.   As I recall, there was people that had to be

17   moved out of the area; and the decision was made that

18   Kiona would be one of those people.  And when it

19   happened, Kiona had stated that -- to me, that she felt

20   it was probably due to her race.

21   Q.   And was she separated from Mr. Ebner because

22   of this allegation?

23   A.   Yes, she was.

24   Q.   Was that done to accommodate her?

1      A.   Yes, it was.

2      Q.   Was there ever any proof that Mr. Ebner had

3  made the decision to remove her from the shift because

4  of her race?

5      MR. ASONYE:  Objection, form.

6          You can answer.

7      THE WITNESS:  It's okay to answer?

8      MR. ASONYE:  Yeah.

9  BY THE WITNESS:

10     A.   Not other than Kiona's statements.

11     Q.   Did you conduct the investigation in regard to

12  her allegation against Mr. Ebner?

13     A.   I did.

14     Q.   And had there ever been any other allegations

15  against Ray Ebner that implied that he was a racist?

16     A.   Not that I was aware of, no.

17     Q.   Were you in any manner involved in the

18  allegations that she made against Nicholas Close?

19     A.   Yes, I was.

20     Q.   And what happened to Nicholas Close?

21     A.   Nicholas was terminated.

22     Q.   Why?

23     A.   For using racial slurs towards Kiona.

24     Q.   You talked about Exhibits 23 and 24, the

1    A.    I personally would have no way of, you know,

2    saying yes or no to that question.

3         MR. ASONYE:   I have no further questions.

4                   RECROSS-EXAMINATION

5    BY MS. HUBBARD:

6         Q.    I actually have another question.   I'd like

7    you to look at Exhibit 36.   What was Lewis Gregg's

8    position before June 26th, 2006, according to that form?

9         A.    He was a forklift operator.

10        Q.    Could he fire the Plaintiff?

11        MR. ASONYE:   Objection, form and foundation.

12   BY THE WITNESS:

13        A.    Absolutely not.

14        Q.    Could he discipline her?

15        MR. ASONYE:   Objection, form, foundation.

16   BY THE WITNESS:

17        A.    Absolutely not.

18        Q.    Was he a coworker of hers?

19        MR. ASONYE:   Objection, same objection.

20   BY THE WITNESS:

21        A.    He was a coworker in the sense that we --

22   those two worked for the same company, yes.

23        Q.    He was not her supervisor until the 26th of

24   June 2006; is that true?

1          A.     That is correct.

2          Q.     After the 26th of June 2006, did he have the

3     ability to fire the Plaintiff?

4          A.     Yes, he did.

5          Q.     And he had the ability to discipline her,

6     correct?

7          A.     Yes, correct.

8          Q.     And, in fact, I'd like to show you Exhibit 38.

9     That is the document written by Amanda Olson; is that

10    true?

11         A.     Yes.

12         Q.     That is four days after Lewis Gregg has become

13    the Plaintiff's supervisor; is that correct?

14         A.     Yes, that's correct.

15         Q.     To your knowledge, at any time prior to

16    June 30, 2006, to your knowledge, did Jordan complain

17    about any of Mr. Gregg's conduct toward her?

18         A.     Not that I recall, no.

19         MS. HUBBARD:  I have no further questions.

20                    FURTHER REDIRECT EXAMINATION

21    BY MR. ASONYE:

22         Q.     Exhibit No. 38, do you know what day it was

23    written?

24         A.     It says at the top, June 30th, 2006.