## Exhibit C

Excerpts from the deposition of Kiona
Jordan

1    would impair your ability to testify truthfully?

2        A    No.

3        Q    Are you on any kind of medication at all?

4        A    No.

5        Q    Have you ever sued an employer before?

6        A    No.

7        Q    Have you brought any charges of employment

8    discrimination before against any employer?

9        A    Yes.

10        Q    Against whom have you brought employment

11    discrimination charges?

12        A    Kemlite.

13        Q    And when did you bring that complaint?

14        A    I'm not sure.

15        Q    Did you review any documents in preparation

16    for your deposition today?

17        A    Yes.

18        Q    What documents did you review?

19        A    The interrogatories.

20        Q    Anything else?

21        A    No.

22        Q    You didn't review your personnel file?

23        A    Yes.

24        Q    So you did review other documents other

1        Q    Yes.

2        A    I don't know the exact month.

3        Q    Tell me about the incident that led to your

4    allegations against Kemlite.

5        A    My supervisor was saying inappropriate

6    things to me and about me to other coworkers.  One of

7    the coworkers didn't like what was being said.  And

8    he went to HR and reported it.

9        Q    What were the inappropriate things that

10   were being said?

11       A    How big his penis was.  That I should come

12   over to his house.  That if I did come over to his

13   house, I probably couldn't handle him because he had

14   a very large penis.

15       Q    I gather from what -- well, anything else

16   that you recall that he was saying to you that was

17   inappropriate?

18       A    Not that I recall right now.

19       Q    He made these comments in front of a

20   coworker?

21       A    Yes.

22       Q    Who was the coworker, do you recall?

23       A    I can't think of the guy's name.  Young

24   guy, I can't think of his name.  But he went and

1    witnesses.  And they basically gave me a complaint

2    form.  And on the that complaint form I filled out

3    every question that was asked.

4         Q    And what happened next?  Was Ellis

5    disciplined, to your knowledge?

6         A    Yes.

7         Q    What happened to Ellis?

8         A    Ellis terminated.

9         Q    How long between your meeting with Alan

10   Spitz and HR and Ellis's termination, do you know?

11        A    Approximately a week.

12        Q    When did the harassment with Ellis start,

13   do you recall?

14        A    No.

15        Q    Were there any other problems that occurred

16   at Kemlite after you reported this conduct?

17        A    Yes.

18        Q    What else happened?

19        A    A lot of the coworkers started talking and

20   saying real bad things about me because Ellis got

21   terminated.  And they felt like Ellis was there for

22   ten years and I come in and they just looked at it as

23   I got him terminated from his job and I was just a

24   temp.

1      Q    Did you report what the coworkers were

2   saying to Human Resources or to any management

3   employee of Kemlite?

4      A    Yes.

5      Q    Okay.  And what happened at that point?

6      A    The lady from HR was like, You don't have

7   to accept nobody saying bad things about you.  You

8   work here just like everybody else work here.  You

9   shouldn't have to put up with being harassed by other

10  coworkers because what you did was right.

11              And she told me if anyone was

12  bothering me or anyone said anything to me to come

13  back and let her know because early in the morning we

14  would go to -- we have like a locker room and we

15  would change our clothes.  And in the locker room

16  it's kinds of like high school.  All the women in

17  there would be saying things about me.

18     Q    So what happened next in -- the Human

19  Resources person says to you, You were right to come

20  forward.  You shouldn't have to put up with this.

21  What happened next?

22     A    I worked -- I continued working and a woman

23  from my temp service, Manpower, called me and she

24  told me about, you know, if I was uncomfortable

1    employee?

2         A    Oh, I didn't say R&O.  It's called Arnold.

3         Q    Arnold.

4         A    Like a guy's name.

5         Q    Oh, okay.

6         A    Arnold Logistics.

7         Q    Gotcha.

8              And where is Arnold Logistics?

9         A    Joliet, Illinois.

10        Q    Did you get a paycheck from Manpower or

11   from Kemlite?

12        A    Manpower.

13        Q    So Kemlite was not your employer?

14        A    No.

15        Q    Did you file an EEOC charge against

16   Kemlite?

17        A    Yes.

18        Q    And what happened to that charge, do you

19   know?

