1    Q    Did you report the comment about -- that he

2    made in regard to keeping your car to anyone in

3    management?

4         MR. ASONYE:  Objection.  Form.

5              You can answer.

6         THE WITNESS:  No.

7    BY MS. HUBBARD:

8    Q    And was that for the same reason?

9    A    Yes.

10   Q    That you didn't want to be embarrassed?

11   A    Yes.

12   Q    Was there any further conversation with

13   Lewis Gregg on or about June 26th concerning why you

14   didn't come over to his house?

15   A    When I came back to work that next week, we

16   had a meeting.  The first thing when we came in, we

17   had this meeting.  And in the meeting he was being

18   really aggressive, like.  Everything, Kiona,

19   everything, Kiona; Kiona why you didn't do this?

20   Kiona, why you didn't do that?  Kiona, Clarissa

21   shouldn't have to tell...  And I'm just looking like

22   this must have something to do with why -- because I

23   didn't come over to his house so now he acting all

24   mean to me.

1        So, he said, And if you got a problem

2    with anything I'm saying, you can leave.  You can be

3    walked out.  You can leave right now.  So as he

4    telling me this, I can't believe it because I'm like,

5    this is not Lewis, not the Lewis that -- talking to

6    me every day, saying nasty things to me every day

7    being, you know, extra extra friendly.  Now he's

8    acting crazy, telling me he'll walk me out, all this

9    crazy stuff.

10        So I don't know where all this was

11    coming from.  So around breaktime I called my momma

12    and I told my momma what happened.  And I told her

13    that he was saying that he was going to walk me out

14    and stuff.  So she was like, You need to go and tell

15    on him.  And I said, No, I'm not going to go tell on

16    him because I know what happened to me at my last job

17    when I went and told on somebody.  And she was like,

18    Well, if you don't tell, then I'm going to go up

19    there to R&O and tell because you shouldn't have to

20    go through the same thing again.

21        Q    So did you have any conversations with

22    anyone other than your mother on June 29th?

23        A    I've had conversations with a lot of people

24    about what Lewis was doing, people that I was close

1    call her when I was talking to Tim.  Tim said I

2    should call Leslie because she could help me.  So

3    that's who I called.

4    BY MS. HUBBARD:

5        Q    Did you make any effort to call Human

6    Resources at R&O on June 29th?

7        A    No, I don't remember.

8        Q    So did you come to work the next day on

9    June 30th and talk to Ray Ebner?

10       A    Yes.

11       Q    What, if anything, did Ray Ebner say to

12   you?

13       A    I just gave him a piece of paper that I

14   wrote, you know, what Lewis was doing and saying.

15   And he just looked at it.  He didn't really read it.

16   He just glanced at it.  He said, I'll take it to

17   Amanda, why don't you follow me.  So we walked up to

18   the T&T Office and he left us in there by ourself.

19       Q    And he what?

20       A    He left us in there by ourself.

21       Q    I'd like you to look at Exhibit 32.

22       MR. ASONYE:  Counsel, the exhibits she has

23   aren't marked.  So it's kind of hard for her to

24   follow.  Do you want to give her the marked exhibits?

1    A    Well, you want me to read this whole thing?

2         No.

3    Q    Why did you not include his marks about the

4    shoe size in this memo?

5    A    It wasn't really directed to me.  Him and

6    Clarissa was having a conversation.  Clarissa like

7    girls.  She don't mess with men.  So he would say

8    stuff to her jokingly all the time.  I was standing

9    there when he said it.  He didn't say, Well, Kiona,

10   shoe size is this.  He was just saying it out loud.

11   And that's why Clarissa was like, You need to be

12   quiet because you can't talk to everybody like you

13   talk to me.

14   Q    Well, did you consider the comments about

15   the shoes to be sexual harassment of you?

16   A    It was sexual harassment for whoever was

17   offended by it.

18              And I was offended by it.  You don't

19   even know me like that so you can be talking like

20   that around me.  And that's what Clarissa was saying

21   to him, like, you -- you and me -- you talk amongst

22   ourself about stuff.  You can't say stuff like that

23   around everybody.  And that's when he was like, Oh,

24   oh, my bad.

 1        Q    So you considered that to be sexual

 2   harassment?

 3        A    Yes.

 4        Q    But you did not put it in the memo that you

 5   wrote?

 6        MR. ASONYE:  Objection.  Argumentative.  Asked

 7   and answered.

 8              You can answer.  Answer it again.

 9        THE WITNESS:  No.  Clarissa told them what he

10   was saying and they said, Well, Clarissa told us what

11   you were saying, but they were just jokes,

12   inappropriate jokes.

