# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **Kiona Jordan,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) No. 07-C-06452 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| **R&O Aurora Inc.,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Before this Court is Defendant R&O Aurora, Inc.'s ("Defendant") motion for summary judgment against Plaintiff Kiona Jordan ("Plaintiff" or "Jordan") pursuant to Federal Rules of Civil Procedure 56. For the reasons stated below, Defendant's motion is GRANTED in part and DENIED in part.

## FACTS[1]

Plaintiff was hired by Defendant R&O Aurora, Inc., on December 7, 2005, at a rate of $9.00 an hour. Although Plaintiff was initially assigned to a first shift kitter position, the parties agree that employees of R&O could be reassigned at any time to any position.[2] In January of 2006, her salary increased to $10 an hour, at which rate her salary remained until she voluntarily resigned on July 31, 2006.

---

[1] These facts are derived from the parties' statements of facts filed pursuant to L.R. 56.1(b). The facts included herein are considered undisputed unless otherwise noted.

[2] The parties disagree regarding the frequency with which employees' assignments changed. Although Defendant asserts that employees "are moved around daily to different positions," Plaintiff disagrees, noting that she worked solely in kitting from January 30, 2006, until July 5, 2006.

1

Plaintiff received a procedures manual at orientation that included the company's sexual harassment policy. Within nine days of starting employment, Jordan got into an argument with a co-worker, during which the co-worker called her a "nigger." After another employee reported the incident, the individual responsible for the slur was fired.

In May of 2006, Jordan and two other employees were transferred to the second shift kitting position. Jordan complained about the transfer, citing difficulties regarding child care.[3] Amanda Olson, R&O's director of human resources, gave Jordan the option of remaining on the second shift or being terminated and rehired when a first shift position became available, and Jordan chose the former. At some point in June, Lewis Gregg became supervisor to Jordan and assumed disciplinary control over her.[4] Between this time and June 30, Jordan had a number of interactions with Gregg that she found offensive, though the exact nature and content of these interactions is disputed. On June 29, 2006, during the course of an employee meeting, Gregg criticized Jordan's job performance, leading Jordan to conclude that she would be disciplined.

On June 30, 2006, Jordan presented a 4-page document to her supervisor, Ray Ebner, detailing a number of interactions with Lewis Gregg that had made her uncomfortable. This was the first time Jordan had relayed her complaints regarding Gregg's behavior to any management-level employee at R&O. Ebner took the document and brought the Plaintiff to meet with Amanda Olson. Olson read Jordan's statement, apologized, and assured Jordan that she would "get to the bottom of the situation." The parties disagree as to whether there was any discussion regarding the substance of the allegations in Jordan's document. Olson asked if there was

---

[3] The parties dispute whether Jordan also accused her supervisor, Ray Ebner, of transferring her because he was a racist. Jordan claims that she never made such statements.
[4] The parties dispute whether Gregg had such disciplinary authority when he was employed as a supervisor in training, from on or about June 15, 2006, until he was promoted to full supervisor on June 26, 2006.

anyone else with knowledge of the behavior described in Jordan's complaints. Jordan named three other R&O employees: Seneca Carter, Clarissa James, and Erica Washington.[5]

Olson interviewed Seneca Carter and Clarissa James for the purpose of determining whether they had directly observed Gregg behaving inappropriately towards the Plaintiff. Carter said that he had not directly observed any offensive conduct toward Jordan. The Plaintiff claims that this was because his knowledge of Gregg's conduct was based on what the Plaintiff had privately told him. James, on the other hand, said that she had witnessed Gregg making inappropriate jokes and comments in the workplace. At no point did Olson seek or record examples of these comments. Olson did not probe James on the exact nature of Gregg's comments and why she found them to be inappropriate. Furthermore, Olson did not ask whether other employees had witnessed these incidents.

Finally, the parties do not dispute that Erica Washington was not present at work and was not returning phone calls on June 30, 2006, though they disagree whether she had voluntarily resigned or been fired. Regardless, Olson was unable to interview Erica Washington regarding the substance of the Plaintiff's complaints. Olson also interviewed Gregg, who denied the allegations against him, though he stated that he had given everyone in his department his home phone number for the purpose of informing him about absences.