20        A    The EEOC, they called me in and I had like

21   a little meeting with them.  And then I'm not sure

22   how much time passed, I got a letter from Kemlite

23   offering me my job back.

24        Q    And did you take it?

1      A    No.

2      Q    Why not?

3      A    I just felt like everything that happened

4  there I just wanted to put it in the past.  I didn't

5  really want to go back into that situation people

6  think that I got fired, people got all these crazy

7  thoughts about me.  I was one of the youngest persons

8  in there.  So a lot of them already had a perception

9  of me just young, you know.  I didn't really talk to

10  a lot of people in there.

11      MS. HUBBARD:  Let's mark this as Exhibit 53.

12                        (Whereupon, Jordan Deposition

13                         Exhibit No. 53 was marked for

14                         identification.)

15  BY MS. HUBBARD:

16      Q    I show you which appears to be a letter of

17  November 23, 2005, to you from Sharon Bowerman, VP of

18  Human Resources of Kemlite.  Is this the letter

19  you're referring to?

20      A    Yes.

21      Q    And did you respond to this letter?

22      A    Yes.

23      Q    What did you -- how did you respond?

24      A    I called.

1       Q    And did you talk to Sharon Bowerman?

2       A    Yes.

3       Q    What did you say to her and what did she

4   say to you?

5       A    Told her that I had received a letter from

6   Federal Express and that I thanked her for sending me

7   the letter for being a little, you know, concerned,

8   but that I wasn't going to take the position.

9       Q    How long -- strike that question.

10                  You received this letter on or about

11  November 24th, 2005; would that be fair?

12      A    Approximately.

13      Q    And when did you call her, do you recall?

14  Was it the day you got the letter?

15      A    I called her that Monday that I was

16  supposed to report to work.

17      Q    So that would have been Monday,

18  November 28th, 2005?

19      A    Yes.

20      Q    What happened to your EEOC charge?

21      A    I never went through with it.

22      Q    Did the EEOC dismiss the charge?

23  MR. ASONYE:  Objection.  Form.  Foundation.

24                  You can answer.

1    second; is that correct?

2        A    Third is first; first is second; second is

3    last.

4        Q    Okay.  That word between first and second

5    is "or"?

6        A    Mm-hmm.

7        Q    You need to say "yes" or "no."

8        A    Yes.

9        Q    You weren't asked which preference you had;

10   correct?  The question doesn't ask you what's your

11   preference?

12       A    The question asks what shift do you want to

13   work, and that's how I answered; third preferably;

14   first; or second, if nothing else is available.

15       Q    Okay.  So you would have worked any shift;

16   correct?

17       A    Yes.

18       Q    After you filled out the application did

19   you have an interview?

20       A    Yes.

21       Q    And with whom did you interview at R&O?

22       A    Mike.

23       Q    Saltzman?

24       A    I don't know his last name.

1      Q     Was he a Human Resources manager?

2      A     Yes, I believe.

3      Q     You went to Appletree Plaza in Shorewood to

4    meet with him?

5      A     That's where I had my interview at,

6    Appletree Plaza.

7      Q     Right.

8            How long did the interview last?

9      A     I don't remember, maybe 30 minutes to an

10   hour.  I don't remember exactly.

11     Q     And do you remember what was discussed

12   during the interview?

13     A     Pretty much what's on the application.

14   People that I knew prior to working at R&O.

15     Q     You list on Exhibit 1 as friends and

16   relatives working here Paul Harris and Cornelia

17   Harris.  Cornelia Harris you told me was your aunt?

18     A     Yes.

19     Q     Who is Paul Harris?

20     A     Cousin.

21     Q     He's related to Cornelia Harris in some

22   manner?

23     A     Yes.

24     Q     That would be Cornelia's son?

1     A     No.

2     Q     Who is he then?  I'm confused.

3     A     Second cousin.

4     Q     Okay.  You reference Geraldine Grey as a

5   supervisor.  Who was she?

6     A     Friend of the family.

7     Q     Okay.  And Leigha Newland, who is she?

8     A     Friend of the family.

9     Q     And Bishop Sanders is your pastor?

10    A     Yes.

11    Q     What church is that?

12    A     All Nations Church of God in Christ.

13    Q     Did you interview with anyone else?

14    A     Not that I remember.

15    Q     When were you told that you were going to

16  be hired?