13   BY MS. HUBBARD:

14        Q    I'd like you to take a look at the last

15   page, Bates stamped 74.  You state -- you're talking

16   here at the top of the page about he gave us his home

17   number in case we're not coming in.  Could you read

18   that first sentence there.  You need to read it out

19   loud.

20        A    I'm trying to find out where you're saying.

21        Q    Start at the beginning, But I knew...

22        A    Just the day before he was trying -- just

23   the day before he was -- I don't know what that

24   say -- asking me to come over and telling me what

1    disgusted with --

2        A    The way.

3        Q    -- I've been treated and don't understand

4    why I keep getting put in these situations.  Is that

5    what you wrote?

6        A    Yes.

7        Q    So what do you mean when you say here that

8    I turned him down countless times?  What are you

9    referring to?

10       A    Like him asking me take me out.  Him asking

11   me to come over to his house.  Him asking me about

12   going to Chicago and us being alone, nobody found out

13   about us.

14       Q    Okay.

15       A    And asking me to watch nasty movies with

16   him.

17       Q    I'm sorry.  I didn't hear you.

18       A    Him asking me about watching the nasty

19   movies with him.

20       Q    Did he ever touch you physically?

21       A    No.

22       Q    Did you ever think that he was going to

23   touch you?

24       A    No.

1    and said, You shouldn't have -- I shouldn't have to

2    tell you what to do, you have been here seven months.

3    Is that a correct statement?

4         A    Yes.

5         Q    Did you think you were going to be

6    disciplined?

7         A    Yes.

8         Q    What was the reason that Gregg raised his

9    voice and yelled at you?

10        A    I don't remember exactly what it was, but I

11   know it had something to do with leaving the tickets

12   in the tower.  I don't know if he thought it was me.

13   He really didn't -- he really wasn't saying

14   specifically.  But he figured because I've been there

15   the longest that I shouldn't have let it happen, no

16   tickets in the tower at all.

17        Q    And according to the EEOC charge that you

18   wrote, this is also the same day that he made the

19   comment about the wood?

20        A    Yes.

21        Q    Did you assume that his comment was

22   referring to his penis?

23        MR. ASONYE:  Objection.  Form.  Argumentative.

24              You can answer.

1    If I wrote that letter on the 29th, I saw her the

2    next day.

3    BY MS. HUBBARD:

4        Q    And you gave her the handwritten notes that

5    we've been talking about?

6        A    Yes.

7        Q    Is it correct that she said to you, Kiona,

8    I'm very sorry that this happened to you.  I'm going

9    to get to the bottom of this and find out what's

10   going on?

11       A    Yes.

12       Q    Did you believe her?

13       A    Yes.

14       Q    I'd like you to take a look back at

15   Exhibit 2.

16       A    I have it.

17       Q    On Paragraph 2B, it states that sexual

18   harassment is a form of misconduct that undermines

19   the employment relationship.  No R&O Specialties

20   employees either male or female should be subjected

21   verbally or physically to unsolicited and unwelcome

22   sexual overtures or conduct.

23            Did you believe that Lewis Gregg's

24   conduct was unsolicited and unwelcome?

1    A    Yes.

2    Q    Did you think that his conduct was behavior

3    that is personally offensive that debilitates moral

4    and, therefore, interferes with your work

5    effectiveness?

6    A    Yes.

7    Q    On the second page the policy states, If

8    you experience or witness sexual harassment in the

9    workplace report it immediately to the manager of

10   Human Resources; is that correct?

11   A    Where you reading that?

12   Q    At the top of Page 105 there are three

13   subparagraphs, 1, 2, 3, and the second paragraph

14   below that.

15   A    Okay.

16   Q    The policy states, does it not, If you

17   experience or witness sexual harassment in the

18   workplace, report it immediately to the manager of

19   Human Resources; correct?

20   A    Yes.

21   Q    You believe you were experiencing sexual

22   harassment, didn't you?

23   A    Yes.

24   Q    And you believed you'd been experiencing

1    sexual harassment since approximately June 15th; is

2    that correct?

3         A    Yes.

4         Q    This states that you may approach any

5    member of R&O Specialties management with whom you

6    feel comfortable to report the harassment; isn't that

7    true?

8         A    Yes.

9         Q    You did not do that until on or about

10   June 30th; is that correct?

11        MR. ASONYE:  Objection.  Form.  Foundation.

12                  You can answer.

13        THE WITNESS:  Correct.

14   BY MS. HUBBARD:

15        Q    And, again, the reasons you did not report

16   any of this conduct was because you were embarrassed

17   by it?

18        MR. ASONYE:  Objection.  Form.

19   Characterization.

20                  You can answer.

21        THE WITNESS:  Because of what happened to me at

22   the prior job.  I didn't want to get fired.  I didn't

23   want everybody knowing what happened to me, talking

24   about me.  I've been through this before.