The parties disagree as to what, if any, disciplinary action was taken against Gregg. The Defendant, though admitting that Gregg was neither terminated nor suspended, contends that Olson issued Gregg a written permanent probation notice stating that he would be immediately dismissed if an incident were to occur again. Plaintiff disputes that any such warning was issued. Furthermore, Olson decided to move Jordan to first shift kitting, her original position before she

---

[5] According to Jordan, she had identified Seneca Carter as someone in whom she had earlier confided regarding Gregg's conduct toward her, as opposed to someone who had directly observed his behavior.

had been transferred to the second shift. On July 5, 2006, Jordan was again transferred, but this time to first shift repack, a position that entailed different responsibilities than kitting. Repack differed from kitting in that the repack department was not air-conditioned, was dirty, and required Jordan to move heavy objects,[6] whereas kitting was air-conditioned, sanitary, and involved lifting no more than ten pounds. Furthermore, kitting was a Class III position, whereas repack was only a Class I position. Although R&O is able to exercise some element of discretion as to an individual employee's pay, there are different pay ranges associated with each class of position within which an employee's salary will generally fall. The pay for kitting, a Class III position, ranged from $10.00 to $13.00 per hour, whereas repack, a Class I position, ranged from $8.00 to $10.00 per hour.[7] Furthermore, a higher class value reflected the increased skill required of the position.[8] According to the Defendant, Jordan was transferred due to an immediate need in the repack department, though Jordan claims that she witnessed another employee being moved from first shift repack to first shift kitting on the same day.

On June 30, 2006, another supervisor, Robert Dillon, was informed by two employees, Constance Daniels and Demetria Jenkins, that they thought the Plaintiff had fabricated her allegations against Gregg. Dillon referred these complaints to Olson, who then interviewed Daniels and Jenkins. Only Jenkins purported to have discussed the matter directly with Jordan, whereas Daniels' knowledge was limited to what Jenkins herself had told her regarding her

---

[6] The parties dispute (1) whether Plaintiff had to lift these objects by hand or with a hoist, and (2) the exact weight of the objects Plaintiff was required to lift in repack, with the Plaintiff contending that they weighed sixty pounds.
[7] Defendant disputes this fact, disavowing the authenticity and relevance under Fed. R. Evid. 901 of Plaintiff's Exhibit 66, which purports to demonstrate the pay ranges for each class of position. Plaintiff argues that because it received this document in response to its discovery request for "documentation identifying the pay scale for the positions of kitter and repack for the relevant time period, *Pl.'s Ex. A,* ¶ 6, the document has been authenticated. *See Thanongsinh v. Board of Ed.,* 462 F.3d 762, 778-779 (7th Cir. 2006) ("[r]equiring authenticating affidavits … would be an empty formality" when the party against whom a document was sought to be used produced the document in discovery from its own files). We agree with the Plaintiff, and give full credit to Plaintiff's Exhibit 66.
[8] The Defendant disputes this fact. *See Def.'s Resp. Pl.'s 56.1(a)(1) Statement of Add'l Facts.,* ¶ 27. However, Amanda Olson's deposition is unambiguous in support of the Plaintiff's factual allegation. *See Pl.'s Tab C, Dep. Of Olson* 213, line 21.

conversation with Jordan. According to a form prepared by Olson in order to document her interview with Jenkins, Jenkins said that "Kiona mentioned that by the end of the week she would be on [first] shift. She also said/encouraged another employee (Erica Washington) to do the same. This would happen by whatever means necessary." *Pl.'s 56.1(a)(1) Statement of Add'l Facts.*, ¶ 34. Defendant disputes that the conversation form contained everything that Jenkins communicated to Olson. *See Def.'s Resp. Pl.'s 56.1(a)(1) Statement of Add'l Facts.*, ¶ 34. Olson then made a determination that Jordan had lied about Gregg's conduct, and decided to suspend her for three days without pay.

On July 7, 2006, Jordan was called into a meeting in which she was told that she had fabricated her allegations and that she would be suspended for three days without pay. Jordan yelled at Olson and repeatedly asked for the names of the witnesses who had made accusations against her. Jordan did not deny that she had fabricated the allegations against Gregg, although it is unclear whether she had the opportunity to do so. Olson told Jordan that she could either accept the suspension and continue in the repack department, or submit her resignation. Jordan accepted the suspension and returned to work on July 11, 2006.

On July 17, 2006, Jordan attended a job fair and obtained a job offer from Schneider Logistics. On the same day, she notified the Defendant that she would be voluntarily resigning her position after July 31, 2006. On September 5, 2006, Lewis Gregg was terminated when complaints by two other employees of sexual harassment were received and investigated.

Plaintiff filed an EEOC complaint on September 2, 2006. On November 2, 2007, she received a right to sue letter, and on November 14, 2007, Plaintiff initiated the instant action.