17    A     Prior to after my interviews, is what you

18  asking me?

19    Q     Mm-hmm.  Yes.  I have to say "yes," too.

20    A     I'm not sure.  I just know that my start

21  date was December 7th.

22    Q     Okay.  And you started at the Caterpillar

23  plant in Joliet?

24    A     Yes.

Jordan, Kiona

1      Q      What was your first position?

2      A      Kitter.

3      Q      And you were in the Clean Room?

4      A      Yes.

5      Q      Which is the absolute center of the

6      building, is it not?

7      A      Yes.

8      Q      Was there any discussion with Mike about

9      the various jobs that you might need to be performing

10     while you were at the Caterpillar plant for R&O?

11     A      I was told that I was going to be in

12     Kitting.  I had no clue what kitting was so I asked

13     my auntie did she know anything about kitting.  She's

14     like, Yeah, I'm in Kitting.  We prepare the work for

15     Caterpillar workers.  We take all the tools that they

16     need to their bench.  We make up boxes what they call

17     a kit and we put every piece that they need to

18     build -- as example, a transmission.

19                    If they're building a transmission, we

20     get all the little parts together in a kit and we

21     sort it out for them and we label it.  And we have

22     somebody check the kit, which is to verify if we put

23     the right things in there and then that's our job

24     title.

1      Q   Are you aware of any other employees that

2   were assigned to other positions that R&O staffs at

3   the Caterpillar plant?

4      A   No.

5      MS. HUBBARD:  Let's mark this Exhibit 2.

6                     (Whereupon, Jordan Deposition

7                     Exhibit No. 2 was marked for

8                     identification.)

9   BY MS. HUBBARD:

10      Q   I show what you we've mark as Deposition

11   Exhibit No. 2, which is the R&O sexual harassment

12   policy standards of conduct.  Have you seen this

13   document before?

14      A   Yes.

15      Q   When did you first see it?

16      A   In a little orientation that we have.

17   Going through the pages, I noticed it.

18      Q   Did you read it?

19      A   Yes.

20      Q   I'd like you to look at the second page of

21   Exhibit 2.  In the middle of the page it states, If

22   you experience or witness sexual harassment, report

23   it immediately to the manager of Human Resources.  Do

24   you see that?

1    54 and you would still have been earning $10.00 an

2    hour; correct?

3         MR. ASONYE:  Objection.  Form.  Foundation.

4             You can answer.

5         THE WITNESS:  Doing harder work is the

6    difference.

7    BY MS. HUBBARD:

8        Q   That's not my question.

9             My question is, no matter what the

10   class number that was given to you, you were still

11   earning $10.00 an hour; isn't that true?

12        MR. ASONYE:  Objection.  Form.  Foundation.

13            You can answer.

14        THE WITNESS:  Yes.

15   BY MS. HUBBARD:

16       Q   You were earning $10.00 an hour as a kitter

17   and you were going to earn $10.00 an hour in Repack;

18   correct?

19       A   Yes.

20       Q   Okay.  Same benefits; correct?

21       A   Yes.

22      MS. HUBBARD:  Mark this as Exhibit 3.

23

24

1    Class 1 is not a good choice.  It's not --

2         Q    Did anyone tell you that?

3         A    I asked my auntie about it because I had

4    never really, you know, went into the depth of the

5    classes anyway.  I just knew that we was Class 3, we

6    was in the Clean Room.  You know, that was a good

7    thing.  That was probably the best you could do at

8    Caterpillar.

9                   So when I told her I was in a Class 1

10   she said, Oh, Class 1.  She said, That ain't good.  I

11   said, What you mean that's not good?  She said, Well,

12   Class 1 you going to be doing something you probably

13   don't want to do.  And she's like, What did they --

14   did they tell you where you were going?  I said,

15   Repack.  She looked at me, like, Repack?  Oh, they

16   trying to get you to quit.  Well, I said, I never

17   worked Repack before.  I said, I'm not the type that

18   back down to jobs, you know.  You know, I need the

19   job so I got to do it.  And she just looked at me,

20   like, good luck.