1          I know -- you complain about sexual

2    harassment, you the victim, but everybody looking at

3    you like the villain, that you the one that did

4    something wrong.  What did you do to cause him to do

5    it?  What did you -- everybody looking at me like the

6    bad guy.  I've been through it.  I do not want to go

7    through it again, so I was going to keep quiet.

8    BY MS. HUBBARD:

9        Q    Well, let me ask you a question.  Did any

10   of the coworkers or any of the managers at R&O harass

11   you, retaliate against you or make your life

12   miserable after Nick Close was fired?

13       A    No.

14       Q    So why did you believe that reporting Lewis

15   Gregg's sexual harassment would result in the same

16   instances of coworker harassment that you'd

17   experienced at an entirely different employer?

18       MR. ASONYE:  Objection.  Argumentative and

19   form.  She did report.  I'm not sure if there's some

20   confusion in your questions or...

21          Go ahead and answer.

22       THE WITNESS:  What did you ask me?

23       MS. HUBBARD:  Could you read my question back,

24   please.

1              (Whereupon, the record was read

2                     as requested.)

3      MR. ASONYE:  Objection.  Form.  You can answer.

4      THE WITNESS:  Just the way people react to

5  certain things.  That job was made up of a lot of

6  men -- majority men.  So by me saying he was sexual

7  harassing me, a lot of men going to look at me and

8  not want to talk to me.  Won't -- look at me

9  different.  Going to think I'm just out to get

10  people, and that's not the person I am.

11  BY MS. HUBBARD:

12      Q    Those are assumptions you made?

13      A    That's what I believed and that's why I

14  didn't go and tell.

15      Q    On Exhibit 2 do you see where it states,

16  R&O Specialties will not permit employment based

17  retaliation against anyone who brings a complaint of

18  sexual harassment?

19      MR. ASONYE:  Objection.  Form and foundation.

20              You can answer.

21      THE WITNESS:  That's what that say.

22  BY MS. HUBBARD:

23      Q    Do you have any independent basis of

24  believing that you were going to be retaliated

Jordan, Kiona

1    they going to have his back.  They don't want to look

2    bad.

3        Q    Did anyone ever --

4        MR. ASONYE:  Let her finish.  You said you

5    wanted her to answer, let her answer.

6        MS. HUBBARD:  All right.

7        THE WITNESS:  They were going to have his back.

8    They didn't want him to look bad.  They just made him

9    a supervisor, so you know bad that's going to look on

10   them?  We just made you a supervisor and you getting

11   complained on already.  I had all of that in my mind.

12             I complained on a supervisor before,

13   he got terminated and I got dogged out for it.  I got

14   my job took.  I got talked about.  I didn't want to

15   go through that no more.  My mother told me, Kiona,

16   if you don't go tell, I'm going to R&O personally and

17   I'm going to tell them.  And that's exactly what

18   happened.

19       Q    Did anyone in management ever tell you that

20   if you reported a supervisor for sexual harassment,

21   you would be retaliated against?

22       A    No.

23       Q    And, in fact, when you reported it on

24   June 30th, the director of Human Resources states to

1    you she's very sorry that this happened to you; isn't

2    that correct?

3         A    Yes.

4         Q    June 30th was a Friday?

5         A    I don't recall.

6         Q    I have -- I don't know if we need to mark

7    this as an exhibit, but it's a perpetual calendar for

8    all years from 1775 to 2100.  Would you please look

9    in Column 1 on June -- which apparently is Column 1

10   for 2006.

11        MR. ASONYE:   Counsel, I find this particularly

12   hard to read.

13        THE WITNESS:   Yes.

14        MR. ASONYE:   Why don't you ask your question

15   and I'll see if I need to object.

16   BY MS. HUBBARD:

17        Q    I would like you to look at Column 1 and I

18   would like you to look at June.

19        A    Mm-hmm.

20        Q    You with me?

21        A    Yes.

22        Q    June 2006 on June 30th is a Friday, is it

23   not?

24        A    Yes.

1      Q    Does that refresh your memory as to the day

2  of the week that you talked to Amanda?

3           MR. ASONYE:  Objection.  Form.  Foundation.

4           THE WITNESS:  Approximately.

5  BY MS. HUBBARD:

6      Q    What, if anything, did you tell -- tell me

7  about your conversation with Amanda.  What did you

8  say?  What did she say?