Plaintiff's Complaint contains three counts:

    Count I:    Hostile Work Environment Sexual Harassment

Count II: Retaliatory Transfer, Suspension, and Demotion

Count III: Quid Pro Quo Sexual Harassment and Sex Discrimination

## STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, she must go beyond the pleadings and support her contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). However, it is possible to rebut a motion for summary judgment with the allegations of a complaint, but only to the extent that they are based upon the plaintiff's personal experience. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (requiring that allegations are admissible at summary judgment under 56(e) so long as they are "based on personal knowledge and [set] forth specific facts showing that there is a genuine issue for trial"). The fact that those statements may be "self-serving" is not a valid ground for deeming them inadmissible. *See id.*

ANALYSIS

I.  Hostile Work Environment and Quid Pro Quo Sexual Harassment[9]

Under Title VII, employers with more than fifteen employees may not "discriminate against any individual with respect to his . . . conditions . . . of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of sex discrimination. *See DeClue v. Central Ill. Light Co,* 223 F.3d 434, 437 (7th Cir. 2000). To establish a prima facie case of sexual harassment based upon a theory of hostile work environment, a plaintiff must demonstrate that "she was 1) subjected to unwelcome sexual conduct, advances, or requests; 2) because of her sex; 3) that were severe or pervasive enough to create a hostile work environment; and 4) that there is a basis for employer liability." *Erickson v. Wisc. Dep't of Corrections,* 469 F.3d 600, 604 (7th Cir. 2006). Merely offensive conduct does not give rise to liability, for "Title VII is not a civility code." *Patton v. Keystone RV Co.,* 455 F.3d 812, 815 (7th Cir. 2006). "Occasional vulgar banter, tinged with sexual innuendo, of coarse and boorish workers" does not establish a hostile work environment. *Id.* at 816; *see also Minor v. Ivy Tech State Coll.,* 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a [co-worker] … fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.").

To create a hostile working environment, the harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an

---

[9] Although the Plaintiff has presented her Title VII sexual harassment claims as two separate counts of hostile work environment and *quid pro quo* sexual harassment, the Supreme Court has indicated that such distinctions have limited value for purposes of evaluating a Plaintiff's sexual harassment claims. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also Faragher v. City of Boca Raton*, 54 U.S .775 (1998). As the Supreme Court explained in *Burlington,* "quid pro quo" and "hostile work environment" do not appear in the statutory text. *Id.* at 752. "Quid pro quo" has been used to refer to situations in which an alleged harasser has carried out threats to retaliate against an employee if she does not submit to his sexual advances. *See id.* at 753-54. The Plaintiff here complains of several comments allegedly made by Gregg, but never contends that Gregg successfully fulfilled any of his threats against her when she refused to submit to his advances. Therefore, her complaint must be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct. *See id.* at 754.

abusive working environment." *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 975 (7th Cir. 2004). To be actionable, the working environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1045 (7th Cir. 2002). "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger,* 361 F.3d at 975-76; *see also* 29 C.F.R. § 1604.11(a) (defining sexual harassment as "verbal or physical conduct of a sexual nature" that unreasonably interferes with the individual's work performance). "In the typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton,* 455 F.3d at 816. Therefore, the court must consider the totality of the *Wyninger* factors as applied to the Plaintiff's circumstances and then exercise judgment to determine whether the conduct is actionable. *Cf. Robinson v. Sappington*, 351 F.3d 317, 329-30 (7th Cir. 2003) ("It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other.").

The parties first dispute whether Gregg was Jordan's supervisor beginning June 16, 2006, when his official title was "supervisor in training," or June 26, 2006, when he became a full supervisor. We need not address this issue, as the relatively benign level of conduct alleged here and the short span of time over which the actions occurred does not indicate a hostile work environment even if this Court considers Gregg's actions beginning on June 16. Plaintiff primarily accuses Gregg of making a small number of relatively unthreatening comments that, while offensive, were not so severe as to rise to the level of an actionable hostile work

9

environment. *See Pl.'s Compl.* at ¶¶ 14 ("[O]n or about June 15, 2006, Gregg made comments … such as, "I love the way you look," "You are very sexy to me," and "You need to stop coming to work looking like that"), 17 ("You can leave under one condition, you come over to my house when I get off at 11:30 or 12. We can watch movies together. I got a lot of movies, especially a lot of x-rated movies that I want you to see"), and 21 ("Kiona and Erika, I need you all to handle my wood," [referring to his penis], "I'm just playing, but I really do need you to move some wood").