21        Q    So before you had this conversation with

22   your aunt -- I assume in July of 2006; is that

23   correct?

24        A    Yes, approximately July.

Jordan, Kiona

Page 65

1      Q    -- had anyone from R&O management explained

2  to you what class designations mean?

3      A    Not that I recall.

4      Q    Okay.  So this is an assumption that your

5  aunt made, that this was not a good thing, do you

6  know?

7      MR. ASONYE:  Objection.  Form.  Foundation.

8              You can answer.

9      THE WITNESS:  I've heard it through a

10  Caterpillar worker -- like a real Caterpillar worker,

11  no contractor.  He said that classes, you know,

12  affect your -- it can affect your pay.  Because I

13  wanted to get hired in through Caterpillar.  And he

14  was telling me, you know, The higher your class you

15  can get it -- you know, you can make some pretty

16  decent money.

17  BY MS. HUBBARD:

18      Q    Why did you want to get hired into

19  Caterpillar?

20      A    My grandfather retired from Caterpillar,

21  and from my understanding the benefits are very well

22  and the pay is pretty good.

23      Q    So you were planning on leaving R&O if you

24  got a job at Caterpillar?

Jordan, Kiona

```
1         A    I was called to the office.

2         Q    To the T&T Office?

3         A    Yes.

4         Q    Who called you to the office?

5         A    I believe Keith Cecil, I'm not sure.

6         Q    Okay.  Why did he call you to the T&T

7    Office?

8         A    He had found out about me being called a

9    nigger.

10        Q    How did Keith Cecil know about this

11   incident with Nick Close?

12        A    Marty went and told.

13        Q    Did the incident happened on December 16th?

14        A    Approximately.

15        Q    Is it your recollection that you filled out

16   this Conversation Form on the same day as the

17   incident with Nick Close?

18        A    Yes.

19        Q    And what you describe in here is what

20   occurred?

21        A    Yes.

22        Q    Was Marty -- Marty's last name is Stanick;

23   is that true?

24        A    I'm not sure of his last name.
```

1     Q    Okay.  He was also a production worker?

2     A    Yes.

3     Q    Did he overhear these remarks, to your

4  knowledge?

5     A    Yes.

6     Q    And what time did this event with Nick

7  Close occur, do you recall?

8     A    No.

9     Q    Was it in the morning?  Was it in the

10  afternoon?

11     A    I don't remember.

12     Q    How much time between Nick Close's comments

13  and your filling out this Conversation Form elapsed?

14     A    I'm not sure.  Marty went and told.  They

15  called me after Marty came from the office.

16     Q    So Marty told Keith Cecil, is that your

17  understanding?

18     A    Yes.

19     Q    And Keith Cecil called you to the office?

20     A    Yes.

21     Q    Who was in the meeting?

22     A    I don't remember.

23     Q    Well, was Keith Cecil there?

24     A    Keith was present.  I don't remember if

1    anybody else was there.

2         Q    And did Keith ask you to fill out a

3    Conversation Form?

4         A    Yes.

5         Q    And you did; correct?

6         A    Yes.

7         Q    What, if anything, did you say to Keith

8    Cecil when you met with him?

9         A    He asked me about what Marty told him.  Was

10   it true that Nick called me a nigger?

11        Q    What is Keith Cecil's race?

12        A    Caucasian.

13        Q    And how about Marty?

14        A    Caucasian.

15        Q    And what did you say to Keith Cecil?

16        A    I told him, Yes.

17        Q    Anything else?

18        A    He asked me what led up to the incident.

19        Q    And what did you say?

20        A    I told him that some parts got dropped off

21   to Nick, and Nick thought I put the parts in his cart

22   or whatever.  And I told Nick, I didn't put those

23   parts, you know, in your cart.  They got put there on

24   accident.  And Nick -- he gets this thing, he'll like

1    kind of yell loud, get mad real easy.  And he was

2    like, You did put those parts, you're trying to get

3    me in trouble.  I'm like, Nick, I wouldn't do that to

4    you.  I wouldn't try to get you in trouble.