9      A    I gave her a letter that I wrote.  She read

10  it, and that's when she apologized.  She said she's

11  going to get to the bottom of this.  In the meantime,

12  I could get back to work.

13     Q    You gave her the notes?

14     A    Yes.

15     Q    Did she read them?

16          MR. ASONYE:  Objection.  Form.  Foundation.

17          THE WITNESS:  Yes.

18          MS. HUBBARD:  Why is that a form and foundation

19  question?

20  BY MS. HUBBARD:

21     Q    Did she read the notes in your presence?

22          MR. ASONYE:  That's a different question.

23  BY MS. HUBBARD:

24     Q    While you were sitting there with Amanda

1    Olson, did you see her read your notes?

2        A    Yes.

3        Q    Did she ask you any questions about them?

4        A    No.

5        Q    How long did the meeting with Amanda take?

6        A    Approximately 15 minutes --

7        Q    Had you met Amanda Olson prior to this

8    date?

9        A    Not that I remember.

10        Q    She was in the building when you and Ebner

11   went up to see her?

12        A    Yes.

13        MR. ASONYE:  Counsel, at a good time can we

14   just take a two-minute break?  It doesn't have to be

15   now.

16        MS. HUBBARD:  Sure.  That's okay.

17                            (Whereupon, a break was taken.)

18   BY MS. HUBBARD:

19        Q    Were you pleased that you were able to talk

20   to a woman about what had occurred in regard to Lewis

21   Gregg?

22        A    Yes.

23        Q    Did you give her the names of Seneca

24   Carter, Clarissa James and Erica Washington to talk

```
1    to?

2         A    Yes.

3         Q    To your knowledge, did Erica Washington

4    ever talk to Amanda Olson about your situation?

5         A    Not to my knowledge.

6         Q    In your conversations with Erica Washington

7    she never told you whether or not she had had any

8    communications with Amanda Olson?

9         A    No.

10        Q    So you knew that there was nothing wrong in

11   terms of the procedure at R&O about submitting the

12   kind of documentation that you gave to Amanda Olson

13   on June 30th; is that fair?

14        A    No, I didn't think there was nothing wrong.

15        Q    I mean, it was okay -- I mean, it was

16   perfectly acceptable to R&O to --

17        MR. ASONYE:  Objection.  Form.  Foundation.

18        MS. HUBBARD:  I hadn't even finished the

19   question.

20        MR. ASONYE:  Yeah, well, you stopped and I

21   wanted to be sure that -- I wasn't quite sure if you

22   had been done.  And I didn't want to miss my

23   objection so I had to squeeze it in.

24
```

1    performance.  But I go into about sexual harassment

2    and there's nothing, nothing ever brought up about

3    the Conversation Form or even a complaint form.  I

4    never filled one out.

5    BY MS. HUBBARD:

6        Q    Well, you'd given her four pages of

7    handwritten notes concerning what had happened; isn't

8    that correct?

9        MR. ASONYE:  Objection.  Argumentative.

10                You can answer.

11        THE WITNESS:  Yes, but that's not nothing that

12    the job gave me.  That's something I wrote.  That's

13    something my momma told me, Write down everything

14    that happened to you so you won't forget.  Write down

15    everything that happened to you and let them know.

16    So by me letting them know what happened to me, I

17    still never filled out no Conversation Form, no

18    complaints telling them -- with their documents.

19                    That's how they keep -- their traces

20    of what's going on by their Conversation Forms.  I

21    have plenty of them in the file so why wasn't I given

22    one about sexual harassment, one of the most serious

23    matters?

24        Q    Well, to your understanding, was there

1    things about Lewis asking me to go out, coming over

2    to his house.  I told him a lot of things and his

3    answer was to record him and get him caught up that

4    way.

5        MS. HUBBARD:  Could you read my question back,

6    please.

7                        (Whereupon, the record was read

8                        as requested.)

9        MR. ASONYE:  Restate objection.

10       THE WITNESS:  I just told you, he told them

11   what I said.  That's what he told me.

12   BY MS. HUBBARD:

13       Q    To your knowledge, did Seneca have any

14   knowledge of Lewis Gregg's behavior toward you other

15   than what you had told him?

16       MR. ASONYE:  Objection.  Foundation and form.

17                   You can answer.

18       THE WITNESS:  None that I know of.

19   BY MS. HUBBARD:

20       Q    Okay.  So as opposed to the situation with

21   Nick Close and Marty, who overheard the conversation,

22   to your knowledge, Seneca never overheard any of

23   these remarks that Lewis Gregg made to you; is that

24   correct?

Jordan, Kiona

Page 182

1       A     Correct.

2       Q     Okay.

3       A     Seneca worked in a whole nother department

4    than I did.