The Seventh Circuit has upheld grants of summary judgment when the factual background alleged was far more severe than the instant action. *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998) (holding that conduct including ambiguous teasing about bananas, rubber bands, low-neck tops, staring and attempts to make eye contact and touching on the arms, fingers, and buttocks was not sufficiently severe as to amount to an objectively hostile environment); *McPherson v. City of Waukegan*, 379 F.3d 430 (7th Cir. 2004) (inquiries about the plaintiff's bra color, suggestive tone when asking whether he could "make a house call," and pulling back the plaintiff's tank top did not create a hostile environment). Plaintiff cites *Quantock v. Shared Marketing Services, Inc.*, 312 F.3d 899 (7th Cir. 2002), a case in which the Seventh Circuit reversed the district court's grant of summary judgment when the plaintiff's supervisor "outright solicit[ed] numerous sex acts" acts, including oral sex, phone sex, and participation in a "threesome," he had a significant position of authority at the company, and he and the plaintiff worked in close quarters. 312 F.3d at 902, 904. In contrast, the comments made by Gregg here were characterized by innuendo and jokes as opposed to outright solicitations. Furthermore, Gregg's lack of seniority and his lack of constant proximity to the Plaintiff indicate that her situation did not have the element of threat that was present in *Quantock*.

Although Gregg made a comment suggesting that Jordan could leave work early if she watched "x-rated movies" with him later, the conduct of both parties afterward indicated that it was made in jest and that the Plaintiff did not interpret it as a serious threat. Jordan left work early despite Gregg's comment, and was not disciplined upon her return. Although Gregg did criticize the Plaintiff's work performance on an isolated occasion, *see Pl.'s Compl.* at ¶ 20 ("[O]n or about June 29, 2006, during a meeting between Karissa James…[Plaintiff], and Gregg, Gregg raises his voice and yelled at Plaintiff, "Kiona, you know you know better than to leave those tickets in the tower. Karissa shouldn't have to tell you what to do, you have been here [seven] months!"), the Plaintiff provides no evidence showing that this had anything to do with her failure to submit to Gregg's advances, nor does she show that Gregg took any tangible action against her. The Plaintiff also accuses Gregg of attempting to give her his home phone number, but testimony indicates that he gave his phone number to all of his subordinates because he had not yet been issued a work phone. Therefore, the conduct described by the Plaintiff is a far cry from the severe and threatening behavior required for a finding of actionable sexual harassment, and was limited to a small number of offensive but relatively benign comments that did not significantly interfere with the Plaintiff's ability to do her job.

Finally, the interval over which the Plaintiff's interactions with Gregg were alleged to have occurred was relatively short, lasting only about two weeks. Gregg made the sexually offensive comments mentioned above on June 15, 24, and 29, 2006, a relatively small number of occasions. His conduct towards Jordan ceased on June 30, 2006, when she filed a complaint with R&O. Although "abusive conduct need not be both severe *and* pervasive to be actionable; one or the other will do," *Quantock*, 312 F.3d at 904 (internal citations omitted), Plaintiff is unable to show that Gregg's conduct met either standard.

Therefore, this Court finds that Plaintiff's portrayal of her work environment amounts to "relatively isolated instances of nonsevere misconduct." *Ngeunjuntr*, 146 F.3d at 467. While Gregg's conduct was repugnant, there is insufficient evidence to say that it was objectively hostile or abusive as is required. *See Rogers*, 320 F.3d at 752. Because the behavior alleged by the Plaintiff does not meet the standards of an actionable hostile environment under Title VII, we need not address the Defendant's *Faragher/Ellerth* affirmative defense. Consequently, summary judgment is GRANTED with respect to Plaintiff's sexual harassment claims (Counts I and III).

## II. Retaliation

Defendant also seeks summary judgment on Plaintiff's retaliation claim. A plaintiff may state a claim for retaliation using the direct or indirect method. *See Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (2004). In this case, Plaintiff has proceeded under the indirect method. Under the indirect method, the plaintiff must establish a prima facie case of retaliation by showing that she (1) engaged in a statutorily protected activity; (2) met the Defendant's legitimate expectations; (3) suffered an adverse employment action; (4) was treated less favorably than similarly situated employees. *Haywood v. Lucent Techs.,* 323 F.3d 524, 531 (7th Cir. 2004).

Here, the parties do not contest that the Plaintiff engaged in statutorily protected activity by filing a sexual harassment complaint. However, the Defendant disputes that Plaintiff is able to meet the other elements of a retaliation claim. We will consider Jordan's transfer to first shift repack and her three-day suspension in turn to determine whether summary judgment is appropriate on her retaliation claims.