5                    And my auntie come over there -- she

6    worked with Nick before -- and she said, Well, Nick

7    can be like that.  Sometimes he get loud and, you

8    know, get all frustrated, just, you know, ignore him

9    and he'll stop.

10                   So then I just kept on doing what I

11   was doing.  And then every time I go over there,

12   Yeah, you trying to get me in trouble and you're

13   trying to, you know, get me all fired and stuff.  I'm

14   like, Nick, I'm not trying to get you in trouble.  I

15   wouldn't do that to you.  And then he was like, Yeah,

16   that's what niggers do.

17        Q    And --

18        A    I wasn't sure if I heard him correct.

19        Q    Okay.

20        A    And Marty's like, You heard what he said?

21   I said, He called me a nigger.  And Marty's like, I'm

22   going to go tell on him.  I'm like, No, wait.  I'll

23   go tell myself.  And he's like, No, I'm going to go

24   tell right now.  I was like, All right.

1          So Marty went up there and told.  He
2     said, Nick always getting away with stuff.
3          Q    So Marty was the one who initiated the
4     complaint then to Keith Cecil, not you; is that true?
5          A    Right.
6          Q    Why did you not complain?
7          A    I was going to tell.  I just wasn't going
8     to tell right away.  And my auntie was like, You
9     better go tell on him.  Because people always say
10    that Nick was crazy and he'll do something to you.
11    They always said that about Nick, that don't mess
12    with Nick, and Nick, he'll wait on you after work and
13    do this and do that.  If I was you, I wouldn't tell.
14    Just basically listening to people -- I was like,
15    Well, I'm going to go tell on him, just let me do it
16    on my own.  I'll go and tell.  I'm going to tell on
17    him, just let me do it on my own.  Then Marty -- all
18    of them was rushing like, Go tell right now.  Go tell
19    right now.  And then Marty's like, If you don't go
20    tell right now, I'm going.  So Marty told first.
21         Q    Was Marty upset about what had happened to
22    you?
23         MR. ASONYE:  Objection.  Form.  Foundation.
24              You can answer.

1       THE WITNESS:  Yes, he was.

2   BY MS. HUBBARD:

3       Q    Nick Close was fired by R&O; isn't that

4   true?

5       A    Yes.

6       Q    In fact, he was fired almost immediately,

7   is that your understanding?

8       A    Yes.

9       Q    Do you think that R&O reacted promptly to

10  your statements when Keith Cecil found out from Marty

11  about what had occurred?

12      A    Yes.

13      Q    They do anything wrong, in your opinion?

14      A    Not to my knowledge.

15      Q    Were you thinking that you were going to

16  file a race discrimination case against R&O because

17  of the event with Nick Close?

18      A    No.

19      Q    Were you satisfied with the way R&O dealt

20  with the Nick Close problem?

21      A    I didn't think they were going to fire him.

22  Think maybe he get disciplined, but I didn't think

23  that -- like it was going -- he was going to get

24  fired, stuff like that.

1      Q    Why did you think he wouldn't be fired?

2      A    Just listening, people were telling me like

3   Nick always doing things and saying things and he get

4   away with a lot.

5      Q    Who are "people"?  I don't know who

6   "people" --

7      A    Marty was telling me that.  My auntie was

8   telling me that.  A lot of people in the kitting area

9   was telling me that Marty usually get away with

10   saying and doing different things.

11      Q    Marty or Nick Close?

12      A    No, Nick.  That Nick usually say things and

13   do things and they'll just, you know, don't really do

14   too much to him.  They used to Nick.

15      Q    Well, correct me if I'm wrong, but the

16   scenario is Marty reports Nick Close's comments to

17   you on the day they occur.  You have a meeting with

18   Keith Cecil and confirm Nick Close's comments on the

19   day they occurred and Nick Close is immediately

20   fired.  Is that correct, according to your

21   recollection of the event?

22      A    Yes.

23      Q    Do you think that R&O took this matter

24   seriously?

1      A    Yes.

2      Q    Do you think that R&O has the right to take

3   employee misconduct seriously?

4      A    Yes.

5      Q    Do you think that R&O has the right to

6   discipline an employee for misconduct?

7      A    Yes.

8      MS. HUBBARD:   Let's mark this as Exhibit 7.

9                         (Whereupon, Jordan Deposition

10                         Exhibit No. 7 was marked for

11                         identification.)