5       Q     What department did he work in?

6       A     He worked in a department they call Joe

7    Noser.  It's on the other side of the building.

8       Q     How often did you see Seneca?

9       A     On my breaks I'd go over there and talk to

10   him because I didn't want to be around Lewis.  I'd go

11   over there and tell him -- he asked me, What's been

12   going on over there, and I'll tell him or he ask me

13   if Lewis been saying anything, and I'd tell him.  But

14   he was one of the people that I would go and talk to

15   or have lunch with.

16      Q     So it's not uncommon for people in

17   different departments to talk to each other?

18      MR. ASONYE:  Objection.  Form.  Foundation.

19           You can answer.

20      THE WITNESS:  If you worked in the Clean Room

21   and you didn't supposed to be in the Clean Room, you

22   get chewed out.  So for breaks your best bet was to

23   go to, you know, another area and they can -- you can

24   talk to them in the area.  But the Clean Room, they

Page 183

1   didn't play about that room.  If you weren't working

2   there, you do not have permission to be in there.

3   BY MS. HUBBARD:

4       Q    But you saw Seneca, for example, on your

5   breaks or lunch or whatever; is that correct?

6       A    Yeah, he worked for Joe Noser.  Joe Noser

7   bring us parts.  So he was a trucker, but he was a

8   lead for Joe Noser.  And what we do is we order parts

9   from his area, and Seneca or whoever working at

10  trucking, they'll come and bring us a part.  So Joe

11  Noser probably was the only area that could have an

12  excuse to be in the Clean Room.

13      Q    When did you first meet Lewis Gregg?

14      MR. ASONYE:  Objection.  Asked and answered a

15  long time ago.

16              You can answer it again.

17      THE WITNESS:  I met Lewis prior to him being a

18  supervisor.  He wasn't a supervisor, just a trucker.

19  So I don't remember the month, day.  I just know that

20  when I did know him as a trucker, he didn't have a

21  supervisor title.

22  BY MS. HUBBARD:

23      Q    Was there any conduct toward you of the

24  sexually harassing nature that occurred before you

Page 184

1    believe he become a supervisor?

2        A    No.

3        Q    Were you aware of the fact that Lewis Gregg

4    was given a written warning about his conduct?

5        MR. ASONYE:  Objection.  Form.

6    Characterization.

7                You can answer.

8        THE WITNESS:  I was told he was disciplined.  I

9    didn't know what type of, you know, discipline that

10   they did to him.

11   BY MS. HUBBARD:

12       Q    When were you told that he was disciplined?

13       A    I was called to the T&T Office.

14       Q    By whom?

15       A    Don Chapman came and got me from Repack.

16   He said they need to see me so this is -- the

17   investigation was still going on.  So I go to the T&T

18   Office and in the room Amanda, Bob McGee, Keith and

19   Don Chapman sitting up there.

20                So as soon as I walk through the

21   door -- I didn't even get to sit down good -- Amanda

22   looked at me like, Kiona, the investigation is over

23   with.  You lied to us.  You was not telling the truth

24   and because you lied to us you have been suspended

1   for three days -- and I'm trying to get my story out

2   to ask her what is going on?  You never came back and

3   talked to me.  She said, You lied to us and because

4   you lied to us you are being suspended for three

5   days; and when you come back, you come back as a

6   Class -- your Class 1 job, Repack.

7        MS. HUBBARD:  I want the record to reflect that

8   the client has raised her voice and is becoming

9   aggressive.

10       THE WITNESS:  I was saying how she was saying

11  it to me.  I'll use that example how she's talking to

12  me.

13  BY MS. HUBBARD:

14       Q    My question to you is whether or not you

15  were ever told that Lewis Gregg was disciplined?