### A. Transfer to Repack

The Defendant disputes that the Plaintiff's transfer to repack was a materially adverse employment action. The Supreme Court has defined materially adverse actions for the purpose of retaliation claims to be actions that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe R.R. Co. v. White,* 548 U.S. 53, 67-68 (2006).

Jordan contends that her transfer to a repack position was materially adverse because it was "hotter, dirtier, and required more heavy lifting" than her previous position in kitting. Furthermore, she notes that repack was subject to a lower pay range than kitting and was considered less prestigious. The lower class level assigned to repack reflects that this position was considered to require less skill by the Defendant itself. The Defendant responds that it was R&O's policy to reassign employees to different departments as needed. The Supreme Court addressed a similar situation in *Burlington Northern*, where the Court stated that the reassignment of job responsibilities could constitute discrimination even if the job position itself remained the same. *See id.* at 70-71. In that case, the reassignment of duties to encompass work that was dirtier, more arduous, and less prestigious, was adequate for a finding of a materially adverse change in employment. *See id.* at 71.

Here, the Defendant does not dispute Jordan's characterization of the kitting and repack positions. Additionally, the differences between the positions in prestige and pay range make clear that Jordan's transfer was an adverse employment action. The remaining question is whether Jordan was treated differently than other similarly situated employees. The Defendant contends that it was R&O's policy to transfer employees between positions as needed, and that employees were transferred regularly. It is unclear whether this is actually the case, as Plaintiff

points out that she occupied a kitting position for several months before she was transferred to repack shortly after her sexual harassment complaint. Furthermore, the Defendant's system of classifying positions indicates that there was an upward trajectory that employees typically followed as they gained skills, which also correlated with pay increases. Finally, the Plaintiff alleges that she witnessed an employee being transferred from first shift repack to first shift kitting on the same day that she was moved to repack, indicating that there was no immediate need in the repack department. For the purposes of summary judgment, this Court must construe the evidence in the light most favorable to the Plaintiff and conclude that there is a genuine issue of material fact as to whether the Plaintiff was treated less favorably than other similarly situated employees. Therefore, summary judgment is inappropriate on Plaintiff's retaliation claim as to her transfer to repack.

### B. Three-Day Suspension

R&O does not contest that Jordan's three-day suspension was an adverse employment action. However, it argues that the discipline was justified because Jordan failed to meet its legitimate expectations. R&O contends that it took action against Jordan after receiving reports from two employees that Jordan had falsified her allegations against Gregg, which Jordan does not dispute, but the parties disagree whether she was treated the same as other employees in the course of the disciplinary proceedings against her.

Jordan argues that R&O treated her differently in its course of discipline than other similarly situated employees, specifically Gregg. Jordan notes that she was never given an opportunity to respond to the allegations against her prior to the meeting in which Olson communicated her decision to suspend Jordan. Furthermore, Jordan cites the conversation forms completed by Olson in support of her argument that Olson relied upon allegations made by an

employee with no first hand knowledge of whether Jordan had said she had fabricated her claims against Gregg. Jordan contrasts Olson's procedure in pursuing the claims against her with the procedure she followed when Jordan had filed a complaint against Gregg, arguing: (1) Gregg had the opportunity to respond before any disciplinary decision was made, and (2) Olson was only willing to reply on employees' direct knowledge of the interactions between Jordan and Gregg. Defendant admits that Olson made the decision to suspend Jordan before she interviewed her. However, it argues that Jordan failed to deny the accusations when Olson met with her to discuss her punishment, though it is unclear whether Olson ever afforded Jordan the opportunity to do so. Taking the facts in the light most favorable to Jordan, there is a dispute as to whether the discipline against Jordan was justified, and whether other employees were treated better than Jordan in the course of disciplinary actions.

In *Filipovich v. K & R Express Sys.,* 2001 U.S. Dist. LEXIS 8464 at *32, the court denied summary judgment when there existed a similar factual dispute as to whether the discipline meted out against the plaintiff was warranted. Although that decision is not binding, it is persuasive in this situation where the Plaintiff has alleged a significant contrast in the disciplinary procedures applied to her versus other employees shortly after she filed a sexual harassment complaint. Because there are remaining issues of fact, summary judgment is inappropriate on Jordan's retaliation claim as to her three-day suspension.

## CONCLUSION

For the forgoing reasons, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's claims I and III, and DENIED with respect to Plaintiff's claim II.

Enter:


/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **December 22, 2008**