12   BY MS. HUBBARD:

13      Q    Show you what we've marked as Exhibit 7,

14   which is an Employee Warning Notice to you dated

15   February 6, 2006.  Does this document contain your

16   signature?

17      A    Yes.

18      Q    You state that you agree with the

19   employer's statement in this matter?

20      A    Yes.

21      Q    You were supposed to wear safety goggles

22   while on the floor of the R&O plant; isn't that true?

23      A    Yes.

24      Q    And you're also supposed to wear earplugs?

Jordan, Kiona

1        Q    Have you ever seen this document before?

2        A    No.

3        Q    Okay.  Is the T&T Office open to any

4   employee who wants to go in there?

5        A    Yes.

6        Q    And the Conversation Forms in blank are

7   kept at the T&T Office?

8        A    Yes.

9        Q    You knew that you could go to the T&T

10  Office and ask for a Conversation Form at any time;

11  is that fair?

12       A    You can't get one and just go and fill it

13  out.  If you go to the T&T Office with a problem, you

14  filled it right then and there in front of them.

15       Q    But it's your understanding of the

16  procedure that they want you to fill out -- that

17  management at R&O wants you to fill out a

18  Conversation Form if there's a problem?

19       MR. ASONYE:  Objection.  Form.  Foundation.

20              You can answer.

21       THE WITNESS:  Yes.

22  BY MS. HUBBARD:

23       Q    Do you recall a conversation with Keith

24  Cecil on March 3, 2006?

1    document there appears to be an undated form -- or an

2    undated note that starts, Hi, Keith.  This is Kiona.

3    Do you see that document?  It's at the back of the

4    exhibit.  It commences on Bates Stamp 75.  Have you

5    found it?

6         A    Yes, the, Hi, Keith.

7         Q    Is this your handwriting?

8         A    Yes.

9         Q    This is a note you addressed to Keith

10   Cecil?

11        A    Yes.

12        Q    And on Bates Stamp 81, is that your

13   signature?

14        A    Yes.

15        Q    Do you recall when you wrote this document?

16        A    I don't remember the exact day.

17        Q    Why did you write this note to Keith Cecil?

18        A    Addressing the write-up that I had.

19        Q    This is not on a Conversation Form, is it?

20        A    No.

21        Q    So you understood that you could use not

22   only a Conversation Form, but also you could give

23   notes, such as this one, to management about concerns

24   that you had; is that true?

1       A    Yes.

2       Q    What is a hot kit?

3       A    A hot kit, one that you don't take your

4    time with.  You do it as soon as you get it.  Most

5    kits we get they'll put them on the shelf.  They can

6    stay on the shelf until you finish the one you're

7    working on.  But a hot kit you jump that in front

8    of -- just about whatever you're doing, it jumps in

9    front of.

10      Q    That's because somebody from Caterpillar

11   needs that right away?

12      A    ASAP.

13      Q    Okay.  Do you think you wrote this memo in

14   March of 2006, approximately?

15      A    I think it was right after the write-up.

16   It had to be the day after the write-up after

17   speaking with Keith after that Conversation Form he

18   gave -- the write-up that's dated on the 1st saying

19   that I was giving little effort and spend too much

20   time socializing.

21      Q    What Exhibit No. is that?

22      A    I don't know what Exhibit No. it is.

23      Q    So you're referring to Exhibit 8?

24      A    Yes.

Jordan, Kiona

1        Q      Which supervisor was first?

2        A      They were both -- they both were covering

3   Kitting.  So they both checked in on us and they both

4   came over to make sure we was all right.

5        Q      To your knowledge, when did Lewis Gregg

6   become your supervisor?

7        A      About the middle of June, approximately.

8        MS. HUBBARD:    Mark this as Exhibit 40.

9                              (Whereupon, Jordan Deposition

10                              Exhibit No. 40 was marked for

11                              identification.)