16       A    Yes.

17       Q    By whom?

18       A    Amanda.

19       Q    When?

20       A    When they called me to the office and told

21  me that the investigation was over with.  Amanda was

22  so loud and being so unprofessional.  And that's when

23  I said --

24       Q    I don't want you to characterize this

```
 1   behavior.  It is not responsive to my question.
 2        MR. ASONYE:  You can let her answer.
 3   BY MS. HUBBARD:
 4        Q    My question is simply, did you ever get
 5   told that Lewis Gregg was disciplined, "yes" or "no"?
 6        MR. ASONYE:  No, Counsel, she doesn't have to
 7   answer "yes" or "no."  She needs to answer it the way
 8   she thinks is best.
 9             Now take a deep breath.  I know things
10   are getting charged.
11   BY MS. HUBBARD:
12        Q    Were you ever told --
13        MR. ASONYE:  Let her answer.  There's a
14   question pending.
15             Go ahead.  You need to take a deep
16   breath.
17        THE WITNESS:  Amanda looked at me and said, You
18   are being suspended and he is being disciplined.
19   You're being suspended because you lied on him, and
20   we have two witnesses that said that you lied on him.
21   So when you get your three days' suspension, you're
22   going to return to your Class 1 job, Repack.
23   BY MS. HUBBARD:
24        Q    So she did tell you that he is being
```

```
 1   disciplined; correct?

 2        A    Correct.

 3        Q    And when did this conversation occur?

 4        A    This conversation happened around July, I

 5   don't know the exact date.

 6        Q    If you look at your EEOC charge, if you

 7   look at 2B, C -- 1C, Page 7, you state, On or around

 8   July 5 you were demoted to -- from the kitter

 9   position to the repack position.  Is this the date of

10   the conversation with Amanda or was that conversation

11   at a different date and time?

12        A    That happened after I was already in

13   Repack.  So it happened after July 5th.

14        Q    The conversation with Amanda?

15        A    The conversation with me being suspended

16   and her telling me that he was being disciplined for

17   what he did.

18        Q    So when did you learn you were going to be

19   reassigned to the repack position?

20        A    I don't know the exact date, but I was

21   told -- Ray Ebner came to me and he said, Kiona, get

22   your things, I need you to come with me.  And I said,

23   What's going on, you know, am I in trouble?  He said,

24   Oh, no, we just need you to work in Repack.  I said,
```

Jordan, Kiona

Page 188

1    Repack?  He was like, It's not my decision.  This was

2    given to me by the authority management so you have

3    to -- you know, you have to oblige by it.  So I'm

4    like, Oh, my God, I got to go to Repack.  So I went

5    to Repack.

6        Q    When was your first day in Repack?

7        A    I don't know.  It was in July.  Like, when

8    I came off -- it had to be after the 4th of July that

9    I worked in Repack.

10       Q    No one worked on July 4th?  The plant was

11   closed?

12       A    No, they don't close for no holidays.

13       Q    Did you work on the 3rd?

14       A    I don't remember.

15       Q    Did work on the 4th?

16       A    I don't remember.

17       Q    Your EEOC charge states July 5.  Do you

18   think that's the date you first went to Repack?

19       A    Approximately July 5th.

20       Q    You were still on second shift?

21       A    No.

22       Q    What shift were you on when you went from

23   the kitter position to the repack position?

24       A    First.

1        MR. ASONYE:  If I may just respond to that, she

2    has been answering your questions.  The reason we're

3    running out of time is because you spent a lot of

4    time on race discrimination, cases against other

5    companies that have nothing to do with this.  We

6    spent the first three to four hours on those.

7                So obviously that -- she has been

8    answering the questions and please continue answering

9    the questions the way you've been answering them,

10   which is thoroughly.

11       THE WITNESS:  Amanda -- when I came in Amanda

12   stated to me, Kiona, you lied and because you lied

13   you are being suspended for three days.  She said,

14   The investigation is over with.  We have two

15   witnesses that said you lied on Lewis.  She went on

16   to say, You are a Class 3 and now you will return to

17   your Class 1 job in Repack.

18   BY MS. HUBBARD:

19       Q    Anything else that you recall her saying?

20       A    She said Lewis was being disciplined.  I

21   asked her, Why?  She said, You both being

22   disciplined.  I said, Well, how come we both being

23   disciplined?  She said, I don't have to explain

24   anything to you.  I'm don't have to tell you anything

1    but what I've told you.

2        Q    Did Chapman say -- well, is there anything

3    else that you said that Amanda said to you during

4    this conversation?

5        A    Not that I recall.

6        Q    So you've testified to everything at this

7    point that you remember that Amanda said to you?

8        A    I believe so.

9        Q    Okay.  Did Chapman say anything?

10       A    No, I don't think so.

11       Q    Bob McGee, did he say anything?

12       A    No.

13       Q    Keith Cecil, did he say anything?

14       A    He told me to come with him and that he

15   would walk me out.

16       Q    Was Ray Ebner there or no?

17       A    No.  I don't remember no Ray Ebner being

18   there.

19       Q    What did you say to Amanda?

20       A    She wouldn't let me talk.  I asked her,

21   What's going on?  She kept on talking.  I asked her,

22   Who were the witness?  She said, Don't worry about

23   the witnesses, that's not any of your business.  I

24   asked her, Well, why we both being disciplined?  She

1    said she didn't have to let me know that.  So

2    everything I was asking, she wouldn't tell me.

3        Q    Was there anything else other than these

4    three statements, what's going on, who were the

5    witnesses and why you're both being disciplined, is

6    there anything else that you remember that you said

7    to her during this needing?