12  BY MS. HUBBARD:

13       Q      Show you what we've marked as Exhibit 40,

14  which is the Employee Position Change Form.  Lewis

15  Gregg was a trucker; is that correct?

16       MR. ASONYE:    Objection.    Form.    Foundation.

17                 You can answer.

18  BY MS. HUBBARD:

19       Q      If you know?

20       A      Before him becoming a supervisor?

21       Q      Correct.

22       A      From my knowledge, I seen him on trucks.

23       Q      Does this refresh your memory as to when he

24  become your supervisor?

1      Q    Why do you think that Lewis Gregg was not

2    lying to you?

3      A    Because he was there and no other

4    supervisor was there.  The next day and the following

5    days adding up he was the only one there acting as a

6    supervisor.  And he came around and he asked for all

7    our -- he asked for my number.  And he's like, What's

8    your number?  And then I said, What you want my

9    number for?  He said, Well, I asked everybody for

10   their number.  I said, Well, don't we got to call in,

11   you know, if -- like if, you know, you ain't coming

12   in or something, don't I need to know that?  And I'm

13   like, Well, if I ain't coming in, I'll just, you

14   know, call the T&T Office or R&O.  He's like, Well,

15   everybody -- you know, ain't nobody else complaining.

16   You're the only one complaining about giving me your

17   number.  He said, I get it from everybody because I

18   don't have a cell phone yet.

19              All the supervisors have cell phones.

20   He said I haven't got mine yet so I needed your

21   number.

22      Q    Did you give him your number?

23      A    No.

24      Q    Did he discipline you for that?

```
 1    BY MS. HUBBARD:
 2        Q    So you asked him, What is that supposed to
 3    mean; is that correct?
 4        A    Yes.
 5        Q    And what was his response?
 6        A    He said, You know what I mean, and he like
 7    smiled.
 8        Q    Was there anything else that he said?
 9        A    No.
10        Q    Did you at any time report either of these
11    incidents to anyone in management at R&O?
12        A    No.
13        Q    What was the next incident with Lewis
14    Gregg?
15        A    About a week later he came back to me and,
16    you know, he'd tell little jokes and stuff.  And,
17    like I say, I don't pay him no attention because I
18    know how he is.  He makes it so uncomfortable to be
19    around.  So I asked him --
20        Q    What kind of jokes does he tell you?
21        A    He just say jokes, like perverted jokes.
22        Q    Well, I don't know what you mean by
23    "perverted jokes."
24                  What, to your knowledge and
```

1    recollection, were the actual perverted jokes in your

2    opinion, that he was telling you?

3           A    Just jokes about size of men penises and --

4           Q    What did he say?

5           A    He just said, like, Yeah, mens with the

6    small shoes can't do it like men with the big shoes

7    because men with the big shoes like me, I can go all

8    night.  I'm glad I wasn't born with small feet.  And

9    then he just laugh and think that stuff like that is

10   funny.

11              And one of the coworkers, she was kind

12   of like a lead at the time, Clarissa, she was telling

13   him like, Lewis, you need to stop because you don't

14   even know these girls like that.  Her and Lewis were

15   good friends.  She was like, You know me like that

16   and you can play with me like that, but you can't

17   play with everybody like that.

18              And one day during our meeting --

19           Q    Hold on.  I want you to stay focused on

20   answering my questions.

21           A    I'm telling you about the jokes he was

22   saying.

23        MR. ASONYE:  You asked about the jokes.  Let

24   her finish, please.

1        MS. HUBBARD:  Okay.  All right.

2        THE WITNESS:  One day during the meeting we had

3    we had to line some wood up against the wall because

4    when the truckers ride by, sometimes they scratch up

5    the wall.  So he said, Kiona, Erica, I need you all

6    to handle my wood.  And I'm like, Wood?  What do you

7    mean your wood?  And he's like, You all know what I'm

8    talking about.  And then he's like, No.  No.  Let me

9    stop playing with you all like that.  I'm talking

10   about the wood outside the warehouse, outside the

11   Clean Room.  I need you all to line it up against the

12   wall for me.

13            And then Clarissa told them again,

14   Lewis, why is you steady playing with them girls like

15   that?  And he's like, I ain't going to say nothing

16   else because I ain't trying to get in trouble.

17       Q    What was the date of that conversation?

18       A    I don't remember.

19       Q    What other instances of what you allege to

20   be sexual harassment occurred with Lewis Gregg?