8        A    I said, I had witnesses that told you what

9    he was doing to me.  She still wouldn't answer

10   nothing.  I told her, So we both being disciplined,

11   but how am I lying if he getting disciplined for

12   something?  That's contradicting yourself.  She

13   wouldn't say nothing.  She just kept on going about

14   why I was being suspended.  She never stopped to

15   answer nothing that I had to say.

16              And that's when I started crying and

17   Keith told me to get up and to -- that he'll walk me

18   out.

19       Q    So you were allowed to go home for the rest

20   of the day?

21       A    I was suspended, walked out by Keith Cecil.

22       Q    And what were the dates of your suspension?

23       A    To my recollection, starting July 7th to

24   the 11th.

Jordan, Kiona

1          Q    And you returned to work then on July 11th?

2          A    Yes, approximately July 11th.

3          Q    And you took -- and you gave notice and

4     left on July 24th?

5          A    I gave notice prior to July 24th because I

6     put in a two-week notice.  I left exactly two weeks.

7          Q    So two weeks before July 24th?

8          A    I gave notice that I found another job.

9          Q    So you gave notice then on July 10th, if we

10    look at the perpetual calendar?

11         MS. HUBBARD:  Let's mark this as an exhibit,

12    actually.  Why don't we mark it as Exhibit No. 60.

13                         (Whereupon, Jordan Deposition

14                          Exhibit No. 60 was marked for

15                          identification.)

16         THE WITNESS:  It was a job fair that Saturday.

17    BY MS. HUBBARD:

18         Q    On the --

19         A    The same week of that Tuesday that I got

20    suspended.  When I came back off of my suspension,

21    there was a job fair that Saturday and I got hired,

22    Schneider Logistics.

23         Q    On July 8th?

24         A    No, it was a job fair that same week.  So

1    July the 11th was a Tuesday.  I let them know when I

2    came back to work that Monday, the 17th.  I got hired

3    on the 15th.  I got hired on the -- yeah, the 15th I

4    got the job.

5         Q    So if you got hired on the 15th --

6         A    Yeah, that was a Saturday.

7         Q    You did not give them two weeks' notice,

8    did you?

9         A    I put in the two weeks' notice.

10        Q    You put in the two weeks' notice before you

11   went to the job fair; is that correct?

12        A    No.  I put in the two weeks' notice when I

13   came back on the 17th, and I started on the 31st of

14   July.

15        Q    But your last day -- your last day of work

16   you told me was July 24th, that's only one week.

17        A    Yeah, I had vacation days and I took those

18   vacation days prior to me leaving.

19        Q    Okay.  So July 31st, in effect, your last

20   day then on the payroll?

21        A    Yeah, they sent -- I had got a check and

22   they put my vacation hours in.  So it was two weeks

23   with my vacation days added in.

24        Q    Okay.  So the notice that you gave for your

1    termination was July 17th; correct?

2        A    Yes.   Came in, I told them that I found a

3    job.

4        Q    And you left voluntarily?

5        A    Yes.

6        Q    You could have continued to work at R&O,

7    but you chose to obtain other employment; is that

8    your testimony?

9        MR. ASONYE:  Objection.   Form.   Foundation.

10                   You can answer.

11       THE WITNESS:  That was the main reason why I

12   looked for employment because I could not do Repack

13   too long.

14   BY MS. HUBBARD:

15       Q    Did you ever at any time tell anyone at R&O

16   that you thought you could not do repack?

17       A    Yeah, I told Keith.   I told Don Chapman.

18   And they was like, Oh, well, we -- you have to be

19   over there because they need you over there so

20   they -- really isn't much we could do about it.

21       Q    What did you tell Keith?

22       A    I was asking Keith why did I have to go and

23   stay in Repack?   And he said, well, he didn't really

24   know.   And Keith was the one who told me to obtain an

1           Prompt is -- she could have asked him

2    right then and there and kept him from around me.

3        Q    Are you aware of the fact that Amanda, in

4    fact, did talk to Lewis Gregg on June 30th?

5        MR. ASONYE:  Objection.  Form.  Foundation.

6               You can answer.

7        THE WITNESS:  No, I'm not sure if she talked to

8.   him on June 30th.

9    BY MS. HUBBARD:

10       Q    So you have no evidence one way or the

11   other as to whether or not Amanda Olson talked to

12   Lewis Gregg about the situation the very day you

13   reported it?

14       A    No evidence.

15       Q    Okay.

16       MS. HUBBARD:  Exhibit 38.

17                        (Whereupon, Jordan Deposition

18                         Exhibit No. 38 was marked for

19                         identification.)

20   BY MS. HUBBARD:

21       Q    Exhibit 38 is an Amanda Olson June 30th,

22   2006 Lewis Gregg write-up.

23       MR. ASONYE:  I'll object on the basis of form

24   and foundation.