21       A    One time I asked him, Can I go home early?

22   And I came to Lewis, I said, Lewis, my mother said

23   that she had to go to some district meeting at church

24   and that if I could come home because she couldn't

1    miss it, whatever -- she couldn't miss it.  And he

2    said, Oh, it's no problem, you can go.  He said, But

3    under one condition, you got to come over to my house

4    and watch these movies with me.  I'm like, Watch what

5    movies, Lewis?  Ain't nobody coming over to your

6    house.

7                    And then he's like, You know what kind

8    of movies I sell.  I sell them nasty movies.  He's

9    like, By the end of the night you'd be in love with

10   me.  He said, I got all type of movies:  Movies with

11   just girls in them, girls on girls, and you know all

12   type of positions.  And by the end of the night

13   you'll be in love with me.

14                   I said, Lewis, I am not coming over to

15   your house.  And he said, Well, if you're not coming

16   over to my house, then if you leave, you'll get wrote

17   up.  And then I'm like, Lewis, you sound real stupid.

18   You're my supervisor and you telling me that I need

19   to come over to your house.  And then he's like, No,

20   you can go ahead and leave, and he let me leave.

21       Q     Anything else about this conversation that

22   you recall?

23       A     Just the fact he just said I should butter

24   him up if I want privileges for him to let me leave

1    or let me do certain thing that I should butter him

2    up.

3              When I was giving him the cold

4    shoulder, as he called it -- when he was coming, kept

5    on complimenting me and kept on saying things to me

6    and I wasn't saying nothing back, and I told him that

7    I had a boyfriend.  And he was like, Well, if you

8    would have buttered me up and been nice, you know, I

9    probably wouldn't have a problem with you leaving.

10   But he ended up letting me leave anyway.

11        Q    The jokes about the shoe size, did you

12   report that to anyone in management?

13        A    No.

14        Q    The issue about going home early and his

15   comments about coming over to his house, did you

16   report that comment to anyone in management at the

17   time that it happened?

18        A    No.

19        Q    Why not?

20        A    Because I know how it's going to look on

21   me.  If I'm the one going to tell -- I've been

22   through this situation before.  I don't want to be

23   embarrassed, humiliated.  The same way things

24   happened to me before, I didn't want it to happen

1    again.  So I just blocked it out.

2                    Don't nobody know the pain that you go

3    through being humiliated and embarrassed at work when

4    it come to these type of incidents.

5        Q    In regard to the issue about watching the

6    movies, did you report that to anyone at work in

7    management?

8        MR. ASONYE:  Objection.  Form.  Are you talking

9    about -- can you put a time frame to your question,

10   or no?

11       MS. HUBBARD:  She has told us that in mid to

12   late June 2006 there was a conversation with Lewis

13   Gregg about coming over to his house and watching

14   nasty movies.

15   BY MS. HUBBARD:

16       Q    My question is, did you report that to

17   anyone in management at the time that it happened?

18       MR. ASONYE:  Objection.  Form.

19                    You can answer.

20       THE WITNESS:  No.

21   BY MS. HUBBARD:

22       Q    For the same reason?  You didn't want to be

23   embarrassed?

24       A    Yes.

Jordan, Kiona

1    Q    Did you report the comment about -- that he

2    made in regard to keeping your car to anyone in

3    management?

4         MR. ASONYE:  Objection.  Form.

5                   You can answer.

6         THE WITNESS:  No.

7    BY MS. HUBBARD:

8         Q    And was that for the same reason?

9         A    Yes.

10        Q    That you didn't want to be embarrassed?

11        A    Yes.

12        Q    Was there any further conversation with

13   Lewis Gregg on or about June 26th concerning why you

14   didn't come over to his house?

15        A    When I came back to work that next week, we

16   had a meeting.  The first thing when we came in, we

17   had this meeting.  And in the meeting he was being

18   really aggressive, like.  Everything, Kiona,

19   everything, Kiona; Kiona why you didn't do this?

20   Kiona, why you didn't do that?  Kiona, Clarissa

21   shouldn't have to tell...  And I'm just looking like

22   this must have something to do with why -- because I

23   didn't come over to his house so now he acting all

24   mean to me.