Page 218

```
 1         MR. ASONYE:  Objection.  Form.  Foundation.

 2                  You can answer.

 3         THE WITNESS:  I knew nothing about a probation.

 4   BY MS. HUBBARD:

 5         Q    So you didn't know one way or the other; is

 6   that correct?

 7         A    Correct.

 8         Q    You were told, as I understand it, that

 9   Lewis Gregg was being disciplined in this meeting

10   that you had on July 7th?

11         MR. ASONYE:  Asked and answered several times.

12                  You can answer it again.

13         THE WITNESS:  Yes.

14   BY MS. HUBBARD:

15         Q    Okay.  Why did you not write up a memo or a

16   Conversation Form in regard to what Amanda had said

17   to you during the July 7th meeting?

18         A    I did write it in my notes what she said to

19   me.

20         Q    What do you mean you wrote it in your

21   notes?

22         A    I wrote it in my notes that I gave to my

23   attorney.

24         Q    No.  Let me rephrase the question.  It
```

Page 244

1    all about Amanda after July 7th, 2006?

2        A    Not that I recall.

3        Q    Did at any time after January 30th, 2006

4    (sic), Lewis Gregg sexually harass you?

5        A    No, he did not.

6        Q    So the same day that you reported it was

7    the day the harassment ceased, is that what you're

8    telling me?

9        MR. ASONYE:  Objection.  Form.

10                You can answer.

11        THE WITNESS:  To my knowledge.

12   BY MS. HUBBARD:

13       Q    Well, you would know, would you not, if

14   there were any further events that Lewis Gregg

15   engaged in that you considered to be sexually

16   harassing; correct?

17       A    He didn't make any more sexual

18   comments and --

19       Q    After --

20       A    -- try to --

21       Q    After the very day that you complained;

22   correct?

23       A    Right.  He didn't do that anymore.

24       Q    Okay.  And the only other comments that

Page 245

1    Lewis Gregg made to you were these statements after

2    you were in Repack of, How are you doing today, or,

3    Is it warm here, or things along that line?

4        A    Yes.

5        Q    But there was no more sexual harassment?

6        A    No.

7                        (Whereupon, Jordan Deposition

8                         Exhibit No. 11 was marked for

9                         identification.)

10   BY MS. HUBBARD:

11       Q    Show you what we've marked as Exhibit 11,

12   which is a memo of June 2, 2006, involving Ray Ebner.

13   It's a Conversation Form involving a ticket off the

14   printer.  And at the bottom -- do you recall this

15   conversation with Ray Ebner?

16       A    No.

17       Q    And do you recall a problem or a document

18   disagreement with Anthony Brown, Erica Washington and

19   Clarissa James having a disagreement about a ticket

20   on the printer?

21       A    No, I don't remember this.

22       Q    Do you recall saying to Ray Ebner at any

23   time that you were sorry about your attitude with him

24   and that you apologized?

1       Q    So when they said, You lied, they didn't

2   give you any details or how to respond to it?

3       A    No, there wasn't nothing to talk about.

4       Q    Did she give you an opportunity to respond

5   to it?

6       A    No, she told me that she didn't have to

7   tell me anything about the situation and what she

8   investigated.  She said that it was confidential.

9   That she didn't have to discuss anything of that with

10  me and she didn't.

11      Q    You were shown Exhibit No. 40.  That shows

12  the signature of Don Chapman.  You don't know --

13  strike that.

14               Do you know who prepared this

15  document?

16      A    No.

17      Q    Do you know what day it was actually

18  prepared?

19      A    No.

20      Q    So all you can go by is what's written on

21  the paper; right?

22      A    Yes.

23      Q    You have no way of knowing if what is on

24  the paper is correct?  Do you have any way of knowing

1   harassment?

2        A    To my knowledge, I felt I was being

3   suspended for that reason.  I had no other reason for

4   being suspended.

5        Q    Do you understand, as you sit here today,

6   that you were suspended because two witnesses came

7   forward and said you lied about the allegations

8   involving Lewis Gregg?

9        MR. ASONYE:  That is a false statement.  That's

10  not true.  Objection.  Form.

11             You can answer.

12       THE WITNESS:  I was told that, but I never

13  heard -- no witnesses never was sat in front of me

14  and said -- it was just told to me that we have two

15  people that disagreed with your statement.

16  BY MS. HUBBARD:

17       Q    You understand that that is considered by

18  R&O to be a separate and distinct matter from your

19  allegations of sexual harassment; do you not?

20       MR. ASONYE:  Objection.  Form.  Foundation.

21             You can answer.

22       THE WITNESS:  If they would have investigated

23  properly, I wouldn't have been getting suspended.

24